```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

JEAN AZOR-EL, et al.

          Plaintiffs,
VS.                          1:20-cv-03650-KPF

CITY OF NEW YORK, et al.,

          Defendants.
-------------------------------x
```

THE ORAL DEPOSITION of DEPUTY COMMISSIONER PATRICIA
FEENEY, produced, sworn and examined on behalf of the
Plaintiffs, pursuant to Notice to Take Deposition, on
Tuesday, November 10, 2020, beginning at 12:10 a.m.
eastern time, via videoconference, before me,

TRICIA D. TATE
CERTIFIED COURT REPORTER
HERITAGE REPORTING

a Certified Court Reporter, in a certain cause now
pending before the United States District Court,
Southern District of New York, wherein the parties
are as hereinbefore indicated.

A P P E A R A N C E S:

For the Plaintiffs:

          Keenan & Bhatia, LLC
          90 Broad Street, Suite 200
          New York, New York  10004
          By Edward "E.E." Keenan, Esq.
          Email:  ee@keenanfirm.com
          (Appearing via teleconference)

Page 2

APPEARANCES CONTINUED

For the Defendant Department of Correction:

New York City Department of Correction
7520 Astoria Boulevard, Suite 305
East Elmhurst, New York  11370
By Melissa Guillaume, Esq.
Chlarens Orsland, Esq.
Antonin Gaitani, Esq.
Cory Forster, Esq.
(Appearing via teleconference)

ALSO PRESENT:  Julia Gokhberg

---

Page 3

EXAMINATION INDEX

Examination by Mr. Keenan...................... 4

EXHIBIT INDEX

EXHIBIT          DESCRIPTION          PAGE
Exhibit 1   Notice of 30(b)(6) deposition....... 9
Exhibit 2   Affidavit, 3/26/2020................ 23
Exhibit 3   Affidavit, 4/2/2020................. 38
Exhibit 4   Updated Affidavit, 4/24/2020........ 53
Exhibit 5   BOC Weekly Report................... 54
Exhibit 6   BOC Housing Area Capacity Data...... 55
Exhibit 7   Letter, 11/6/20 to Brann, et al..... 56
Exhibit 8   Bates NYC000001..................... 60
Exhibit 9   Bates NYC000002 - 7................. 60
Exhibit 10  Bates NYC000008 - 10................ 61
Exhibit 11  Bates NYC000011 - 12................ 63
Exhibit 12  Bates NYC000013 - 14................ 63
Exhibit 13  Bates NYC000015 - 16................ 63
Exhibit 14  (Not used)...........................
Exhibit 15  Bates NYC000018 - 19................ 64
Exhibit 16  Bates NYC000020 - 24................ 64
Exhibit 17  Bates NYC000025 - 28................ 66
Exhibit 18  Bates NYC000029 - 34................ 66
Exhibit 19  Bates NYC000035 - 36................ 66

---

Page 4

EXHIBIT INDEX

EXHIBIT          DESCRIPTION          PAGE
Exhibit 20  Bates NYC000037 - 38................ 67
Exhibit 21  Bates NYC000039 - 40................ 67
Exhibit 22  Bates NYC000041 - 42................ 68
Exhibit 23  Bates NYC000043 - 180............... 68
Exhibit 24  Bates NYC000181 - 323............... 70
Exhibit 25  Bates NYC000330 - 335............... 76
Exhibit 26  Progress Report Cover Letter........ 89
Exhibit 27  May - August 2020 Report on
            Environmental Conditions............ 90
Exhibit 28  Attachment 1, Vacant Cells.......... 91
Exhibit 29  Attachment 2, Unclean to sight...... 93
Exhibit 30  Attachment 3, Surfaces (not)
            Smooth and Easily Cleanable......... 93
Exhibit 31  Attachment 4, Ventilation........... 93
Exhibit 32  Letter, 9/4/20, to Brann and Glazer. 102

---

Page 5

PROCEEDINGS

DEPUTY COMMISSIONER PATRICIA FEENEY,
was called as a witness and, having been sworn,
testified as follows:

EXAMINATION

BY MR. KEENAN:

Q   Good afternoon, Deputy Commissioner Feeney.  How
are you today?

A   I'm very well.  How are you?

Q   I'm doing well.  We had a chance to briefly get
acquainted before we got on the record today.
Again, for the record, my name is E.E. Keenan.  I
am an attorney representing various Plaintiffs in
this matter that's going by the caption Jean
Azor-El versus City of New York, et al.  You
understand that you are here today as a corporate
representative of the City of New York to give
testimony on various topics pursuant to a
deposition notice, correct?

A   Yes.

Q   And Deputy Commissioner Feeney, could you start
us off by stating your full legal name.

A   Patricia Ann Feeney.

Q   And Deputy Commissioner Feeney, I want to make
sure that I'm addressing you by the correct title

Page 6

1 or mode of address. Would you prefer
2 Commissioner Feeney, Deputy Commissioner Feeney,
3 Ms. Feeney, how do you prefer to be addressed?
4 A  It really doesn't make a difference to me.
5 Q  Okay.
6 A  Ms. Feeney, Deputy Commissioner Feeney, it
7 doesn't matter.
8 Q  Okay.  Deputy Commissioner, saying that each
9 time, may be a little long, so I may have say
10 Commissioner Feeney or Ms. Feeney, if that's
11 okay.
12 A  All right.
13 Q  I want to just ask you some preliminary
14 questions.  Is there any condition, medication,
15 substance or illness that would affect your
16 ability to recall information --
17 A  I didn't hear the last part.
18 Q  Okay, I'll repeat the question.  Is there any
19 condition, medication, substance or illness
20 affecting you that would influence your ability
21 to recall information or testify truthfully
22 today?
23 A  No.
24 Q  Are you aware of any reason that your deposition
25 should not proceed at this time or why you would

Page 7

1 not be able to give a deposition?
2 A  No.
3 Q  You understand that the testimony you're giving
4 here in this deposition is under the same oath
5 and the same requirements as if you were
6 testifying in open court, correct?
7 A  Yes.
8 Q  Have you ever given a deposition before?
9 A  Yes.
10 Q  Okay.  Have those depositions been in connection
11 with your functions at the Department of
12 Correction?
13 A  Yes.
14 Q  Commissioner Feeney, what is your present title
15 and role at the New York City Department of
16 Correction?
17 A  I am the deputy commissioner for quality
18 assurance and integrity, and basically the
19 majority of the compliance units report to me, so
20 environmental health, fire and safety, the office
21 of policy compliance, the compliance and safety
22 center, and then the engineering auditor, the
23 emergency preparedness unit and the internal
24 audit review unit.
25 Q  How long have you been with the Department of

Page 8

1 Correction?
2 A  Since February of 1992.
3 Q  And to whom do you report?
4 A  The commissioner, Commissioner Cynthia Brann.
5 Q  Commissioner Cynthia Brann, B-r-a-n-n?
6 A  Yes.
7 Q  Okay.  And where physically are you today while
8 you're giving your testimony?
9 A  I am at our headquarters in the Bolivar Corporate
10 Center.
11 Q  We are doing this deposition by remote means due
12 to the pandemic.  We're here via Zoom.  I think,
13 as all of us have learned via Zoom over the last
14 few months, sometimes the Zoom can fade in and
15 out.  If there is an interruption in the Zoom
16 feed and you're not able to hear me, will you let
17 me know that?
18 A  Sure.
19 Q  And if there is any question that I ask that you
20 need me to clarify or ask in a different way,
21 will you ask me to do that?
22 A  Yes.
23 Q  And so if I ask you a question and you go ahead
24 and answer the question without asking for
25 clarification, is it fair for us to conclude that

Page 9

1 you understood the question?
2 A  Yes.
3      MR. KEENAN:  Julia, could we please
4 pull up the 30(b)(6) deposition notice.
5 Q  (By Mr. Keenan)  And as we introduced before we
6 got on the record here, Commissioner Feeney,
7 our paralegal and litigation manager, Julia
8 Gokhberg, is going to be helping with the
9 exhibits here so I'll be calling on her at
10 various points today.
11      MR. KEENAN:  And Mr. Thayer, also if
12 you need us to pull up any exhibits for you,
13 we're happy to do that.
14      (Deposition Exhibit 1 marked.)
15 Q  (By Mr. Keenan)  This will be marked as
16 Deposition Exhibit 1, Commissioner Feeney.
17 This is a notice of Rule 30(b)(6) deposition.
18 Have you seen this document before?
19 A  Yes, I have.
20 Q  And you understand that you're here, while you've
21 individually taken an oath, you are here to give
22 testimony on behalf of the City of New York,
23 correct?
24 A  Yes, I am.
25 Q  What did you do to prepare for this deposition

Page 10

1 today?

2 A  I met with the law department attorneys and the

3   DOC attorneys once.

4 Q  Have you reviewed any documents in preparation

5   for today's deposition?

6 A  No.

7 Q  Have you been involved in the production of

8   documents in this case?

9 A  No.

10 Q  Generally speaking, you understand that there's a

11   list of topics that we are seeking deposition

12   testimony on in Exhibit 1, correct?

13 A  Yes.

14 Q  Do you have an understanding of which topics you

15   are here today to testify on?

16 A  The ones relating to the department's COVID plan.

17 Q  To the department's COVID plan?

18 A  Yes.

19        MR. KEENAN:  Okay.  So, and David, you

20   may be able to help me out on this, I don't know

21   that we ever got a formal response to this, which

22   it doesn't matter, I just want to know are -- is

23   the City producing Deputy Commissioner Feeney on

24   all topics today or on specified topics?

25        MR. THAYER:  On specified topics.

Page 11

1        MR. KEENAN:  Okay.  Do you want to

2   just -- to shortcut this, I don't want to ask

3   Commissioner Feeney to guess.  What topics --

4   I'll just ask you, what topics is the City

5   producing Commissioner Feeney on today?

6        MR. THAYER:  Sure.  Let me scroll over

7   to my own version of this.  So I think Ms. Feeney

8   is able to speak about, as she just indicated,

9   the policies and procedures and guidelines

10   applicable to Rikers Island facilities relating

11   to the COVID-19 pandemic.  That is number four.

12        I understand her to be able to testify

13   to Rikers' policies and procedures regarding the

14   handling of inmates testing positive for

15   COVID-19.  That's number eight.

16        And those who are -- I think within

17   that, those who are vulnerable to contracting

18   COVID.  That would be number nine.

19        And I think that is it.

20 Q  (By Mr. Keenan)  Okay.  Commissioner Feeney,

21   you heard Mr. Thayer specify that you're here

22   today to present testimony on topics four,

23   eight and nine.  Is that your understanding?

24 A  Yeah.  I could answer questions about ten if it's

25   related to the COVID, the department's scope and

Page 12

1   plan.  And the questions regarding the handling

2   of inmates testing positive, I can talk about the

3   department's part of it but not how CHS medically

4   treats inmates.

5        (Reporter interruption.)

6        (Brief recess.)

7        THE WITNESS:  So I'm saying that I can

8   answer about the handling of positive individuals

9   from a custody kind of standpoint but not from a

10   medical treatment standpoint.

11        MR. KEENAN:  Okay.

12        MR. THAYER:  I just wanted to jump in,

13   I'm sorry.

14        MR. KEENAN:  Go ahead.  Please.

15        MR. THAYER:  I also wanted to relay

16   that we're producing Ms. Feeney with respect to

17   one and three, one being the organizational

18   structure of the Rikers Island's facilities, and

19   three being the -- at least with respect to the

20   New York City Department of Correction's

21   policies, procedures and guidelines related to

22   COVID-19.

23        MR. KEENAN:  Okay.  So we'll go through

24   those just to be clear.  Julia, if we could go to

25   number one.

Page 13

1 Q  (By Mr. Keenan)  Ms. Feeney, number one is the

2   organizational structure of the Rikers Island

3   facilities.  You are prepared today to testify

4   as to that, correct?

5 A  Yes.

6 Q  And then number three, as to the New York City

7   Department of Correction, you are prepared to

8   testify as to Department of Correction, or DOC's,

9   policies, procedures and guidelines related to

10   COVID-19, correct?

11 A  Yes.

12 Q  And then topic four, I'm not going to read all of

13   that into the record, but you can see it here,

14   correct?  Are you able to see topic four,

15   Ms. Feeney?

16 A  Yes, I can.

17 Q  Okay.  You're here today and prepared to testify

18   as to the matters set forth in topic four?

19 A  Except for the medical treatment protocol.

20 Q  Okay.  Everything except subparagraph 4-H,

21   correct?

22 A  Yes.

23        MR. KEENAN:  And let's go to the next

24   page, if we could, please, Julia.

25 Q  (By Mr. Thayer)  And topic number eight,

Page 14

1  "Rikers' policies and procedures on the
2  treatment and handling of inmates testing
3  positive for COVID-19."  Ms. Feeney, you are
4  prepared to testify as to that topic, correct?
5  A  As to the DOC handling of the individuals but not
6  their medical treatment, yes.
7  Q  All right.  And then topic nine, "Rikers'
8  policies and procedures on the treatment and
9  handling of inmates vulnerable to contracting
10  COVID-19, including but not limited to inmates
11  with pre-existing conditions, respiratory
12  conditions and compromised immunity."
13        Are you prepared today to testify as to
14  that topic with respect to the DOC?
15  A  Yes.
16  Q  Okay.  Is there anything I've missed that you're
17  here to testify as to?
18  A  I think that's it.
19        MR. KEENAN:  Okay.  David, anything I
20  missed there?
21        MR. THAYER:  I think that, to the
22  extent that there may be overlap between some of the
23  other topics and the topics we've identified, I
24  think Ms. Feeney will be able to testify towards
25  those, but I think that encapsulates the heart of

Page 15

1  Ms. Feeney's expected testimony.
2  Q  (By Mr. Keenan)  Okay.  And we're going to be
3  talking a lot, obviously, today, Ms. Feeney,
4  about the policies in place at Rikers.  My
5  questions are directed to Rikers generally, all
6  of the units at Rikers unless I specify
7  otherwise.  So I just wanted to make sure we
8  have that understanding.
9  A  Okay.
10  Q  Some quick background questions.
11  A  I can't hear you.
12        (Reporter interruption.)
13  Q  (By Mr. Keenan)  Some quick background
14  questions.  Can you identify who Hazel Jennings
15  is?
16  A  She's our chief of department.
17  Q  And can you tell us what Ms. Jennings does?
18  A  She is the highest ranking uniformed member of
19  the department.  She oversees all of the
20  uniformed facilities and uniformed staff members.
21        MR. KEENAN:  Ms. Tate, did you get
22  that?
23        THE COURT REPORTER:  No, I didn't get
24  the last word.
25        THE WITNESS:  Staff, uniform staff

Page 16

1  members.
2  Q  (By Mr. Keenan)  And then Cynthia Brann is the
3  commissioner of correction, correct?
4  A  Yes.
5  Q  And she is in overall charge of the Department of
6  Correction, right?
7  A  Yes.
8  Q  So we understand the structure of the Department
9  of Correction, Rikers Island encapsulates most of
10  the detention and correctional facilities
11  operated by the City of New York, correct?
12  A  Yes.
13  Q  There are various other facilities located
14  elsewhere in the city, correct?
15  A  Yes.
16  Q  There's the Manhattan Detention Center, which is
17  also known as The Tombs, correct?
18  A  Yes.
19  Q  Okay.  It is still in operation at this time,
20  right?
21  A  Yes.
22  Q  Is there a plan to reduce operation at the
23  Manhattan Detention Center or reduce the number
24  of inmates being held there?
25  A  Yes.  We're closing the facility.

Page 17

1  Q  When is that occurring?
2  A  Before the end of the year.  I don't have an
3  exact date.
4  Q  Okay.  Does that relate to COVID-19 or is it just
5  part of the long-term general planned closure of
6  the facility?
7  A  It's part of the long-term plan to build the new
8  borough-based jails.
9  Q  Other than Rikers and the Manhattan Detention
10  Center, are there any -- are there any other
11  correctional facilities that the City operates
12  other than simply a short-term lockup located at
13  a police precinct?
14  A  Yes, we have the Vernon C. Bain Center in the
15  Bronx.
16  Q  And which inmates does that location house?
17  A  They're detainee inmates.
18  Q  Is there any difference between who is sent to
19  Center in the Bronx and who's sent to Rikers or
20  NVC?
21  A  The facilities generally get admissions from the
22  boroughs that they're -- that they're in, and
23  VCBC is getting new admission -- is getting new
24  admission inmates right now.
25  Q  All right.  Is the facility in the Bronx slated

Page 18

1  to be closed?
2  A  No.
3  Q  Okay.  And so there are no plans to close or
4  reduce inmate population at this time at the --
5  at the Center in the Bronx?
6  A  Not at this time, no.
7  Q  The inmates who are presently housed in the
8  Manhattan Detention Center, are they going to
9  have to be re-aligned to being housed in Rikers?
10 A  Or in VCBC, yes.
11 Q  Okay.  And there's been no addition of space or
12 construction of new housing units either in the
13 Bronx or at Rikers, correct?
14 A  No.  It will be the number of closed housing
15 areas that we're going to open to bring the new
16 inmates into.
17         (Reporter interruption.)
18 Q  (By Mr. Keenan)  Is DOC -- and I'll speak
19 generally about DOC, and I assume this applies
20 to Rikers unless you tell me otherwise, is DOC,
21 including its operations at Rikers, accredited
22 by any accrediting organizations such as the
23 American Correctional Association or the
24 National Commission on Healthcare and
25 Corrections?

Page 19

1  A  No.
2  Q  All right.  Is DOC seeking accreditation by any
3  accrediting agency or organization?
4  A  Not to my knowledge, no.
5  Q  Why not?
6  A  I think that we're waiting to seek accreditation
7  in the new facilities.
8  Q  If DOC sought accreditation at this time, do you
9  believe you would not obtain accreditation for
10 some reason?
11 A  I haven't looked at the accreditation standards
12 in quite some time, so I'm not sure.
13 Q  In dealing with COVID-19 --
14 A  Uh-huh.
15 Q  -- what standards have you looked to, and when I
16 say "you," I mean the Department of Correction,
17 what standards or guidance has the DOC looked to
18 in developing its response to COVID-19?
19 A  The CDC guidelines, the New York State Department
20 of Health guidelines, and the New York City
21 Health Department guidelines.
22 Q  Okay.  Anything else?
23 A  No, I think that's it.
24 Q  Tell us why the DOC has looked to the CDC
25 guidelines, what -- what importance you place in

Page 20

1  those guidelines?
2  A  The CDC is one of the preeminent public health
3  agencies in the country.
4  Q  And same question with respect to the New York
5  State and New York City departments of health,
6  why are you looking to their guidelines and
7  guidance in developing your COVID-19 --
8  A  Again, they're public health experts.
9  Q  And would you agree with me that the CDC, the New
10 York State Department of Health and the New York
11 City Department of Health have greater expertise
12 in public health response in dealing with
13 pandemics than the DOC has in-house?
14 A  Yes.  That's why we run most of our plans through
15 the health department and the city.
16 Q  And when you said you run most of your plans
17 through the health department and the city, can
18 you tell us what you mean by running it through
19 the health department?
20 A  So like when we're working to reopen services,
21 our plans are reviewed by the health department
22 and we work with them to make sure that we have
23 the best plans that we can to keep our staff and
24 individuals safe.
25 Q  Commissioner Feeney, would you agree that the DOC

Page 21

1  has a duty to inform itself about public health
2  threats?
3  A  Yes.
4  Q  Okay.  And would you agree that the DOC has a
5  duty to seek advice from competent healthcare
6  professionals?
7  A  Yes.
8  Q  Would you agree that the DOC has a duty to
9  explore what the available alternatives are for
10 dealing with public health threats?
11 A  Yes.
12 Q  And would you agree with me that the DOC has a
13 duty to act based on facts and not just based on
14 assumptions?
15 A  Yes.
16 Q  Would you agree that the DOC has a duty to
17 consult national, state and local public health
18 guidance in responding to COVID-19?
19 A  Yes.
20 Q  Would you agree with me that the DOC has a duty
21 to keep Rikers Island safe and sanitary?
22 A  Yes.
23 Q  Would you agree the DOC has a duty to keep both
24 staff and inmates safe?
25 A  Yes.

Case 1:20-cv-03650-KPF   Document 67-4   Filed 01/22/21   Page 7 of 29
Paula Feeney 41/1/2021
Jean Azor-El, et al. vs. City of New York, et al.

Page 22

1 Q  Would you agree that the DOC has a duty to update
2    or reconsider its protocols when circumstances
3    have changed?
4 A  I'm sorry, you broke up.  And I didn't hear the
5    whole question.
6 Q  So would you agree with me the DOC has a duty to
7    update or reconsider its protocols if
8    circumstances have changed?
9 A  Yes.
10 Q  Would you agree with me that it's not enough just
11    to have policies on paper, the DOC needs to
12    enforce the policies?
13 A  Yes.
14 Q  And would you agree with me that in order to
15    ensure the policies are actually being enforced
16    and implemented, the DOC and its management have
17    a duty to monitor whether staff and inmates are
18    complying with policies?
19 A  Yes.
20 Q  And the DOC has a duty to take action if people
21    are not complying with policies?
22 A  Yes.
23 Q  When was the first time that DOC received
24    information about COVID-19 being a potential
25    health threat?

Page 23

1 A  I think we had our first meeting about it in
2    February.  We were meeting to update our pandemic
3    plan.
4 Q  Did DOC already have a pandemic plan at that
5    time?
6 A  Yes, we did.
7 Q  Has DOC ever responded to any prior epidemic or
8    pandemic?
9 A  Yes.
10 Q  What epidemics or pandemics has DOT responded to?
11 A  H1N1 was the most recent pandemic.
12 Q  And so you had a pandemic plan at that time?
13 A  Yes.
14 Q  Is that correct?
15 A  Uh-huh.
16 Q  And then did you go about updating that plan?
17 A  Yes, we did.
18      MR. KEENAN:  I want to bring up a
19 series of affidavits.  Julia, if we could bring
20 up the March 26, 2020 affidavit of Deputy
21 Commissioner Feeney.  This will be Exhibit 2.
22      (Deposition Exhibit 2 marked.)
23 Q  (By Mr. Keenan)  Commissioner Feeney, this is
24    going to be marked as Exhibit 2.  It is an
25    affidavit that you executed in March of 2020.

Page 24

1    Why don't we just briefly go through the four
2    pages of that so you can see every page of it.
3 A  Okay.
4 Q  Having seen all four pages of Exhibit 2,
5    Commissioner Feeney, do you recognize this as an
6    affidavit that you executed on March 26, 2020?
7 A  Yes.
8 Q  Okay.  Would you agree with me that COVID-19
9    poses a serious threat of harm or even death to
10    people who contract it?
11 A  Yes, it can.
12 Q  And would you agree with me that COVID-19 is a
13    serious health threat and safety threat?
14 A  Yes.
15 Q  Let's go to page 2.  Okay?
16 A  Uh-huh.
17 Q  I want to ask you about hand hygiene.  This talks
18    about some guidance.  Let's go to the prior page
19    if we could, Julia.
20      So your affidavit says:  As part of the
21 ongoing efforts to contain the spread of
22 COVID-19, the DOC has implemented various
23 measures communicated then to staff and persons
24 in custody.  These recommendations include the
25 following.

Page 25

1      And then I'm paraphrasing here, but
2 then we go to the next page, and it says in
3 subparagraph D, "Hand hygiene - wash hands
4 frequently with soap and water.  If soap and
5 water are not available, the use of alcohol based
6 hand sanitizer shall be employed.  Only staff may
7 carry hand sanitizer per DOC policy."
8      Did I read that correctly?
9 A  Yes.
10 Q  Okay.  Would you agree with me that hand hygiene
11    is critical in stopping the spread of COVID-19?
12 A  Yes.
13 Q  And why do you suggest or has DOC suggested the
14    use of hand sanitizer?
15 A  We only suggest the use of hand sanitizer when
16    washing with soap and water in a sink is not
17    available per CDC guidelines.  It's much better
18    to wash your hands with soap and water.  And
19    after you physically remove the virus from your
20    hands, then to use hand sanitizer.
21 Q  You acknowledge in your affidavit that a sink to
22    wash your hands with soap and water is not always
23    necessarily going to be available to staff and
24    inmates at Rikers, correct?
25 A  For the staff, definitely not.  To the

Page 26

1  incarcerated individuals, it is most of the time.
2  Q  How do you know that?
3  A  Because I worked here and toured the jails for
4  many years and I know that there are sinks with
5  soap and water in every cell and every housing
6  area.
7      I know that the intakes have sinks with
8  soap and water in them, as do the clinics.  There
9  are inmate bathrooms in areas like social
10 services, although during COVID, the individual
11 separate staying in their housing area.
12     Additionally, we do audits every day.
13 The captains audit each one of their areas three
14 times during an eight-hour tour.
15     And in addition to that, my staff and
16 the bureau chief of facility operations staff
17 conducts additional tours of additional audits so
18 we're basically auditing the audits to ensure
19 that there's soap at every sink, that the sinks
20 are operable, that we have adequate sanitizing
21 solution, and that PPE is available.
22 Q  Why does DOC not make hand sanitizer available to
23 inmates?
24 A  Because it has 60 percent alcohol in it and it's
25 highly flammable so it's dangerous.

Page 27

1      And also, in other jurisdictions there
2  have been reports of individuals drinking the
3  hand sanitizer for the alcohol content.
4      And since soap and water is available
5  at the sinks, it's a risk that we don't want to
6  take.
7  Q  You mentioned sinks.  Isn't it the case that one
8  means of responding to COVID-19 is that people
9  are supposed to engage in social distancing and
10 not congregate in spaces?
11 A  Yes.
12 Q  Okay.  Sinks in congregate spaces, if people are
13 all trying to wash their hands at the same time,
14 run the risk of people congregating and not being
15 able to socially distance, correct?
16 A  Well, I've been touring the jail daily and weekly
17 since COVID started and have never seen a long
18 line at any of the sinks for individuals to wash
19 their hands.  But I guess, theoretically, that
20 would be correct.
21 Q  And it might well be that the reason you haven't
22 seen a long line is that people don't want to
23 congregate, right?
24 A  I have not had anybody tell me that they haven't
25 been able to wash their hands because there are

Page 28

1  too many people in the bathroom.  And one of the
2  questions that we ask on the audit is:  Are there
3  any complaints that the incarcerated individuals
4  have about what's going on in the area.
5  Q  You said that you have received or heard of
6  reports of people drinking hand sanitizer in
7  other jurisdictions.  Which reports are --
8      (Reporter interruption.)
9  Q  (By Mr. Keenan)  Which reports have you heard
10 and in what jurisdictions?
11 A  I don't know the specifics of which ones off the
12 top of my head.
13 Q  Do you know if those -- so you don't -- you don't
14 have the details of what happened or what facts
15 were those supposed scenarios, correct?
16 A  No, not with me.
17 Q  Has anyone in DOC's custody ever drunk hand
18 sanitizer?
19 A  I don't know.
20 Q  You're not aware of any situation ever in which
21 anybody in DOC custody has drunk hand sanitizer,
22 correct?
23      MR. THAYER:  Objection.  You can
24 answer, Ms. Feeney.
25 A  I don't know.  Like medical staff doesn't always

Page 29

1  give us information about inmates' medical
2  conditions.
3  Q  (By Mr. Keenan)  But you -- you, as you sit
4  here today, are not aware of any instance of
5  that ever happening, are you?
6  A  No.
7  Q  Okay.  Are you aware of any instance ever in
8  which an inmate in DOC custody has lit hand
9  sanitizer on fire?
10 A  We don't give them access to it, so no.
11 Q  What means -- do inmates have access to lighters
12 or matches such that they could light hand
13 sanitizer on fire if they wanted to?
14 A  They should not, but they are -- they have set
15 fires with batteries and wires.
16 Q  How many fires have been set in Rikers in the
17 past month?
18 A  A couple.  I don't know the actual number.
19 Q  Okay.  How many inmates are there at Rikers right
20 now?
21 A  Approximately 7,000.
22 Q  Let's go to paragraph 8e.  This talks about
23 social distancing strategies that have been
24 employed.  In dormitory style settings --
25 A  Uh-huh.

Page 30

1 Q  -- what -- are people actually sleeping at least
2  six feet apart from each other?
3 A  In some instances.  In some instances we
4  recommend that they sleep head to toe.  We've
5  been predominantly keeping the inmates in kind of
6  the same group of inmates.  We haven't been
7  transferring them out a lot, and we have not had
8  a case of transmission in the jail since
9  May 19th.  The only positive cases have been new
10  admission inmates.
11 Q  You do not test current inmates, correct?
12 A  You would have to ask medical for the reason that
13  they test.  But if someone is symptomatic, they
14  would get tested.
15 Q  But there's no -- there is no program in place
16  for the regular testing or even random testing of
17  inmates who are in Rikers, correct?
18 A  You would have to ask the medical staff that
19  question.
20 Q  But -- but you're not aware -- you're not aware
21  of that, are you?
22 A  No, but the medical staff wouldn't necessarily
23  tell me that.
24 Q  Who's in charge of medical staff at Rikers?
25 A  Drs. Patsy Yang and Dr. Ross McDonald.

Page 31

1      (Reporter interruption.)
2 Q  (By Mr. Keenan)  Can we hear those names again?
3 A  Patsy Yang and Ross McDonald.
4 Q  McDonald or McDonnelly?
5 A  McDonald.
6 Q  McDonald, okay.  So back to my question of social
7  distancing.  Are people actually sleeping at
8  least six feet apart from each other in
9  dormitories or not?
10 A  Not every dormitory, no.
11 Q  Okay.  Does the DOC have in place a set of
12  processes or standards for deciding whether DOC
13  is going to release certain inmates in order to
14  relieve the number of people in Rikers?
15 A  There's a work release program that the
16  commissioner can identify people to participate
17  in.  And the medical staff identified and
18  recommended that a certain number of individuals
19  be released due to their medical condition and
20  that is going through the appropriate legal
21  process, and approximately 1500 individuals were
22  released.
23 Q  Are all of the people in Rikers who are being
24  detained people with violent criminal records, or
25  are there some people with non-violent records as

Page 32

1  well?
2 A  The majority of our individuals in custody right
3  now I believe are violent --
4      (Reporter interruption.)
5 A  For violent crimes; the majority of them are
6  felony arrests at this point.
7 Q  (By Mr. Keenan)  That's a majority, but it's
8  not everybody, correct?
9 A  Correct.
10 Q  All right.  Why is it that at least six feet of
11  distance is not being maintained in every
12  dormitory setting?
13 A  In some instances, the beds are bolted to the
14  floor so that's why we suggest they sleep head to
15  toe.  We've been bringing more housing areas on
16  line so that we can clean out housing areas that
17  are a little higher in occupancy.
18 Q  Which housing areas have you been brought back on
19  line?
20 A  We're working on the one in EMTC to bring back on
21  line; they're working in RNDC.
22 Q  How many additional beds or space for how many
23  additional inmates are you going to be able to
24  bring back on line by reopening some of these
25  closed facilities?

Page 33

1 A  I don't know offhand.
2 Q  You said you don't know offhand?
3 A  Uh-huh.
4 Q  Where will we find that out?
5 A  Custody management.
6 Q  What is the timeline for bringing these
7  facilities back on line?
8 A  I don't know.
9 Q  Okay.  Is the reason that there's not at least
10  six feet of distance between everybody in
11  dormitory setting basically a space issue;
12  there's just presently not enough space?
13 A  I'm not sure that that's correct.  I know that,
14  like I said, they've been transferring housing
15  areas in cohorts and we have been trying not to
16  move people, but I don't necessarily know that
17  it's we don't have space to put other people.
18 Q  And --
19 A  If we needed to, we can open EMTC also, so we
20  have beds.
21 Q  What is EMTC?
22 A  One of the jails.
23 Q  And -- and it's presently closed?
24 A  Yes.
25 Q  How come it hasn't been reopened yet?

Page 34

1 A  Well, we opened it during COVID, that's where we
2   housed symptomatic and positive individuals.  And
3   when that number went down so that those
4   individuals could be housed in west facility, the
5   facility, we would be able to open it anytime we
6   needed it.
7 Q  And if it's closed right now and you have people
8   who are presently sleeping less than six feet
9   apart from each other, how come you don't reopen
10   it right now in order to thin out the population
11   so people can distance?
12 A  So I think we have to look at the COVID plan as a
13   whole, and, as I said, we haven't had a case of
14   transmission since May 19th within the
15   facilities, so I don't necessarily think that the
16   number of individuals in the housing area right
17   now --
18       (Reporter interruption.)
19 A  -- is harmful.
20 Q  (By Mr. Keenan)  So DOC has basically made a
21   judgment at this point that it's not necessary
22   to have at least six feet of distancing because
23   you haven't had a reported case of in-facility
24   transmission since May?
25 A  That's not what I said, but I'm saying you have

Page 35

1   to look at the whole -- the whole COVID plan as a
2   whole --
3 Q  What --
4 A  -- is successful.
5 Q  How do you define success, Commissioner Feeney?
6 A  That we haven't had transmission in the facility
7   since May.
8 Q  Have you had any kind of transmission?
9 A  New admission inmates coming in when they get
10   tested when they come in to the system have been
11   positive, but not among our inmates who have been
12   here.
13 Q  Do you test every inmate upon admission?
14 A  Yes.
15 Q  And until you get the test results back, what are
16   the protocols in place for housing those people
17   while you're waiting on it?
18 A  So they're housed in new admission housing where
19   they remain for at least 14 days and their COVID
20   test returns, and the individuals don't get moved
21   to other housing until the CHS staff clear them
22   to be moved.
23 Q  While inmates are in the new admissions housing
24   for the 14 days, are they in isolation or are
25   they housed with other inmates?  What procedures

Page 36

1   and protocols are in place for how they are
2   housed and interacting with people during those
3   14 days?
4 A  So they're housed by classification so some are
5   in dorms and some are in cells.
6 Q  And is that classification according to
7   dangerousness or their record, or how are they
8   classified for dormitory versus cell housing?
9 A  It's a -- it's a whole system.  It deals with
10   what their charges are, what previous charges
11   within the last seven years were, what their age
12   is, do they have an infraction history.  So
13   there's a whole bunch of things that go into
14   their classification.
15 Q  Other than the admission of -- or the testing of
16   new inmates --
17 A  Uh-huh.
18 Q  -- does DOC do any other testing for COVID?
19 A  DOC does not test for COVID.  CHS tests for
20   COVID.
21 Q  Does CHS do any other testing for COVID?
22 A  As I said, you would have to ask them.  Other
23   than for symptomatic inmates, I don't know what
24   their protocol is.
25 Q  DOC has not implemented a regimen for testing

Page 37

1   staff, has it?
2 A  No.  We set up an agreement with Northwell and
3   they do our testing for us.  We did send staff on
4   to go get tested, but there is no mandatory
5   testing.  But we do screening of everybody that
6   enters the facility.
7 Q  And how do you do that?
8 A  There's a series of questions.  They fill out a
9   form, there's a series of questions that deal
10   with COVID-related symptoms and have you been
11   around somebody who had COVID.
12       And then your temperature is checked.
13   If you have a temperature of 100.4 or greater,
14   you're not allowed into the facility and you have
15   to report to your medical doctor.  And then you
16   have to get cleared by the health management
17   division to return to work.
18 Q  Are all staff, do they have their temperatures
19   taken every day when they report?
20 A  Yes.  Those that report to the jails, yes.
21 Q  Let's go to the April 2nd, 2020 affidavit.
22 A  I'm sorry, I can't hear you.
23       MR. KEENAN:  Sure.  Let's go to the --
24   Julia, let's go to the April 2nd affidavit.  This
25   will be Exhibit 3.  And let's just go through all

Page 38

1    the pages there.
2         (Deposition Exhibit 3 marked.)
3    Q  (By Mr. Keenan)  Commissioner Sweeny, do you --
4    I'm sorry, Feeney.  Apologies.
5    A  No problem.
6    Q  Commissioner Feeney, do you recognize Exhibit 3?
7    A  Yes.  It's another one of the affidavits I wrote.
8    Q  Exhibit 3 is an affidavit that you executed on
9    April 2nd, 2020?
10   A  Yes.
11   Q  Let's go to paragraph 8, please.  Paragraph 8
12   says:  ...DOC's policy is to provide every
13   individual in custody with their own bar of soap
14   and access to cleaning supplies in the housing
15   area janitor's closet including, but not limited
16   to:  Disinfectant, mold and mildew cleaner,
17   general cleaner, and floor cleaner, and cleaner
18   without grit.
19        Did I read that correctly?
20   A  Yes.
21   Q  And -- just getting to the right place here.
22   What type of soap is distributed to inmates?
23   A  Bar soap.
24   Q  Bar soap, okay.  Is it an antibacterial soap or
25   some other kind of soap, or do you know what kind

Page 39

1    of soap it is?
2    A  I'm not sure what kind of soap it is.  It's made
3    by Corcraft.
4    Q  Okay.  Made by corporate you said?
5    A  Corcraft.
6    Q  Spell that for us, please.
7    A  C-o-r-c-r-a-f-t.
8    Q  Do inmates -- are cleaning supplies available
9    only at one central place in each housing unit or
10   are they dispersed throughout the housing units?
11   A  They are locked in the janitor's closet and
12   there's a bucket of sanitizer that, since COVID,
13   we have been leaving out for folks to sanitize
14   the phone before use if they want to.
15        But anytime an individual has out of
16   soap, they can ask for any of the cleaning
17   supplies to clean their own bed or a cell area.
18   And then we have the house detail that's trained
19   in cleaning and sanitizing procedures that does
20   the general cleaning and sanitizing of the
21   housing units.
22   Q  So let's take NIC as an example.  How many people
23   are in NIC?
24   A  Oh, I don't know off the top of my head.
25   Q  Several hundred?

Page 40

1    A  Okay, I don't know the actual number.
2    Q  Okay.  Well, what I'm trying to understand is is
3    there just one janitor's closet available to all
4    the inmates in a given housing unit?
5    A  So there's one janitor's closet for each side of
6    the housing area, or if there's one janitor
7    closet, it has twice the number of supplies.
8    Q  So how many janitors' -- like, for instance, if I
9    want to get a canister or a spray bottle of
10   disinfectant, how many spray bottles or canisters
11   of disinfectant are available for every hundred
12   inmates?
13   A  The disinfectant is provided in a dispenser and
14   the dilution, it's got a very strong dilution
15   ratio so it's a bottle of the concentrated
16   sanitizer that the dispenser dilutes.  And the
17   individuals get it in a bucket.  We don't use
18   spray bottles for disinfectant.
19   Q  So in order -- if you want to get a disinfectant
20   in order to wipe down your cell or your bed or a
21   high-touch surface such as a doorknob, you
22   have -- what are the steps you have to go through
23   to do that as an inmate?
24   A  You say to the officer, I would like to clean and
25   sanitize whatever, and the officer will unlock

Page 41

1    the janitor closet and provide you with the
2    supplies.  When you're done with the cleaning,
3    you return the supplies, clean them, and they are
4    again secured in the janitor closet.
5    Q  And basically only one inmate can do this at a
6    time, right?
7    A  No.  Multiple inmates can do it at a time.
8    Q  How many?
9    A  There are four mop -- mop buckets and mops, and
10   there are six sponges and six green scouring
11   pads, so multiple people can do it at a time.
12   Q  But those -- those sponges and green scouring
13   pads are reused?
14   A  Yes.  When you're done, you place them in a
15   bucket with the sanitizing solution so they get
16   sanitized prior to the next use.
17   Q  Okay.
18   A  So after ten minutes, they're good to go.
19   Q  Okay.  So any given sponge or scouring pad has to
20   be sitting there for ten minutes before it can be
21   reused, correct?
22   A  Yes.
23   Q  Has the department considered acquiring sanitary
24   wipes, such as Clorox wipes, or something, or
25   Lysol wipes to distribute to inmates?

Page 42

1  A  We have some wipes, but we don't generally give
2     them to the incarcerated individuals because they
3     end up getting stuck down toilets and it will
4     clog the toilet.  So if we use the liquid cleaner
5     and sanitizer, we don't have to worry about
6     clogging the toilets.
7  Q  How many instances of clogged toilets in the last
8     month have you had because of a wipe?
9  A  Well, we haven't given them out to the
10    individuals in the last month, but we did do a
11    project in the courts probably a year, year
12    and-a-half ago, where we had the hand sanitizer
13    wipes, not the cleaning sanitizer, and they were
14    constantly being flushed in the toilet.
15 Q  You said you did a project in the -- in the
16    courts?
17 A  Yes.  In the Bronx courts.
18 Q  Tell us about that project.
19 A  Well, it was just that.  We were trying to see if
20    it was easier to hand out sanitizing wipes
21    instead of having bar soap in the court pen, and
22    all it ended up really doing was creating a lot
23    of clogged toilets.
24 Q  Have you ever experimented or tried distributing
25    sanitizing wipes since COVID started?

Page 43

1  A  Not to the incarcerated individuals, no.
2  Q  Okay.  Have you explored simply instructing
3     people that they should throw any used sanitary
4     wipes into a trash can and making more trash cans
5     available?
6  A  Well, there is no reason for us to provide
7     sanitizing wipes because we have adequate
8     sanitizer in the janitor closet.  So we have
9     plenty of sanitizer available for the population.
10 Q  In order to go get the sanitizer, an inmate has
11    to interact face-to-face with a correctional
12    officer, right?
13 A  That would be the same process with the wipes,
14    any wipes.
15 Q  Unless you distributed them to inmates generally
16    or put them in dispensers, right?
17 A  Yeah, we probably we could do that, but
18    dispensers could be broken up into weapons, so we
19    tend to not put dispensers out where the
20    population lives.  A dispenser would be locked in
21    the janitor closet also.
22 Q  Have you ever had a dispenser at Rikers, had an
23    instance of a dispenser for items being made into
24    a weapon?
25 A  Sure, many times.

Page 44

1  Q  Okay.  Give me an example of that.
2  A  So dispensers in kitchens and in bathrooms, the
3     dispensers we have in the janitor closets will
4     get vandalized if the door is left unlocked.
5  Q  Have you explored having secured dispensers or
6     dispensers that are not easy to fashion into
7     weapons?
8  A  These are secured --
9     (Reporter interruption.)
10 A  These are secure dispensers.
11 Q  (By Mr. Keenan)  What about have you ever just
12    personally gotten a bottle of -- or a canister
13    of Clorox wipes or Lysol wipes, you know they
14    come in kind of a plastic, softish plastic
15    canister, have you ever seen one of those?
16 A  Yes.
17 Q  Okay.  Have you ever seen one of those be
18    fashioned into a weapon?
19 A  We don't give them to them so no, I haven't seen
20    them fashioned into a weapon.
21 Q  Okay.
22 A  Again, there's no reason to give them sanitizing
23    wipes.  We have plenty of Virex 256 sanitizer
24    that's effective against COVID.
25 Q  Does have Virex 256 sanitizer have any substances

Page 45

1     in it that could be intoxicating?
2  A  Not to my knowledge.  It's ammonia, it's not an
3     alcohol-based product.
4  Q  Have you explored having a system in place where
5     correctional officers can distribute hand
6     sanitizer directly to inmates upon their request,
7     Hey, I just want a squirt of hand sanitizer?
8  A  No.  There's no reason for them to have the hand
9     sanitizer.  We have sinks with soap and water.
10 Q  Every --
11 A  The CDC recommends that you use a sink with soap
12    and water.  The hand sanitizer is only
13    recommended to be used when a sink is not
14    available.
15 Q  Are there inmates who are on work details at
16    Rikers?
17 A  Yes.
18 Q  Okay.  And when they're on work detail, they are
19    circulating throughout a housing unit in much the
20    same way as a staff member would, right?
21 A  No.  Well, the house detail would live in the
22    housing area.  There are only very few instances
23    where we have an outside inmate detail work
24    inside a housing unit.
25 Q  During a given work detail, it's certainly

Page 46

1  possible that an inmate wouldn't necessarily have
2  immediate access to a sink to wash their hands,
3  right, because they're working?
4  A  Well, no.  There are bathrooms available for them
5  to use while they're working so they could wash
6  their hands in that bathroom.
7  Q  Would that be the case with staff as well?
8  A  Yes.
9  Q  So why -- why do you issue hand sanitizer to
10  staff then but not to inmates who are on a work
11  detail?
12  A  Because staff have cart or posts, they have
13  recreation posts.  They have posts where they do
14  not have access to a sink with soap and water.
15  Q  Are you --
16  A  We have the security posts that are outside, so
17  there are lots of posts where an officer does not
18  have access to a sink and that's where we
19  distribute the hand sanitizer.
20  Q  Does every inmate in Rikers have access to a sink
21  with soap and water in a non-congregate setting,
22  like not a collective bathroom, a sink that they
23  can go use individually while observing social
24  distancing, does every single inmate have
25  continuous access to a sink like that?

Page 47

1  A  Except for when they're walking in corridors or
2  it's hours for rec, yes.
3  Q  What about inmates who are housed in dormitory
4  settings who don't have a sink in their cell,
5  where do they -- where do they access a sink?
6  A  They go to the bathroom where we have multiple
7  sinks.
8  Q  And isn't it the case that a bathroom is a
9  confined space and you might -- the bathroom
10  might be full at any given point in time?
11  A  Since COVID started, only four individuals are
12  allowed in a congregate bathroom at a time.
13  Q  How many sinks and how many bathroom stalls or
14  urinals are in a given congregate bathroom?
15  A  It depends on how many individuals are housed in
16  the area.  So small housing areas, like with 14
17  inmates or 20 inmates might have four, six; and
18  areas that have more, seven or eight sinks.  It
19  depends on the size of the housing area.  It's
20  different in every facility and sometimes in
21  every housing unit.
22  Q  How is soap -- in those congregate bathrooms,
23  what type of soap is being used?
24  A  Bar soap.
25  Q  Bar soap?

Page 48

1  A  Each individual has their own bar soap, plus we
2  put additional bar soap on each sink.
3  Q  Okay.  In order to use the sink, do you have to
4  handle the sink, like turn a knob or something
5  like that?
6  A  Yes.
7  Q  Okay.  And I know we're getting into the details
8  of washing one's hands, but it seems important
9  here.  If you go and wash your hands and you're
10  using bar soap, unless you have an individual bar
11  of soap with you, you're using bar soap that
12  someone else has used, right?
13  A  As I said, every individual has their own bar of
14  soap, but we do put additional soap in the
15  bathroom in case they forgot theirs.
16  Q  So if you don't have your individual soap with
17  you, you have to use soap that someone else has
18  used, right?
19  A  Or you can ask the correctional officer for
20  another bar of soap.  We have boxes of soap in
21  every housing unit.
22  Q  And in order to turn on the sink, you have to
23  handle the knobs of the sink, correct?
24  A  Yes.
25  Q  They're not automated sinks?

Page 49

1  A  No.
2  Q  Okay.  And then when you're done washing your
3  hands -- is there hot water available in all the
4  sinks?
5  A  Some of them have mixed water, where the hot and
6  cold is mixed so it's warm water.  And, really,
7  all the temperature of the water does is increase
8  the amount of suds you get out of the soap.  But
9  there are no sinks that have just cold water.
10  Q  Are inmates able to control the temperature of
11  the water that they are using, or is it pre --
12  A  It depends --
13  Q  -- pre-set?
14  A  It depends on the housing area.  Some have hot
15  and cold knobs, and some have mixed water.
16  Q  And then when you're done washing your hands, you
17  have to handle the knobs again to turn the water
18  off, correct?
19  A  Right.  They can use a towel or a hand towel,
20  depending on where they are, to dry their hands.
21  Q  Are hand towels always available in all of the
22  bathrooms?
23  A  Not in housing areas, but in non-housing areas,
24  yes.
25  Q  Okay.  So --

Case 1:20-cv-03650-KPF   Document 67-11   Filed 01/22/21   Page 14 of 29
Pauline Feeney - 11/10/2020
Jean Azor-El, et al. vs. City of New York, et al.

Page 50

1 A  In housing, individuals have their own towels.
2    We also have the ability for them to sanitize the
3    sinks before they use them if they would like to
4    do so.
5 Q  And how do you make -- how do you make that
6    possible?
7 A  The same way they would do any other cleaning.
8    They ask to get the sanitizer from the janitor's
9    closet.  And if they so desire, they can sanitize
10   the sinks before they use it.  If not, the sinks
11   are sanitized -- countertop surfaces should be
12   sanitized every two hours.
13 Q  Do you know if they actually are?
14 A  So as I said, it's audited by both the captains
15   in the jails and my staff and the bureau chief of
16   facility operations, and one of the questions is
17   when was the last time the sanitary tour was
18   conducted; if it's been longer than two hours,
19   the captain is expected to instruct the officer
20   to have the house detail go do it at that time.
21 Q  If an inmate -- let's talk about turning off the
22   knobs in the bathroom once you're done washing
23   your hands.
24 A  Uh-huh.
25 Q  If I don't want to run the risk of touching the

Page 51

1    knobs that other people have touched and making
2    my hands dirty again that I just washed, how do I
3    turn off the sink?
4 A  You could use some toilet paper.
5 Q  Any other method?
6 A  No.  I think that's about it.
7 Q  Okay.  In order to go get toilet paper, you would
8    have to go back into a toilet stall which is a
9    confined area that, one, is a small confined
10   area; two, that people defecate in, correct?
11 A  Or you bring your own with you.  Most inmates
12   have their own roll of toilet paper, so they just
13   bring it with them.
14 Q  But not all inmates necessarily, right?
15 A  Well, we don't leave toilet paper sitting in the
16   toilet stall so they either -- they have their
17   own roll of toilet paper at their beds or in
18   their cells.
19 Q  Okay.
20 A  So they can bring it with them if they so
21   desired.  And if they didn't have it, they could
22   ask the correction officer for it on the way to
23   the bathroom and they would give it to them.
24 Q  Is there always a correction officer standing
25   there outside the bathroom if an inmate needs to

Page 52

1    get sanitizer or needs to -- or needs to get
2    Virex solution or needs to get toilet paper?
3 A  They're not necessarily standing right outside
4    the bathroom, but they're in the housing area.
5 Q  How many staff have tested positive for COVID-19
6    in the last month?
7 A  Oh, in the last month?  Maybe 10 or 15.
8 Q  And of those 10 or 15 people, did some of them
9    test positive after they had already been working
10   one or more shifts?
11 A  I'm sure they did work at some point before they
12   tested positive.
13 Q  So it's still the case that, at least in the past
14   month, inmates have been exposed to
15   positive-testing staff, correct?
16 A  It could be, but we do tracing.  And every time
17   we have a positive staff member, the facility
18   identifies all staff and incarcerated individuals
19   that the individual came in contact with.  The
20   staff members get a letter that says you were
21   exposed and recommend that they see their
22   personal physician or at least reach out to them.
23        And the list of incarcerated
24   individuals is given to Correctional Health
25   Services and they do their contact tracing with

Page 53

1    those individuals.
2        MR. KEENAN:  Go to the October 24th
3    through 30th weekly report, if we could pull that
4    up.  Actually, before we do that, let's go to the
5    affidavit on April 24th, 2020.  This will be -- I
6    think this will be Exhibit 4, correct, Julia?
7        MS. GOKHBERG:  Yes, Exhibit 4.
8        (Deposition Exhibit 4 marked.)
9        MR. KEENAN:  Let's page through this.
10       MR. THAYER:  Mr. Keenan, before --
11   before you start asking questions on this, would
12   you mind if we took a brief five-minute break?
13       MR. KEENAN:  Sure.  I just want to
14   identify this for the record and then I was
15   planning to take a break.
16 Q  (By Mr. Keenan)  So Commissioner Feeney, is
17   Exhibit 4 an affidavit that you executed on
18   April 24th, 2020?
19 A  Yes.
20       MR. KEENAN:  Thank you.  Let's go ahead
21   and take a -- take a break.  To be realistic,
22   we'll be back on the record in ten minutes.
23       (Brief recess.)
24 Q  (By Mr. Keenan)  We are back on the record,
25   Commissioner Feeney, and you understand, of

Page 54

1  course, you remain under oath until the
2  deposition is completed, right?
3  A  Yes.
4      (Deposition Exhibit 5 marked.)
5  Q  (By Mr. Keenan)  Commissioner Feeney, we're
6  going to look at a weekly report for the Board
7  of Correction.  This will be Exhibit 5.  This
8  is the report of October 24th through the 30th.
9      MR. KEENAN:  If you don't mind bringing
10 that up, please, Julia.
11 Q  (By Mr. Keenan)  Do you recognize Exhibit 5,
12 Commissioner Feeney?
13 A  The weekly COVID report.
14 Q  And let's go to a few pages in, I think it will
15 be five pages in.  Okay, "Total Population in DOC
16 Custody."  Do you see this graph here, do you
17 recognize it as a graph of the total DOC custody
18 population?
19 A  Yes.
20 Q  Okay.  And is that accurate?
21 A  I assume so.
22 Q  Okay.  The information that the Board of
23 Correction has would be the information supplied
24 to it by DOC, correct?
25 A  Yes.

Page 55

1      MR. KEENAN:  All right.  And let's go
2  to the next page, page after that and a page
3  after that and a page after that.
4      (Deposition Exhibit 6 marked.)
5  Q  (By Mr. Keenan)  Okay, let's now look at
6  Exhibit 6 which is an analysis report.
7      MR. THAYER:  Can we just note for the
8  record that this is page 9 of the report, please.
9      MR. KEENAN:  Sure.
10     MR. THAYER:  Thank you.
11     MR. KEENAN:  Sure.  This analysis
12 report will be Exhibit 6.  If you don't mind
13 pulling that up, Julia.
14     MS. GOKHBERG:  Sorry.  Just give me one
15 moment.
16     MR. KEENAN:  Is this it?
17     MS. GOKHBERG:  Yes.
18     MR. KEENAN:  Okay, great.
19 Q  (By Mr. Keenan)  This is Exhibit 6.  Do you
20 recognize this document, Commissioner Feeney?
21 A  I'm back on page 1, it looks like the same Board
22 of Correction report.
23 Q  I think it's a little different.  This is titled,
24 "New York City Board of Correction Housing Area
25 Capacity Data Summary."

Page 56

1  A  Okay.
2  Q  Okay?
3  A  Uh-huh.
4  Q  Do you recognize this document?
5  A  Yes.
6  Q  Okay.  And what is it?
7  A  It's the housing area capacity data summary.
8      MR. KEENAN:  Okay.  Let's go a few
9  pages in Julia, if you could, please.
10 Q  (By Mr. Keenan)  Okay.  And do you see this on
11 page 4 of Exhibit 6, Commissioner Feeney?
12 A  Yes.
13 Q  And this is a jail population census, correct?
14 A  Yes.
15     MR. KEENAN:  All right.  And let's go
16 to Exhibit 7 now.  This will be a letter from
17 legal aid.
18     MS. GOKHBERG:  Which letter would you
19 like?
20     MR. KEENAN:  It's in the outline.
21 It's -- the title is, "Defenders Letter to City,"
22 dated November 6, 2020.
23     (Deposition Exhibit 7 marked.)
24 Q  (By Mr. Keenan)  Okay.  This will be Exhibit 7.
25 Commission Feeney, have you seen Exhibit 7

Page 57

1  before?
2  A  No.
3  Q  All right.  I want to ask you, Commissioner
4  Feeney, about use of masks and gloves.  What are
5  the policies and procedures for staff to wear
6  masks, let's start with masks, while they are at
7  work?
8  A  Right now?
9  Q  Yes.
10 A  Right now, staff are required to wear face
11 coverings when at work.
12 Q  At all times?
13 A  When you're within six feet, it's mandated; it's
14 recommended if you're more than six feet between
15 people.
16 Q  So what -- does that mean that basically it's --
17 if you're in a housing area but you think as a
18 staff member that you could be more than six feet
19 from anybody else, that you could take off your
20 mask if you want?
21 A  For a couple of minutes and then put it back on,
22 yes.
23 Q  And what's the reason for allowing that?
24 A  For following the City guidance in wearing masks.
25 Q  What do you do to monitor whether staff members

Page 58

1  actually are wearing masks?
2  A  So we do several things.  We have those audits I
3     spoke to that the captains do and that my staff
4     and the facility chief of operations staff do.
5        Every supervisor and manager is
6     expected to remind the staff to put on their
7     mask; and if they're willfully not wearing them,
8     then discipline would be -- would be expected,
9     progressive discipline would be expected.
10       And we also use the compliance and
11    safety center, which is a video monitoring unit
12    that I oversee, and that unit is meant to be a
13    pure mentoring unit.  But while we're watching
14    video, if we see a staff member is not wearing a
15    mask, they get called by a peer and it's
16    recommended that they put their mask on, and most
17    of the time people have their mask and do put it
18    on.
19  Q  Has anyone ever been disciplined at Rikers for
20    not wearing a mask?
21  A  I don't know.
22  Q  Who would know?  How would we find out?
23  A  Labor relations probably.
24  Q  What are the policies and procedures for wearing
25    masks and gloves while distributing food and

Page 59

1  medicine?
2  A  Okay, DOC staff does not distribute medication so
3     we don't have a policy regarding that.
4        As far as distributing food, if you're
5     going to have direct hand contact with food,
6     you're required to wear gloves.  That's the New
7     York State glove law from the health code.
8        And folks should be wearing their masks
9     because you're going to be near people.
10  Q  And when you said direct hand contact with food,
11    would that -- would that include, you know,
12    handling a spoon or something else to serve food?
13  A  No.  That's not direct hand contact.  The health
14    code does not require, although it's generally
15    common practice, but the health code requires
16    wearing gloves when you have direct hand contact.
17  Q  Since COVID, have you reevaluated whether the
18    state health code that was enacted before COVID
19    is enough to protect against the transmission of
20    COVID?
21  A  COVID is inhaled.  It's a droplet infection
22    that's inhaled, or if you touch your eyes, your
23    nose then your mouth and you've touch the virus,
24    you catch it.  It's not a food-borne illness, so,
25    no, I didn't spend a lot of time thinking about

Page 60

1  COVID and related to food.
2     MR. KEENAN:  Let's go to what's going
3  to be Exhibit 8.  This is the document that's --
4  well, I should -- I think for the easiest way to
5  do this is going to be to go through the
6  City's full production.
7     Julia, do you have access to that
8  sequentially?
9     MS. GOKHBERG:  Yes.
10    MR. KEENAN:  Okay.  So let's -- let's
11 just start going through that beginning with the
12 first document in the City's production.  This
13 will be -- are we on Exhibit 8 now, Julia?
14    MS. GOKHBERG:  Yes, Exhibit 8.
15    (Deposition Exhibit 8 marked.)
16  Q  (By Mr. Keenan)  This will be Exhibit 8,
17  Commissioner Feeney.  This is a one-page
18  document.  Can you tell us what this is?
19  A  That's the directive that was issued on
20  September 24 that details the City's guidance for
21  wearing masks and mandated that staff where masks
22  and stay within six feet of another individual
23  and strongly recommended that they wear them when
24  they are greater than six feet.
25    (Deposition Exhibit 9 marked.)

Page 61

1  Q  (By Mr. Keenan)  Okay.  And let's go to the
2  next document in the City's production.  This
3  will be Exhibit 9.  This is a six-page
4  document, Exhibit 9.  It is -- can you tell us
5  what Exhibit 9 is?
6  A  Oh, it appears to be a letter from our general
7  counsel Heidi Grossman to The Bronx Defenders.
8  Q  And what is this letter about?
9  A  About a letter that The Bronx Defenders wrote in
10  response to your September 11 regarding COVID
11  pandemic procedures.
12  Q  Let's just page through it.  Were you involved in
13  the drafting of this letter?
14  A  Yes.
15  Q  In what way were you involved?
16  A  The legal division reviewed the policies that we
17  had in place to make sure that they were the most
18  current policies.
19    (Deposition Exhibit 10 marked.)
20  Q  (By Mr. Keenan)  Let's go to the next document
21  in the City's production.  This will be Exhibit
22  10, I believe.  What is Exhibit 10,
23  Commissioner Feeney?
24  A  It's Teletype HQ-01077-0 issued on April 18th,
25  2020, that's outlining the department's policies

Page 62

1   for distributing masks to our incarcerated
2   personnel.
3 Q   You said to incarcerated personnel?
4 A   Incarcerated persons.
5 Q   Okay. What is a teletype order?
6 A   Teletype is an order from the chief that tells
7   the department what needs to be done.
8 Q   And is every staff member given a teletype order
9   when one is issued?
10 A   They might -- they may not be given it by hand
11   but it's read at roll-call and the supervisors
12   for, in my case, like for a non-uniformed
13   manager, I'm required to inform my staff of
14   what's in these teletypes, plus they are also
15   available on our intranet.
16 Q   Are masks available to all inmates at the present
17   time?
18 A   Yes.
19 Q   Okay. How often are inmates given new masks?
20 A   It can be given whenever they ask for them.
21   Every day the facility has to give an inventory
22   of what masks were issued to the chiefs and they
23   get replenished as necessary. So I believe
24   they're delivering and maintaining 40 a couple of
25   times a week, two or three times a week in each

Page 63

1   housing area. But if a facility needs more, they
2   can ask and get them, you know, we have them.
3         (Deposition Exhibit 11 marked.)
4 Q   (By Mr. Keenan) Let's go to the next document
5   in the City's production. This will be Exhibit
6   11.
7 A   So this is a teletype from March 6 issued by the
8   commissioner talking about the COVID-19 outbreak
9   in China.
10         (Deposition Exhibit 12 marked.)
11 Q   (By Mr. Keenan) Let's go to the next document
12   in the City's production. This will be Exhibit
13   12, I believe.
14 A   All right. This is a teletype issued July 23,
15   2020, again by the commissioner, talking about
16   the travel advisory and COVID-19.
17         MR. KEENAN: Let's go to the next
18   document, please, Julia.
19         (Deposition Exhibit 13 marked.)
20 Q   (By Mr. Keenan) This is Exhibit 13. What is
21   Exhibit 13, Commissioner Feeney?
22 A   It is a teletype issued on September 24 by chief
23   of the department Hazel Jennings and it's again
24   reiterating how staff is to protect themselves
25   against COVID-19.

Page 64

1 Q   Let's go to the next document in the City's
2   production. This will be exhibit --
3         MR. KEENAN: Will it be 14, Julia?
4         MS. GOKHBERG: Yes, 14.
5         THE WITNESS: We did this one already.
6         MR. KEENAN: I'm sorry?
7         THE WITNESS: We did this one already,
8   it's the directive on wearing masks.
9 Q   (By Mr. Keenan) Okay. And I think that this
10   was maybe produced twice in the City's
11   production. So this is the directive on
12   wearing masks, Exhibit 14?
13 A   Uh-huh.
14 Q   Is that a yes?
15 A   Yes.
16 Q   Okay. All right. We just have to get that down
17   on the transcript.
18         (Deposition Exhibit 15 marked.)
19 Q   (By Mr. Keenan) Let's go to the next document
20   in the City's production, which is Exhibit 15.
21 A   This is a teletype issued on March 22nd about
22   personal protective equipment and authorized
23   masks, and that was issued by both Commissioner
24   Brann and chief of the department.
25         (Deposition Exhibit 16 marked.)

Page 65

1 Q   (By Mr. Keenan) Let's go to the next document
2   in the City's production, it will be Exhibit
3   16.
4 A   This is a teletype issued March 10th, 2020 by
5   First Deputy Commissioner Angel Villalona talking
6   about the leave policy at the time regarding some
7   employees at risk for COVID-19.
8 Q   And by the way, would you agree with me that the
9   Department of Correction has a duty to provide
10   reasonable accommodations to inmates with
11   disabilities?
12 A   Yes.
13 Q   Okay. And that can include extra protective
14   measures for inmates who are especially
15   vulnerable to COVID-19, correct?
16 A   Yes.
17 Q   Let's go to the next document in the City's
18   production, please.
19 A   This is teletype issued on March 22nd about the
20   leave policy applicable during the outbreak of
21   COVID-19.
22         MR. KEENAN: And which exhibit number
23   is this going to be, Julia?
24         MS. GOKHBERG: 17, I believe.
25         MR. KEENAN: So this is going to be

Page 66

1 Exhibit 17 right here.
2        (Deposition Exhibit 17 marked.)
3        (Deposition Exhibit 18 marked.)
4 Q   (By Mr. Keenan)  Let's go to the next document
5 in the City's production which will be Exhibit
6 18.  This starts at Bates stamp NYC29.  Exhibit
7 18, can you tell us what that is, Commissioner
8 Feeney?
9 A   This is a teletype issued on March 28 from Chief
10 Jennings regarding the implementation of
11 televisits.
12 Q   Okay.  Let's go to the next document in the
13 City's production.  This will be Exhibit 19.
14        MR. KEENAN:  Is that correct?
15        MS. GOKHBERG:  Yes.
16        (Deposition Exhibit 19 marked.)
17 Q   (By Mr. Keenan)  Okay.  What is Exhibit 19,
18 Commissioner Feeney?
19 A   Teletype issued on April 3rd by the chief and the
20 commissioner about the distribution of masks.
21 Q   Okay.  Has that been updated in any way since
22 then?
23 A   April 3rd?  I don't believe so.
24 Q   Okay.
25 A   Except for the directive.

Page 67

1 Q   Let's go to Exhibit -- I'm sorry, say that again.
2 A   Except for the directive.
3 Q   Okay.  The directive we talked about earlier that
4 was issued in September?
5 A   Right.
6 Q   The one-page directive?
7 A   Right.
8        (Deposition Exhibit 20 marked.)
9 Q   (By Mr. Keenan)  Let's go to the next document.
10 It will be Exhibit 20.
11 A   I think this is teletype issued May 26th from the
12 commissioner and the chief regarding distribution
13 of cotton fabric masks to incarcerated persons.
14 Q   What type of masks are being made available to
15 inmates at this time?
16 A   Predominantly surgical masks, but we did
17 receive -- I believe it was -- what's that
18 word -- donations, donation of cotton fabric
19 masks.  And the chief distributed those to the
20 incarcerated persons.
21 Q   How many cotton fabric masks?
22 A   I don't know how many.
23 Q   Who was the donation received from?
24 A   I don't know.
25        (Deposition Exhibit 21 marked.)

Page 68

1 Q   (By Mr. Keenan)  Let's go to Exhibit 21, the
2 next document in the City's production.  What
3 is this, Commissioner?
4 A   This is a teletype from March 12th, 2020 from the
5 commissioner regarding visitors and COVID-19
6 procedures.
7        (Deposition Exhibit 22 marked.)
8 Q   (By Mr. Keenan)  Let's go to the next document
9 in the City's production, it will be Exhibit
10 22.  What is Exhibit 22?
11 A   That is an operations order that was issued on
12 September 14th about the use of infrared camera
13 and hand-held infrared thermometers regarding
14 screening process.
15        MR. KEENAN:  I think the next one will
16 be Exhibit 23.  Is that correct, Julia?
17        (Deposition Exhibit 23 marked.)
18 A   This is the elimination --
19        MS. GOKHBERG:  Yes.
20 A   -- of sexual abuse and sexual harassment
21 directive.
22 Q   (By Mr. Keenan)  Okay.  And this has been in
23 place since before COVID, correct?
24 A   Yes.  It was May 31st, 2019.
25 Q   And what is the purpose of this directive?

Page 69

1 A   This directive goes through our procedures for
2 eliminating sexual abuse and sexual harassment.
3 Q   Okay.  And let's go to page 45 of this document.
4        MR. KEENAN:  And can we go back to the
5 prior page, Julia.
6 Q   (By Mr. Keenan)  So that's -- you recognize the
7 elimination of sexual abuse and sexual
8 harassment policy dated May 31st, 2019 is 44
9 pages long, correct?
10 A   Yes.
11 Q   Then we go to the next page in Exhibit 23, it's a
12 listing of telephone numbers, correct?
13 A   Yes.
14 Q   And let's go after that.  Are these all -- do you
15 recognize -- this is a 138-page document.  Do you
16 know if all of the attachments -- all the
17 components of this 138-page document relate to
18 sexual assault and sexual harassment of prison
19 rape elimination?
20 A   I believe so.
21 Q   And you're familiar, very familiar with the
22 City's policies on this topic, correct?
23 A   Yes.
24 Q   Okay.  In fact, there's a federal mandate to
25 develop policies on prison rape elimination,

Page 70

1  correct?
2  A  Yes.
3          (Deposition Exhibit 24 marked.)
4  Q  (By Mr. Keenan)  Let's go to Exhibit 24,
5    please.  It will be the next document in the
6    City's production.
7  A  This is Directive 4514R-A issued on October 19,
8    2007 regarding housing area logbooks.
9  Q  And we see Exhibit 24 is a rather large document,
10   143 pages long, and just going to go through that
11   very quickly.  What are housing area logbooks?
12 A  Logbooks are bound notebooks, for lack of a
13   better thing, that are lined with number of
14   pages, and it's where everything that happens in
15   the housing area is recorded.
16 Q  Let's now go to page 8 of this Exhibit 24 and
17   tell us what that is.
18 A  That's Directive 3901R-B, it is our directive
19   regarding housekeeping procedures and it became
20   effective April 4th, 2014.
21 Q  Now, it's my understanding you have a
22   professional background in sanitation, correct?
23 A  Yes.
24 Q  What -- tell us what certifications you have in
25   sanitation and what training you've had.

Page 71

1  A  I'm a registered sanitarian in the State of New
2    York and I've been in the environmental health
3    field since 1989, and worked on writing many of
4    these policies with our colleagues in legal aid
5    and consultants.
6  Q  What is the -- what is a registered sanitarian?
7    I don't -- I don't know that I've encountered
8    that exact term.
9  A  A public health sanitarian is the civil service
10   title for a health inspector.  And back when I
11   was a young health inspector, we had the New York
12   state registry of sanitarians and you took a test
13   and became a registered sanitarian in the State
14   of New York.
15 Q  And what are the -- what are the principles of
16   the sanitation field, what are the goals of
17   sanitation?
18 A  Prevent disease, prevent vermin activity, to
19   create a healthful environment.
20 Q  Let's go to page 26 of this Exhibit 24.
21 A  This is the Cleaning and Sanitizing Manual issued
22   November 2013.
23 Q  And were you involved in the creation of the New
24   York City Department of Correction Cleaning and
25   Sanitizing Manual?

Page 72

1  A  Yes.
2  Q  Were you the primary author or one of the primary
3    authors?
4  A  Yes.
5  Q  Is this manual still enforced?
6  A  It is, but it's been upgraded for COVID.  So
7    there's one change that we had to make in the
8    cleaning and sanitizing procedures with COVID.
9    We apply the sanitizer an additional time so the
10   surface stays wet for ten minutes.
11 Q  Do you know if that's reflected here?
12 A  It's not reflected in this, no.  It's reflected
13   in a PowerPoint that's distributed during all of
14   the training.
15 Q  Okay.
16 A  And it's been sent out in writing to all of the
17   facilities so that they have it as well.
18 Q  And following this, there are various attachments
19   that relate to sanitation, correct?
20 A  Yes.
21 Q  All right.  Let's go to page 53 of Exhibit 24.
22 A  This is our directive of the exposure control
23   plan.
24 Q  And what's -- can you sum up for us what the
25   purpose of this directive is?

Page 73

1  A  The exposure control plan was written in response
2    to an OSHA -- the bloodborne pathogen standards
3    and it's the policies that we follow if somebody
4    has been exposed to a bloodborne pathogen.
5  Q  Okay.  Let's go to page 72 of this document,
6    please.  Exhibit 24, page 72.
7  A  This is a teletype that was issued in October 16
8    of 2012 discussing Liberty 670 and 671 which was
9    a general cleaner and disinfectant that we used
10   at that time.
11 Q  Okay.  What are -- what are the general cleaners
12   and disinfectants used at this time?
13 A  I'm sorry, can you say that again?
14 Q  What are the general cleaners and disinfectants
15   being used at this time?
16 A  Oh.  There's Diversity products, the general
17   cleaner is called General Cleaner 15, and the
18   disinfectant is called Virex 256.
19 Q  Let's go to page 73, please.
20 A  This is Directive 3900R issued on April 4th,
21   2014, and it describes our environmental health
22   program.
23 Q  What is the environmental health program?
24 A  The environmental health program is our overall
25   environmental health program that deals with

Page 74

1  sanitation, vermin control, infections. It
2  describes what is expected of the different
3  titles in the department that deal with
4  environmental health. It describes what we're
5  responsible for.
6  Q  Okay. Now let's go to page 95, please.
7  A  This is Directive 4020R-A, it's a directive
8  dealing with the department's definitions of
9  inmate categories.
10  Q  And can you sum up for us what -- what this is?
11  A  It's the definition of the different types of
12  individuals that we -- that we have, whether in
13  general population or they have another category
14  of mental health, whatever would be defined in
15  this directive.
16  Q  Okay. Let's go to page 102, please, of Exhibit
17  24. Commissioner Feeney, can you tell us what
18  starts on page 102 here?
19  A  This is Directive 6002 that deals with attorney
20  visits.
21  Q  Then on page 110, is this a teletype that
22  describes some amendments to the attorney visits
23  directive policy? Is that a yes?
24  A  Yes.
25  Q  And we see some further -- further teletype about

Page 75

1  that on page 112, correct?
2  A  Yes.
3  Q  And following that there is some more guidance
4  about attorney visits and similar visits,
5  correct?
6  A  Well, this updates operations order 110, not the
7  directive, but, yes, it deals with attorney
8  visits.
9  Q  Let's go to page 118, please.
10  A  This is a teletype from April 3rd, 2013 dealing
11  with procedures for all ports of entry.
12  Q  Then let's go to page 120, please.
13  A  This is Directive 6000R-A, effective April 7th,
14  2005, regarding attorney, legal, and official
15  visits.
16  Q  And then we see following that some further
17  teletypes relating to ports of entry and attorney
18  and related visits, correct?
19  A  Yes.
20  Q  And then let's go to page 137, please, of
21  Exhibit 24. Can you tell us what this is,
22  Commissioner Feeney?
23  A  This is Directive 3255R, issued June 18th, 2014,
24  regarding assignment of inmates to work details.
25  Q  Are medically vulnerable inmates assigned to work

Page 76

1  details during COVID or are they kept off of work
2  detail?
3  A  What do you mean by medically vulnerable detail?
4  Q  People with underlying conditions that would make
5  them especially vulnerable to COVID were they to
6  contract such as asthma or being
7  immunocompromised in some way. Are people with
8  asthma or with a compromised immune system placed
9  on work details or not placed on work details
10  during COVID?
11  A  So the general DOC staff member has no idea what
12  an inmate's medical conditions are. For them to
13  work in the barber shop or in kitchens, they have
14  to have a medical -- be medically cleared to work
15  in those two areas. I don't know of any other
16  work that requires medical clearance for an
17  individual to work.
18        (Deposition Exhibit 25 marked.)
19  Q  (By Mr. Keenan) Let's go to what will be
20  Exhibit 25. It will be the next item in the
21  City's production, I think actually the last
22  item in the City's production.
23  A  All right. This is the division assignments, I
24  cannot read the effective date on this. I think
25  it says January 8, 2020, but I'm not sure. And

Page 77

1  this document identifies the wardens and the
2  deputy wardens and the command and who report to
3  who.
4  Q  Okay. I want to go back to a question we
5  explored earlier of hand sanitizer, the idea of
6  having dispensers that would be placed out for
7  people to go get a squirt of hand sanitizer.
8        First question, very basic question, I
9  assume, certainly by this point, you have seen
10  dispensers or hand sanitizer be placed in public
11  places and you've used one, correct?
12  A  Yes.
13  Q  Okay. So you're familiar with the idea that you
14  would have a dispenser and it's either on a stand
15  or bolted to a wall or some other secure surface,
16  somebody can put their hand under it and get an
17  automatic scoop of hand sanitizer and then
18  sanitize their hands, correct?
19  A  Yes.
20  Q  Has the Department of Correction even explored or
21  considered the possibility of placing dispensers
22  of that nature either on a stand or bolted to a
23  secure surface in collective areas of housing
24  units such as mess halls, cafeterias or communal
25  rooms?

Page 78

1  A  Okay, so most inmates don't go to mess halls,
2     they eat in their housing areas.  And I think
3     about it a lot, what's the best and the safest
4     things to do.  And the risks associated with the
5     hand sanitizers to me, when there are sinks and
6     soaps and water available, is not worth the risk.
7           Sanitizer, itself, can be used as a
8     weapon, the dispenser can be used as a weapon,
9     and there are -- there are sinks with soap and
10    water that are monitored and audited multiple
11    times on a daily basis to make sure that there is
12    soap and water present.
13          So weighing those things, I don't think
14    it's worth the risk to put alcohol-based hand
15    sanitizer in inmate occupied areas.
16          Now, during H1N1 when non-alcohol-based
17    hand sanitizer was effective, we did do that in
18    certain areas, but not alcohol-based, it's too
19    potentially dangerous.
20 Q  Okay.  So let's talk about H1N1, you used a
21    non-alcohol-based sanitizer, correct?
22 A  Uh-huh.
23 Q  Is that a yes?
24 A  Yes.
25 Q  And how did you dispense that non-alcohol-based

Page 79

1     hand sanitizer?
2  A  It was in a dispenser that was like in a cage.
3  Q  Okay.  Describe for me what that looks like.
4  A  So there was a dispenser, a regular dispenser
5     that we put locked covering on.
6  Q  Okay.
7  A  And it got destroyed, too.
8  Q  It got -- what got destroyed?
9  A  The dispenser, they were vandalized.
10 Q  Vandalized in what way?
11 A  Pieces of the hard plastic were broken off.
12 Q  And did anybody -- do you have any documented
13    instances of turning -- anybody turning any of
14    those dispensers into a weapon?
15 A  I don't know.
16 Q  All right.  And out of how many dispensers -- how
17    many dispensers did you put out during H1N1 in
18    Rikers?
19 A  I don't know off the top of my head.
20 Q  Several dozen at least?
21 A  I don't know if that many, but there were some.
22 Q  Were all of them destroyed, were some of them
23    destroyed, only one of them destroyed?
24 A  I don't know the number that were destroyed.
25 Q  And so you -- this non-alcohol-based sanitizer,

Page 80

1     you put it in the dispenser with a cage or a
2     covering around it in collective areas, correct?
3  A  In dayrooms.
4  Q  Dayrooms, okay.
5  A  Uh-huh.
6  Q  And by the way, is it the policy to have a staff
7     member or corrections officer present in a
8     dayroom at any given point in time?
9  A  Some places have specific dayroom officers.  Most
10    places just have an officer that controls the
11    whole housing area.
12 Q  Okay.  All right.  And are there video cameras in
13    dayrooms?
14 A  There are now.
15 Q  Okay.  Not then but there are now?
16 A  I don't remember if there were any then or not,
17    but they are now.
18 Q  What matters is there are video cameras
19    monitoring all dayrooms at this time, correct?
20 A  Yes.
21 Q  And those video cameras can be monitored from a
22    central command center or control center?
23 A  They aren't generally monitored from a command
24    center all the time, no.
25 Q  Okay.  But they could be, correct?

Page 81

1  A  They could be.
2  Q  Okay.  You could -- you could just have a live
3     feed into the command center, right?
4  A  It's probably --
5  Q  It's feasible?
6  A  To do it, yes.
7  Q  Okay.  So you're familiar with the idea of
8     somebody getting a squirt of hand sanitizer and
9     there are some that have a gel and some that do a
10    foam, correct?
11 A  Yes.
12 Q  Okay.  Are you -- have you ever heard of anybody
13    lighting a foam-based sanitizer on fire or using
14    it as a weapon?
15 A  If it's alcohol-based, it can be a flammable.
16 Q  Have you ever heard or seen any reports?
17 A  In fact, there was a woman in the news not long
18    ago, maybe a month ago, who got seriously burned
19    from hand sanitizer.
20 Q  Where?  What -- what news --
21 A  It was on -- it was on the regular news, Channel
22    7, Channel 4, she got very badly burned from hand
23    sanitizer.
24 Q  Well, you know, I'm trying to get to the root of
25    what are -- what are likely dangers, not

Page 82

1 theoretical dangers. This is somebody --
2 somebody in the New York area who got a chemical
3 burn from a hand sanitizer?
4 A  No. She actually lit herself on fire.
5 Q  Okay. So this is one instance in this being
6 reported in the news in a city of over 8 million
7 people, correct?
8 A  Yeah. So I have to, as a person who's
9 responsible for environmental health and safety,
10 look at the whole big picture. So, to me, the
11 big picture is really clear, the CDC says when
12 there's soap and a sink available, that is their
13 recommended practice for you washing your hands.
14       They recommend the use of hand
15 sanitizer only when that and that soap are not
16 available.
17       I have a population that does set
18 fires, and I don't know the number because I'm
19 on -- off the top of my head, but we have fires
20 set often in the facility.
21       So I have to make sure my staff is
22 safe. I have to make sure the other individuals
23 are safe. And, to me, it's not worth the risk,
24 and I'm the one who answers for it if something
25 happens.

Page 83

1       It is not worth the risk when there are
2 sinks and soap and water present to provide an
3 alcohol-based hand sanitizer that if it gets
4 thrown on someone, and the individuals splash our
5 staff regularly with urine, feces and other
6 liquids, that should they ignite that, a person
7 will go up like a Molotov cocktail.
8       So we can go back and forth about
9 whether it's possible to put a hand sanitizer
10 dispenser in a housing area, and, yes, it is, but
11 it's also potentially very dangerous and I'm not
12 willing, under my need and responsibility, to say
13 that we should do that when there is a CDC
14 recommended way to wash your hand available in
15 the housing unit.
16 Q  But you're assuming that all inmates have easy
17 and quick and safe access to sinks with warm
18 water and soap at all times, that's -- you're
19 making that assumption, aren't you?
20 A  I'm not assuming. I've walked the jails every
21 day every week for 30 years. I know that sinks
22 and soap are available.
23       We have a very strict three-tiered
24 level audit procedure in place that checks these
25 things on a daily basis, including on the

Page 84

1 weekends.
2       For the amount of time an individual is
3 walking through the corridor until they get to
4 their location, they can wash their hands in the
5 location that they're in.
6       I have not seen lines and lines of
7 individuals waiting to get to sinks. I have not
8 had any complaints from individuals directly that
9 they can't get access to a sink with soap and
10 water. So I believe we've made the correct and
11 safe decision for both the inmate population and
12 for our staff.
13 Q  You -- let me ask you this question while we're
14 on the sanitizer topic, hand sanitizer. Are you
15 aware of any instance in which any inmate
16 anywhere has assaulted a staff member or lit a
17 staff member on fire using hand sanitizer?
18 A  No.
19 Q  Question about --
20 A  By the way, rate every single chemical we use as
21 to whether it's safe that we use in a
22 correctional setting, and I apply that same
23 principle to the hand sanitizer that I do when we
24 want to utilize the new sanitation chemical or a
25 new paint or the maintenance chemical, we go

Page 85

1 through the same procedure to decide if we feel
2 it's safe or not.
3 Q  How are foams in visiting areas or phone call
4 areas sanitized?
5 A  They are sanitized by the house detail and we
6 have a bucket with the Virex available right at
7 the phone area and the Virex gets changed out two
8 or three times a tour, and the individual can
9 sanitize the phone before and after they are used
10 if they want to do it in addition to what the
11 house detail does.
12 Q  And what -- what device would they use to
13 actually wipe down the phone?
14 A  The sponge.
15 Q  Okay. And after you wipe down the phone?
16 A  They can go to the bathroom and wash their hands.
17 Q  While you're leaving the phone like off the hook
18 or something?
19 A  Well, we've got a drier that we use anyway. Most
20 people don't pick up a wet phone.
21 Q  How long does it take to get from the phone to
22 the bathroom and back?
23 A  Two minutes.
24 Q  Do you distribute paper towels to use Virex with
25 or --

Page 86

1  A   Sponges.  You have to allow it to air dry.  You
2      don't want to wipe off the Virex when you're
3      done.  Virex works by the amount of contact time
4      that the chemical has with the Virex.  If you put
5      it on and wipe it off, if you dry it, you're
6      removing the contact time.
7  Q   Does Virex have any toxicity to it or any
8      potential health threats to anyone who is exposed
9      to it?
10 A   No long-term sustaining health effects, no.
11 Q   Any short-term?
12 A   You might get a little skin irritation, which is
13     why we issue yellow gloves and goggles when they
14     are being used.
15 Q   By inmates or just by staff?
16 A   No.  By the incarcerated individuals who are
17     using it.
18 Q   And are those goggles cleaned after use?
19 A   Yes, they are cleaned in the Virex and hung to
20     air dry in the janitor closet.
21 Q   How about the yellow gloves?
22 A   Same thing.
23         MR. KEENAN:  Why don't we take about a
24     five-minute break here.
25         (Brief recess.)

Page 87

1  Q   (By Mr. Keenan)  Ms. Feeney, we are back on the
2      record.  I want to ask you about ventilation.
3      How old are the buildings at Rikers?
4  A   They are all different ages.  NIC is quite old,
5      it's one of the earlier buildings on the island.
6      And OBCC and Rose M. Singer were the newest
7      constructed building.  I think our newest
8      editions were put in -- well, Rose M. Singer, the
9      newest edition, was put in a few years ago.  And
10     OBCC and GRBC newest editions were put in the
11     late '80s, I believe.
12 Q   How old is NIC?
13 A   I don't know exactly, but 1930s-ish, the main
14     building.
15 Q   The HVAC system, HVAC in NIC, do you know when it
16     was installed?
17 A   It was upgraded several years ago when they
18     air-conditioned the building.
19 Q   When they air-conditioned the building?
20 A   Yes.
21 Q   Okay.  Do you know how old the HVAC systems are
22     at the other -- other facilities in Rikers?
23 A   The RNDC HVAC system was also just upgraded.
24     Rose M. Singer and GRVC and OBCC are relatively
25     new buildings so they have not been upgraded

Page 88

1      since they were built, so the HVAC systems are
2      fairly, you know, last 20 years or so.
3  Q   Do you -- have any changes been made to
4      ventilation since COVID came in, whether it's the
5      installation of new filters or changing HVAC
6      processes or equipment or anything like that?
7  A   It's my understanding that we are in compliance
8      with the recommendations with the MERV 13 and the
9      filter and we have increased the outside air in
10     the facilities, but I couldn't give you the
11     specifics on each facility's ventilation system.
12 Q   And when you said increasing the outside air,
13     tell us, is it entirely outside air that's being
14     brought in or is air being recirculated?
15 A   I believe right now it's all outside air.
16 Q   Okay.  Who -- who would know for sure?
17 A   Alex Mahoney.
18 Q   And who is Alex Mahoney?
19 A   He is the executive director for our facilities'
20     maintenance and repair division.
21 Q   And you said the MERV 13 filters, tell us about
22     that.
23 A   Okay.  Again it's a level of filtration.  You
24     would have to get -- I don't know the exact --
25 Q   That's --

Page 89

1  A   I don't know.  I just know that Alex told me we
2      were in compliance compliant with the MERV 13
3      mandate.
4  Q   But Alex Mahoney would probably be the person to
5      talk to about that?
6  A   Absolutely.
7          (Deposition Exhibit 26 marked.)
8          MR. KEENAN:  Let's look at a few new
9      exhibits.  I think this will be 26 now.  This is
10     a progress report cover letter.  If you could
11     pull that up, please, Julia.
12 Q   (By Mr. Keenan)  You'll see this is a cover
13     letter.  Do you recognize this document?
14 A   Yes, I do.
15 Q   What is it?
16 A   It's a report from the Office of Compliance
17     Consultants, dated October 15, 2020.
18 Q   And can you sum up for the record what the Office
19     of Compliance Consultants is?
20 A   They're an oversight agency for the federal
21     court, for the Benjamin court case.
22 Q   This is for the consent decree that's in place in
23     the Benjamin case?
24 A   Yes.
25 Q   Okay.  Have you -- do you review the progress

Page 90

1  reports that are made by the Office of Compliance
2  Consultants?
3  A  I do.
4  Q  And how often are reports made by the OCC, Office
5  of Compliance Consultants?
6  A  They are supposed to be quarterly.
7  Q  Are they actually made on a quarterly basis or is
8  that objective not always met?
9  A  No, that's pretty much always done on a quarterly
10  basis.
11  Q  Let's next look at the May through August 2020
12  report on environmental conditions.  This will be
13  Exhibit 26.  This is an attachment to the most
14  recent compliance report, correct?
15  A  Yes.
16  Q  Okay.  Are you --
17      MS. GOKHBERG:  This is Exhibit 27.
18  Sorry.
19      MR. KEENAN:  Twenty-seven.  Thank you
20  very much, Julia.  This will be Exhibit 27.
21      (Deposition Exhibit 27 marked.)
22  Q  (By Mr. Keenan)  Do you recognize Exhibit 27,
23  this 34-page document, report?
24  A  I recognize the cover page, yes.
25  Q  Okay.  Were you -- have you reviewed the contents

Page 91

1  of it?
2  A  Yes.
3      (Deposition Exhibit 28 marked.)
4  Q  (By Mr. Keenan)  Okay.  And then let's bring up
5  Exhibit 28.
6      Do you -- do you agree with the
7  contents of it, when you reviewed it?
8  A  No, not often.
9  Q  I'm sorry, say that again.
10  A  No, I don't, not often.
11  Q  You do not often agree with what's being said in
12  the Office of Compliance Consultants' reports?
13  A  That's correct.
14  Q  Okay.  Tell me -- tell me more about that, that
15  you do not often agree with the OCC's reports.
16  A  They make assumptions based on taking my unit's
17  reports and pulling them apart and putting them
18  back together in different ways that we don't
19  agree with.  According to our evaluation of the
20  sanitation, the department has a compliance
21  rating of over 80 for ours.
22      MR. KEENAN:  Okay.  Let's -- let's go
23  to the next exhibit.  Will it be 28, Julia?
24      MS. GOKHBERG:  Yes.
25  Q  (By Mr. Keenan)  Okay.  Exhibit 28, it's

Page 92

1  attachment one, PHS findings for Vacant Cell
2  observations.  This is a 24-page document,
3  Exhibit 28.  Do you recognize this document,
4  Commissioner Feeney?
5  A  Yes.
6  Q  What is it?
7  A  Again, it's the staff of OCC taking a complete
8  report for my unit and picking out bits and
9  pieces of it and putting it into these charts,
10  and then indicating that the entire area would be
11  unclean because of one thing, which is not a
12  protocol that we utilize.
13  Q  And it's your understanding, you're much more
14  familiar with the Benjamin litigation than I am,
15  who -- who does the Office of Compliance
16  Consultants work for, basically who pays for it
17  and who do they report to?
18  A  I believe the department pays for it, but they
19  report to the federal court.
20  Q  Okay.  And do you -- do you have an opinion of
21  the Office of Compliance Consultants and what --
22  do you think they're fair or unfair to the
23  department, or have some other opinion of them?
24  A  I don't have a fair or unfair opinion.  I just
25  think that they evaluate the data differently

Page 93

1  than we did.
2      (Deposition Exhibit 29 marked.)
3  Q  (By Mr. Keenan)  Let's go to Exhibit 29.  This
4  is attachment two to the PHS findings.  Do you
5  recognize Exhibit 29?  It's a 28-page document.
6  A  Yes.
7  Q  What is it?
8  A  It's the same thing, it's another table that the
9  OCC staff put together from the DOC staff
10  inspection report.
11      (Deposition Exhibit 30 marked.)
12  Q  (By Mr. Keenan)  Let's look now at Exhibit 30,
13  it's attachment three.  It's a nine-page
14  document.  Commissioner Feeney, do you
15  recognize Exhibit 30 titled, "Surfaces (not)
16  Smooth and Easily Cleanable"?
17  A  Yes.
18  Q  What is -- what is Exhibit 30?
19  A  It's the same thing.  It's another table that OCC
20  put together from DOC's inspection report.
21      (Deposition Exhibit 31 marked.)
22  Q  (By Mr. Keenan)  And then let's look at Exhibit
23  31, it's attachment four.  Commissioner Feeney,
24  do you recognize Exhibit 31, a five-page
25  document?

Page 94

1  A  Yes.
2  Q  And it's titled, "Ventilation," correct?
3  A  Yes.
4  Q  Okay, what -- what is this document?
5  A  It's the exact same thing.
6  Q  Okay.
7  A  It's a table that OCC put together from DOC
8     inspection report.
9  Q  And these would be places where dirty vents or
10    lack of ventilation was found and things like
11    that?
12 A  It's a place where they cited dirty vents for
13    partially occluded vents, yes.
14 Q  Okay.  Do you believe that any -- that any of the
15    information contained here is just inaccurate or
16    not -- that is flat out untrue, or do you -- do
17    you think that it's just not representative of
18    the facility as a whole?
19 A  I think it's not representative of the area
20    that's being inspected as a whole.  Just because
21    a wall vent may be dirty doesn't mean that the
22    airflow -- that the air can't flow through it.
23    If an outside of a vent is dirty doesn't
24    necessarily mean air can't flow through.  I think
25    that they -- that's what I think.

Page 95

1  Q  Okay.  But -- but in terms of the -- just the
2     bare facts reported in these attachments we've
3     just been talking about in the last few exhibits,
4     the fact that a certain floor or bedding area was
5     found to be dirty or that a certain vent was
6     found to be dusty, you don't disagree with that
7     bare fact, correct?
8  A  I don't disagree with what the individual
9     statement is.  I disagree with their overall
10    evaluation of an area.
11 Q  Okay.
12 A  I don't believe that they look at an area as a
13    whole and follow the sanitation protocol to
14    evaluate the overall sanitation of an area.
15       Just because a vent is dirty doesn't
16    mean that an entire area is dirty.  Just because
17    you have a few missing tiles doesn't mean the
18    area is dirty, and I think that this report
19    packages things to make it look worse than it is.
20 Q  I want to ask you some questions about the
21    triaging of risk among inmates.  So just the
22    general question first off, does DOC do anything
23    to triage inmates or assess inmates according to
24    the level of the risk level that they face from
25    COVID-19?

Page 96

1  A  DOC doesn't do medical evaluations of the
2     incarcerated individuals, nor are we -- nor do we
3     have that information available to us.
4        So if the medical provider tells us
5     that people are at risk, we work to get them --
6     to get them released from prison -- from jail.
7  Q  Do you do anything within the facility among
8     people who are still incarcerated to determine
9     who's -- who's high risk, who's medium risk,
10    who's low risk, and to take protective measures
11    within the facilities in which those people are
12    housed according to risk level?
13 A  So again, if the medical staff tells us that
14    individuals are higher risk -- so we cohorted our
15    older inmates in NIC during COVID, that's because
16    medical told us that this number of inmates were
17    at risk and they wanted them housed at NIC closer
18    to the medical staff, closer to the infirmary
19    areas, and we did that.
20       But DOC, itself, does not have access
21    to an individual's medical information so we
22    could not make that assessment.
23 Q  I want to next ask you about outtakes.  How do
24    you -- how do you process or discharges from
25    Rikers?  You test inmates before discharging them

Page 97

1     into the community?
2  A  I don't know, you would have to ask CHS.
3  Q  Do you have any expectations that you place on
4     Correctional Health Services as to whether they
5     do that?
6  A  I don't understand the question.
7  Q  Well, I mean, it's -- I'm trying to understand
8     how Correctional Health Services fits into the
9     overall operations.  DOC has overall charge of
10    running the City of New York's correctional
11    operations, correct?
12 A  Yeah, so we work hand-in-hand with CHS.  So we
13    did a lot of things for COVID that we had never
14    done before.
15       Our new admission inmates stay in new
16    admission housing for at least 14 days and until
17    medical clears them to be transferred to regular
18    housing.
19       We created what we call asymptomatic
20    exposed housing area.  So if an individual in a
21    housing area was symptomatic or positive for
22    COVID, the medical staff informed DOC and we
23    quarantined the housing area, for lack of a
24    better term, even though nobody else in the
25    housing area was sick.

Case 1:20-cv-03650-KPF   Document 67-4   Filed 01/22/21   Page 26 of 29
Pauline Feeney - 11/10/2020
Jean Azor-El, et al. vs. City of New York, et al.

Page 98

1    So we took the symptomatic person and
2  transferred them to either rest facilities or
3  EMTC for the men and the rest of the housing area
4  stayed where they were.  No one else went in, no
5  one else came out until medical determined that
6  the people in the housing area were not sick so
7  we weren't taking somebody who may be in an
8  incubation period and transferred them throughout
9  the facility.  So it's working hand-in-hand with
10  the medical staff.
11 Q  And I appreciate all that.  My -- my question is
12  a little bit more conceptual in terms of in
13  dealing with COVID and things like testing, for
14  instance, is it a situation where DOC goes to
15  Correctional Health Services and says, Hey, we
16  need to make sure that we've got an adequate
17  testing protocol, you all at Correctional Health
18  Services develop a testing protocol for us and
19  implement it, or is it instead a situation that's
20  more like, DOC says, Well, we -- we just don't --
21  that's not our thing, testing; Correctional
22  Health Services, if you -- if you want to test
23  people, do it, but we're not even going to have
24  anything to do with that conversation?
25    I'm trying to understand does -- is DOC

Page 99

1  exercising overall charge and responsibility for
2  Rikers and using Correctional Health Services to
3  fulfill that function of running a safe and
4  sanitary facility, or are these two separate
5  entities that really are equals to each other and
6  they're each kind of doing their own thing?
7 A  So they're not doing their --
8    MR. THAYER:  Ms. Feeney, I need to
9  object.
10 A  -- own thing at all.
11    THE WITNESS:  Huh?
12    MR. THAYER:  I just said objection, but
13  you can answer, Ms. Feeney.
14    THE WITNESS:  Oh, sorry.
15 A  They're not doing their own thing at all.  We
16  work hand-in-hand very, very closely together
17  with CHS.  They are the medical professionals.
18    Together we work with the public health
19  professionals to come up with the best plan for
20  our agency, but CHS is responsible for the
21  medical care of the incarcerated individuals.
22  And CHS and DOC together figure out what is the
23  best safest way to house people and have
24  everybody safe as can be all the time, and
25  especially during COVID.

Page 100

1 Q  (By Mr. Keenan)  Who does CHS report to
2  ultimately?
3 A  They're a part of HAC (phonetic) and they report
4  to the mayor, I believe, like the rest of the
5  agency.
6 Q  Okay.  But -- but say that DOC thinks that
7  Correctional Health Services is not doing its job
8  well or should do something differently, does DOC
9  have any authority over CHS to change or direct
10  change in the way CHS is doing things?
11 A  So I believe if we didn't agree with something
12  CHS was doing, it would be up to city hall to
13  determine which way it should go.  They are --
14  they are equal partners that work with in this.  We
15  are responsible for care, custody and control,
16  getting people ready to go back into the
17  community, and CHS is responsible for the medical
18  staff.
19    But I can tell you throughout COVID,
20  our commissioner, Patsy Yang, those of us in the
21  executive team worked daily, hourly, nightly,
22  weekends with CHS to come up with the best
23  possible program and procedure that we could to
24  keep our incarcerated individuals safe, whether
25  it was recommending that they get released

Page 101

1  because of their risk level, whether it was
2  creating this whole new housing system that we
3  never had before.  So we work very well together.
4 Q  All right.  So to go back to the issue -- you
5  said DOC's responsibilities, one of them is to
6  prepare inmates to go back in to the community,
7  if that's where they're headed, right?
8 A  Uh-huh.
9 Q  Is that a yes?
10 A  Yes.
11 Q  Okay.  Is part of that to ensure that once they
12  get discharged, that they are not a threat to the
13  community?
14 A  Well, I don't know that we could ever say who is
15  discharged is not going to be a threat to the
16  community, but --
17 Q  To minimize that threat, to take reasonable
18  measures to minimize it, would you agree with
19  that?
20 A  I would say yes.  But when it comes to doing
21  medical testing, that is CHS' bailiwick.  It's
22  not DOC's bailiwick.
23 Q  Have you discussed with CHS whether to do testing
24  of inmates before they are discharged?
25 A  I have not, no.

Page 102

1    MR. KEENAN:  Let's go to another
2  exhibit and you tell us which number this will
3  be.  It's the Legal Aid letter to of September 4,
4  2020.  I'm not sure if that's been marked yet,
5  Julia, or not.
6    MS. GOKHBERG:  It is not.  It will be
7  Exhibit 32.
8    (Deposition Exhibit 32 marked.)
9    MR. KEENAN:  Okay.  Let's bring that
10  up, please.
11 Q  (By Mr. Keenan)  This is Exhibit 32,
12  Ms. Feeney.  It's a six-page document, a letter
13  dated September 4, 2020 from the Legal Aid
14  Society, written to Commissioner Brann, as well
15  as Elizabeth Glazer in the Mayor's Office of
16  Criminal Justice.  Do you recognize this
17  document?
18 A  Excuse me.  Yes.
19 Q  Okay.  You've seen it before and read it before?
20 A  Yes.
21 Q  Okay.  All right.  Let's go to the second and
22  third pages, you'll see some reports here.  And
23  having read this letter, you would have read this
24  before, some reports of observations of officers,
25  including in August, of officers and staff not

Page 103

1  wearing masks.  And these are just anecdotal
2  observations.  Do you have a position on whether
3  you think this is true or not true?
4 A  I do not.  And because there were no particular
5  dates and times given, there was no way for us to
6  do a video review to see if it was true or not.
7 Q  Is there any process in place for reviewing video
8  at Rikers to determine whether officers and staff
9  are wearing masks or not?
10 A  Yes.  I explained to you earlier that my
11  compliance and safety center has been doing that,
12  while they're doing their regular -- their
13  regular viewing.
14 Q  What's -- what's their process for that?  How do
15  they select what video to review at what times
16  and what locations and for how long?
17 A  So they generally look at live feed because it's
18  a peer mentoring program, so we -- there's a
19  schedule of particular topics that they look at
20  at a particular time, a couple of hours for -- on
21  particular days.  And while looking at those
22  things, if we see that staff are not wearing
23  their masks, then we'll call and ask them to do
24  so.  And for the most part -- actually, I think
25  all the time, I don't think once they had to call

Page 104

1  me to tell me somebody refused to put their mask
2  on.
3    So if Legal Aid had given us actual
4  dates and times, we could have gone back to video
5  and see if these were, you know, were truthful.
6 Q  Did you follow up and ask for specific dates and
7  times?
8 A  I did not speak to the Legal Aid Society, no.
9 Q  Do you know if anybody else did?
10 A  I do not.
11 Q  We talked earlier today about discipline.  Where
12  will we find out whether anyone has been
13  disciplined, or where would documentation of
14  discipline, if there has been any, for not
15  wearing masks or gloves, where would that be
16  contained?
17 A  Okay, there's no mandate to wear gloves.
18 Q  Okay, so masks, let's deal with masks.  Where --
19  where -- if there has been any discipline for not
20  wearing a mask by a staff member, where would
21  that be documented, if anywhere?
22 A  If it is going through progressive discipline,
23  the first level would be in the facility because
24  that would have been a corrective interview.
25    Then if a CD, a command discipline, was

Page 105

1  issued, that would be in the CD's computer
2  application.  I don't know what you call it,
3  their computer application that all the command
4  disciplines are in.
5    And for non-uniformed staff, again if
6  it went above a corrective interview, it would be
7  labor relation.
8 Q  Do you know why there was only a directive to use
9  infrared thermometers issued in September, why it
10  took that long to issue a directive on that?
11 A  Because we were using the handheld thermometers
12  prior to that.  And the infrared cameras are --
13  their camera that you -- when you walk in the
14  building, it kind of reads your heat signature.
15  Before that, we used handheld thermometers that
16  someone held and had up to your head.
17 Q  We talked today about audit reports, what -- can
18  you walk us through what the process is for
19  audits and how that process works?
20 A  Sure.  Each captain is required to audit their
21  assigned areas three times during an eight-hour
22  period normal tour.
23    There is an audit form that has them
24  check the things:  Is there soap, are the
25  incarcerated individuals wearing masks, do they

Page 106

1    have masks, are the staff wearing masks, are
2    there masks available in the housing unit areas,
3    are sanitation supplies available, and it lists
4    the different ones out, and did you receive any
5    complaints from the incarcerated individual.  It
6    seems like there's one other thing that I'm
7    missing.  Oh, and what time was the last
8    sanitation performed.
9          If any of those things are found to not
10   be in compliance, the captain is required to
11   abate it immediately.  That report gets submitted
12   at the end of the tour to the tour commander and
13   it then gets forwarded to the chief of facility
14   operations and AC Antoine (phonetic.)
15         And then in addition to that, my staff
16   and the chief of facility operations staff go and
17   audit four or five housing areas in the intake
18   every day in different facilities, they rotate
19   the housing areas, so it's like an audit of an
20   audit.
21         And then we have -- and they'll do the
22   same thing, and then we have the cast monitoring.
23   So there's a lot of people looking at this, not
24   to mention the managers and supervisors who are
25   touring on the facilities regularly.

Page 107

1  Q   Where is this all documented, where are these
2    reports kept?
3  A   They're uploaded on a Z drive on your computer
4    system.
5  Q   Have your audits, the audits conducted by you and
6    your team, the audits of the audits, found any
7    deficiencies in the availability of anything
8    ever?
9  A   Maybe once or twice but not -- no, we are -- if
10   they do find anything, it's abated right away.
11   The thing -- I think they found, probably more
12   than anything, would be an inoperable dispenser,
13   and then until maintenance repairs it, we would
14   get the chemicals from the adjacent housing area.
15 Q   You said an inoperable dispenser, what would that
16   mean?
17 A   So the dispenser that I spoke to you about, once
18   or twice we found inoperable dispensers that had
19   to be repaired, like the knob popped off or the
20   hose popped off or the hose popped off type
21   thing.  So the staff has instructed to get the
22   chemical from the adjacent housing area.
23         Most housing areas have an A and B side
24   and a north and south side, so it's easy to get
25   the chemicals from the adjacent side, and that's

Page 108

1    what we do until maintenance repairs the
2    dispensers.
3          MR. KEENAN:  Looking over some notes
4    here.
5          MR. THAYER:  It's 3:03.  I'm not sure
6    how much further you have to go, but --
7          MR. KEENAN:  No, I think I'm done.
8    Give me -- give me one minute just to check with
9    the other folks on my team.  I mean, if we have
10   any more, it's like literally two minutes.
11         THE WITNESS:  No problem.
12         MR. KEENAN:  Just give me a second
13   here.  I'm going to pause the recording.
14         (Off the record.)
15         MR. KEENAN:  We're back on the record
16   after a short break.  Very close to being done
17   here, Commissioner Feeney.
18 Q   (By Mr. Keenan)  So what I'd loop back to
19   staff, would you agree with me that at this
20   present point in time, the biggest risk for an
21   inmate contracting COVID would come from
22   exposure to staff who might be bringing COVID
23   in from outside the facility?
24 A   Yes.
25 Q   Okay.  So, and I know we've talked a lot about

Page 109

1    testing today so forgive me if we've already
2    discussed this, but I want to make sure it's
3    clear on the record.  There is no process in
4    place right now for the regular testing of staff,
5    correct?
6  A   Correct, although there is the ability there for
7    staff to get tested whenever they want to.
8  Q   If they choose to?
9  A   Correct.
10 Q   Okay.  But there is no mandatory testing of
11   staff?
12 A   No.
13 Q   So there's no process in place like each staff
14   member gets tested every two weeks or at any
15   regular interval, correct?
16 A   No.
17 Q   And there is no process for random testing of
18   staff, is there?
19 A   No.
20 Q   Okay.  Commissioner Feeney, are there any answers
21   you gave today that you feel the need to correct,
22   change or amend in any way?
23 A   I don't think so.
24         MR. KEENAN:  Okay.  I appreciate your
25   time today and I have no further questions for

Page 110

1  you at this time.

2      THE WITNESS:  Thank you so much.  Have

3  a great day.

4      MR. KEENAN:  You, too.  No questions

5  from the City?

6      MR. THAYER:  No.

7      MR. KEENAN:  Okay.  All right.  Thank

8  you so much and I appreciate everybody's time.

9  Everybody have a really good rest of your day.

10      (Deposition concluded.)

Page 112

1      CERTIFICATE

2  STATE OF MISSOURI    )

3                       )  SS.

   COUNTY OF JACKSON    )

4

5      I, TRICIA D. TATE, a Certified Court

   Reporter, do certify that pursuant to Notice to

6  Take Deposition, via videoconference,

7

8      PATRICIA FEENEY

9

10  came before me, was by me duly sworn to testify

    the whole truth of her knowledge of the matters

11  in controversy aforesaid, was examined and her

    examination then written in shorthand by me and

12  afterwards typed, the reading and the signing

    of the deposition being expressly requested by

13  witness, and said deposition is herewith

    returned.

14      I further certify that I am not

    counsel, attorney, or relative of either party,

15  or clerk or stenographer of either party, or

    otherwise interested in the event of this suit.

16

17      IN TESTIMONY WHEREOF, I have hereunto set my

    hand and seal this 23rd day of November, 2020.

18

19

20          /s/Tricia D. Tate

            Missouri C.S.R. 1240

21          Kansas C.C.R. 1609

Page 111

1      I, PATRICIA FEENEY, have read the foregoing

2  deposition, and hereby affix my signature that same

3  is true and correct except as noted above.

4      _____

5          PATRICIA FEENEY

6

7  STATE OF_____:

8  COUNTY OF_____:

9

10      Before me,

    on this day personally PATRICIA FEENEY, known to

11  me (or proved to me on the oath of

                          or through (description of

12  identity card or other document) to be the person

    whose name is subscribed to the foregoing

13  instrument and acknowledged to me that they

    executed the same for the purposes and

14  consideration therein expressed.

15

16      Given under my hand and seal of office

    this_____day of_____, 2020.

17

18  Notary Public in and for

    the State of_____:

19

20  My Commission expires:

21

22

23      JEAN AZOR-EL, et al.

24          VS.

25      CITY OF NEW YORK, et al.