OFFICE OF COMPLIANCE CONSULTANTS
5 WEST 15th ST · HIGH IMPACT COMPOUND ·  MERCADO TRAILER · EAST ELMHURST, NY 11370

# Report on Environmental Conditions

*Benjamin v. Brann, 75 Civ. 3073 (LAP)  Progress Report, May  –  August 2020*

Nicole N. Austin–Best
10/15/2020

## I.  INTRODUCTION

The Office of Compliance Consultants ("OCC") is authorized to monitor the

Defendants'—the City of New York's ("NYC") and the NYC Department of Correction's

("DOC" or the "Department")—compliance with the Court's mandates contained in various

orders: the Order re: Fire Safety, dated November 13, 1998; the Order on: Environmental

Conditions (the "Environmental Order"), dated April 26, 2001; the Order re: Testing and Repair

of Ventilation Systems (the "Ventilation Order"), dated November 14, 2003; the Amended

Supplementary Order re: Repair and Renovation of Ventilation Systems (the "Am. Supp.

Ventilation Order"), dated February 11, 2009; the Amended Order re: Lighting Conditions (the

"Am. Lighting Order"), dated October 7, 2010; the "so ordered" Stipulation concerning

withdrawal of sanitation motions and steps to improve sanitation (the "Sanitation Stipulation"),

dated October 14, 2010; the Supplemental Order re: Construction Projects Required by Amended

Supplementary Ventilation Order, dated October 20, 2011; and the Second Supplemental Order

re: Construction Projects Required by Amended Supplementary Ventilation Order, dated

December 18, 2012.

This report summarizes the status of sanitation, ventilation, lighting, and fire safety

within various New York City jails as reviewed by OCC during May–August 2020 (the

"monitoring period").  A discussion of complaints reported to OCC by The Legal Aid Society's

Prisoners' Rights Project ("LAS" or "Plaintiffs," sometimes "Plaintiffs' counsel") conclude this

report.  As required by the Order re: Timetable for Submission of OCC Progress Reports, dated

January 19, 2007, a draft of this report was circulated to the parties for review and comment.  In

accordance with longstanding practice, the parties' comments to the draft report are incorporated

into this final version and appended to this report.  The Plaintiffs' counsel sought and obtained

an order from the Court for a three-week extension to submit the parties' comments.  OCC's

submission of this final report was delayed accordingly.

## II.   MONITORING OBSERVATIONS

### A.  Sanitation

1.   <u>DOC Sanitation Reports</u>

*a. Defendants' Obligations*

The Environmental Order requires Environmental Health Officers to "make a thorough

inspection of the entire institution in the course of the week and [to] make more frequent

inspections when necessary to respond to particular problems—e.g., inmate complaints." ¶ 3b.

"The [E]nvironmental [H]ealth [O]fficer shall submit . . . reports of all such inspections,

including a description of any ameliorative actions taken, planned [,] or recommended."  *Id*. at ¶

3c.  Public Health Sanitarians are required to conduct "weekly inspections of all facilities as well

as weekly reports of deficiencies" and shall "provide reports on a regular basis to [OCC] with

respect to environmental conditions that are the subject of this Order." *Id.* ¶ 4.  "[E]ach jail has

an assigned Environmental Health Officer [], who is a captain trained by civilian managers (who

are Public Health Sanitarians) at DOC's Environmental Health Unit [], and who conduct regular

sanitation inspections.  In addition, certain areas of jails are also regularly inspected by [] Public

Health Sanitarians themselves."  Jan – April 2019 Report at FN1.

*b. Defendants' Performance*

During this monitoring period, OCC received redacted Public Health Sanitarian ("PHS")

reports and Environmental Health Officer ("EHO") weekly reports from the Environmental

Health Unit ("EHU"), intermittently, from May 5 – August 13.  The PHS reports consisted of

inspections conducted March 23 – July 31, 2020 and EHO reports of inspections conducted

March 9 – July 17, 2020.  Each PHS report is comprised of individual inspections of several intake and living areas carried out on a specific date.  The EHO reports, in comparison, are not comprised of individual inspections, but include several locations on each inspection report, dated for a specific day or several days depending on the facility.  The PHS and EHO reports are provided to OCC as individual pages of larger reports instead of full reports since certain of the inspections involve matters or locations that are not currently subject to *Benjamin* monitoring.  For example, OCC does not monitor staff areas, clinics and medical locations, and pantries; accordingly, some of the report pages provided to OCC are redacted for the same reason.

Given the different formatting of the EHO reports and the reporting differences among the individual facilities, which make it difficult to ascertain violation dates, e.g. reporting period covering a day in some facilities versus one week in others, those reports have not been reviewed in this report.  Moreover, these reports are not formatted for *Benjamin* compliance rating and would take an inordinate amount of time for OCC to reformat and calculate.  Nonetheless, the PHS and EHO reports, collectively, provide a snapshot of the conditions observed by the Sanitarians and Officers at a given time and aid in the ongoing assessment of the sanitation conditions within the jails.  OCC's review of the current monitoring period's PHS and EHO reports, as submitted by the EHU, indicates some improvement in the Defendants' compliance.

### c. Defendants' Compliance

The Defendants are not yet in substantial compliance with the Court's sanitation mandates.   Eighty percent (with zero housekeeping management observations) is the agreed upon minimum compliance percentage for the Department to meet accepted sanitation standards in individual intake and living areas and although there has been improvement in intake areas,

the DOC has not met this standard in a significant number of instances.[1]  OCC's analysis of the

PHS findings indicates that during 168 inspections of intake and living areas in May – July 2020,

76% indicated compliance, but significantly, in living areas, the Defendants' compliance is 60%.

*i.*      *OCC Methodology and Analysis*

OCC randomly selected the following thirty living areas plus all intake areas to review for

compliance with the sanitation mandates during the monitoring period:

| | | Living Areas | | | | | Intake Areas | |
|---|---|---|---|---|---|---|---|---|
| *1* | AMKC | 1 Top | *16* | OBCC | 3 Lower | *1* | AMKC | Main Intake |
| *2* | AMKC | 4 Upper | *17* | OBCC | 3 North | *2* | AMKC | C-71 Intake* |
| *3* | AMKC | Mod 1 Upper A | *18* | OBCC | 5 West | *3* | GRVC | Intake |
| *4* | AMKC | Mod 9 B | *19* | OBCC | 7 Lower | *4* | MDC | Main Intake |
| *5* | AMKC | Quad Lower 13 | *20* | RMSC | Building 1 | *5* | NIC | Annex Intake |
| *6* | AMKC | Quad Upper 12 | *21* | RMSC | Building 2 | *6* | NIC | Main Intake |
| *7* | AMKC | West 17 Lower A | *22* | RMSC | Building 3 | *7* | OBCC | Main Intake |
| *8* | AMKC | West 17 Upper A | *23* | RMSC | Infirmary* | *8* | OBCC | Tower Intake* |
| *9* | GRVC | 11B (Quad 4) | *24* | RNDC | 5 Lower South | *9* | RMSC | Intake |
| *10* | GRVC | 4B | *25* | RNDC | 6 Upper South | *10* | RNDC | Intake |
| *11* | GRVC | 7A | *26* | VCBC | 2 BA | *11* | VCBC | Intake |
| *12* | GRVC | 8A | *27* | VCBC | 3 CB | *12* | West Facility | Main Intake |
| *13* | GRVC | 9B | *28* | West Facility | Sprung 10 | *13* | West Facility | CDU Intake |
| *14* | MDC | 5 West | *29* | West Facility | Sprung 11 | | | |
| *15* | NIC | 2C | *30* | West Facility | Sprung 12 | * | no inspections during monitoring period | |

The Court requires that "[s]hower facilities, janitors' closets, laundry areas, and toilets,

washbasins, sinks and other personal hygiene and sanitation facilities . . . shall be thoroughly

cleaned and sanitized at least once daily and more often if necessary."  Environmental Order ¶

---

[1] [[T]he parties' experts and OCC's expert] adopted the 80% score with no sanitation management citations as the scoring criteria to determine a units (sic) pass or failure. The Department felt that a housekeeping score of 80% was easily achievable. The group felt that no sanitation management issues should exist, as these constitute the highest threat to human health.

2013 ENVIRONMENTAL HEALTH INSPECTIONS FOR NEW YORK CITY JAIL FACILITIES AT RIKERS ISLAND at 3.

11(a).[2]  The Department has removed most laundry areas, but the other types of sanitation

facilities remain and are present in intake and living areas.

Intake Areas

OCC reviewed 101 inspection reports of the intake areas in AMKC, GRVC, MDC, NIC,

OBCC, RMSC, RNDC, VCBC, and West Facility during May – July 2020.  Compliance ratings

ranged from 62.16 (West Facility Main Intake on 7/31/20) to 100.00[3] (West Facility CDU Intake

on 6/12/20).  PHS reports indicate intake areas improved in compliance during this monitoring

period, from 62% during last monitoring period to 86% during this monitoring period.[4]  A

number of factors may contribute to this remarkable increase as the Defendants reported working

with staff to improve compliance in these areas.  Per Plaintiffs' counsel, "Whatever lessons may

be learned from the improvement in intake areas should be of interest in improving other areas

and will be essential should we seek remedial measures before the Court."  Pls.' comments at 2.

Living Areas

In addition to the Court's requirement, mentioned above, "Every living area (cells,

dormitory, and modular sleeping areas, and showers/bathrooms in each of these units)

shall be thoroughly cleaned and sanitized each week." Environmental Order ¶ 11(c).   Further:

> Each housing area shall have an adequately ventilated janitor [sic] closet equipped with a
> sink, or accessible to a sink, and shall have an adequate supply of cleaning implements and
> supplies, accessible to all detainees, so that each detainee can clean his cell daily and so

---

[2] This provision of the Environmental Order also requires that showers be power washed with a bleach solution on a quarterly basis. By Order re: Power Washing, dated December 14, 2010, the Court suspended this mandate and permitted the Department to steam clean or use less-damaging measures in an effort to preserve tile work.

[3] The EHU rated West Facility CDU Intake as having 100% compliance on 5/14/20; however, the corrected rating is 95.24 since the slop sink in the janitor's closet was not clean.  Per the "Housekeeping and Sanitation Inspection Strategy and Evaluation Matrix" developed by the *Benjamin* sanitation experts, clean means to be "visibly free from foreign matter such as dirt, accumulated organic or inorganic matter, or impurities; unsoiled."   The PHS noted that the slop sink was "slightly dirty."

[4] West Facility intake areas were not inspected during the previous monitoring period.

that common areas of the housing blocks can also be cleaned.  All cleaning implements shall be cleaned thoroughly after each use and stored in a clean, adequately ventilated place.

*Id*. ¶ 11(f)–(g).

OCC reviewed 67 inspection reports of living areas in AMKC, GRVC, MDC, NIC, OBCC, RMSC, RNDC, VCBC, and West Facility during May – July 2020.  Compliance ratings ranged from 70.00 (AMKC Mod 1UA on 7/22/20[5] and GRVC 11B on 7/20/20) to 97.78 (OBCC 3 Lower on 6/17/20).  Three living areas that were surveyed during the last monitoring period were randomly selected again and surveyed during this monitoring period. The compliance ratings were similar from last monitoring period to the current period, indicating no improvement in these specific areas.

| Facility | Living Area | Inspection Date | Compliance Rating |
|---|---|---|---|
| | | 1/29/2020 | 76.00 |
| | | 2/18/2020 | 73.81 |
| GRVC | 11B | 5/11/2020 | 71.43 |
| | | 6/18/20 | 74.00 |
| | | 7/20/2020 | 70.00 |
| Facility | Living Area | Inspection Date | Compliance Rating |
| | | 1/8/2020 | 84.00 |
| GRVC | 8A | 2/3/2020 | 73.47 |
| | | 5/8/2020 | 82.00 |
| | | 7/13/2020 | 72.00 |
| Facility | Living Area | Inspection Date | Compliance Rating |
| | | 1/30/2020 | 85.00 |
| | | 2/18/2020 | 75.00 |
| RNDC | 6 Upper S | 5/12/2020 | 78.57 |
| | | 6/16/20 | 78.57 |
| | | 7/13/2020 | 76.79 |

---

[5] The EHU incorrectly included the mental health office in the inspection and calculation of the housing area. OCC removed the location from the calculation and corrected the compliance rating to 70.00.

Ultimately, PHS reports indicate living areas declined in compliance during this monitoring period, from 64% during the previous monitoring period to 60% during this monitoring period.

<u>Vacant Cells</u>

The Defendants were additionally not compliant in cleaning and maintaining vacant cells according to the Court's mandate that '[e]very cell shall be thoroughly cleaned and sanitized upon becoming vacant, shall be kept clean of garbage and debris while vacant, and shall be inspected prior to reoccupancy to ensure that it is cleaned and sanitized."  Environmental Order ¶ 11(c).  In the sample reviewed by OCC, the Sanitarians visited one hundred two vacant cells, twelve of which were inspected twice during the monitoring period, resulting in 114 inspections.[6]  Of the 114 vacant cell inspections conducted by the Sanitarians in the areas surveyed by OCC during the monitoring period, 99 (87%) of those inspections yielded a combined 343 violations, as detailed in Att. 1. When compared to the previous monitoring period, there is no marked improvement.

Undoubtedly, the Defendants need to improve sanitation in living areas and are encouraged to apply similar tactics as employed in the intake areas.  Per the Defendants, "[t]his is not that easy due to the differing environments."  Defs.' comments at 3.  Reportedly, the frequent turnover of inmates in the housing areas is an issue because sanitation is their responsibility.  *Id.*  The Defendants must understand that sanitation training and supervision of inmates are the Department's responsibility and regardless of where an inmate is housed, he or she is supposed to have undergone the same training and held to the same standards; consequently, no matter where an inmate is housed he or she should be cognizant of the sanitation protocols and disciplined as necessary when procedures are not followed.  DOC staff

---

[6] One cell, #10 in RMSC Bldg. 2, had no violation during both inspections.

members are additionally responsible for overall sanitation and should also be held accountable

for deficiencies.  The Defendants report that when deficiencies are found the PHS interview area

staff and supervisors and review procedures as necessary.  Defs.' comment at FN1.  Further, "[a]

memo is also typically sent to the Warden informing him or her of the issue, and to further

reiterate the importance of adhering to departmental policies."  *Id.*  OCC is familiar with this

practice and has previously received copies of such memoranda when protocols were not

followed; however, OCC received no such memo during this monitoring period and none was

produced in response to the issues reported by OCC.

A review of the inspection protocol, violations observed during the PHS inspection, and

analysis of the inspections may be helpful toward assessing, improving, and achieving overall

compliance.

<u>Inspection Protocol</u>

During PHS inspections, compliance is assessed in eleven categories, discussed below, using

a binary scoring method of "0" if the location meets accepted standards or requirements and "1" if

the location does not in the particular category. This binary system means that a score can be placed

in the applicable field only if an assessment was made.  Scoring a location in a category for which it

was not assessed skews the compliance rating and makes it inaccurate.  (The effect is similar when

non-*Benjamin* locations (such as staff areas and clinics and medical locations) are included in

inspections for this litigation.) An example of the inspection form is immediately below for

reference.  The sum of scores of each location in an intake or housing area is then calculated to

produce a component trend score, for which "reduced sampling scoring must be 3 or less for the

housing component to be considered to have met sanitary standards or requirements on all rows

except the General, Day Room Furnishings, and Dormitory Bed rows which must be 2 or less."

The compliance percentages are automatically calculated when the electronic inspection reporting form is used because the formula is embedded in the form, an Excel spreadsheet.  Manually, the compliance percentages can be calculated as follows:

$$\frac{the\ sum\ of\ the\ component\ trend\ scores}{the\ count\ of\ scores} - 1$$

The compliance percentage must be 80.00 or higher for an intake or living area to be compliant; however, if there is at least one observation of cleaning and sanitizing procedures not being followed, lack of cleaning chemicals, inadequate cleaning equipment and equipment station, or inadequate water facilities, the area fails the inspection, regardless of score.  An example of this protocol is seen in the sample inspection form below: the area's housekeeping compliance is 81.36%, but it does not pass the inspection because cleaning and sanitizing procedures were not followed in at least one instance.

*Benjamin v. Brann*
75 Civ. 3073 (LAP)

**Environmental Conditions**
**May – August 2020**

NEW YORK CORRECTION DEPARTMENT          NEW YORK CITY JAILS

Facility Name: _____
Date of Inspection: _____

Unit: _____
Type: _____

## CRITICAL SANITARY CRITERIA

| Unit Component | Management/Sanitation | | | | | Housekeeping | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CLEANING & SANITIZING PROCEDURES FOLLOWED | LACK OF CLEANING CHEMICALS | INADEQUATE CLEANING EQUIP & EQUIP SANITATION | ADEQUATE WATER FACILITIES PROVIDED | PRESENCE OF VERMIN OR INDICATOR ORGANISMS | UNCLEAN TO SIGHT | ORGANIC SOIL ACCUMULATIONS | SURFACES SMOOTH & EASILY CLEANABLE | PRESENCE OF ODORS | INADEQUATE LIGHTING | Ventilation | COMPONENT TREND SCORE | INSPECTION NOTES (Place X in box) |
| GENERAL | 1 | 0 | 0 | 0 | 0 | | | | | | | 1 | |
| Showers | | | | | | 1 | 0 | 1 | 0 | 0 | 0 | 2 | |
| Toilet Area | | | | | | 1 | 0 | 0 | 0 | 0 | 0 | 1 | |
| Day Room (general) | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Day Room (toilet) | | | | | | 1 | 0 | 1 | 0 | 1 | 0 | 3 | |
| Day Room (furnishings) | | | | | | 0 | 0 | 0 | 0 | | | 0 | |
| Utility/Janitor Room | | | | | | 0 | 0 | 0 | 0 | 1 | 0 | 1 | |
| Storage | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Cell ( Cell # : ) | | | | | | | | | | | | 0 | |
| Cell ( Cell # : ) | | | | | | | | | | | | 0 | |
| Cell ( Cell # : ) | | | | | | | | | | | | 0 | |
| Cell ( Cell # : ) | | | | | | | | | | | | 0 | |
| Sleeping Area (General) | | | | | | 0 | 0 | 0 | 0 | 0 | | 0 | |
| Dormitory Beds | | | | | | 1 | 0 | 0 | 0 | 0 | | 1 | |
| Common Area | | | | | | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | |
| | | | | | | | | | | | | | |
| **UNIT COMPONENT TOTALS:** | 1 | 0 | 0 | 0 | 1 | 4 | 0 | 3 | 0 | 2 | 0 | | |
| **Management/Sanitation Compliance Score:** | 1.00 | | | | | | | | | | | | |
| **Housekeeping Compliance Percentage:** | 81.36% | | | | | | | | | | | | |
| **Housekeeping Compliance:** | YES | | | | | | | | | | | | |
| **Total Unit Compliance:** | NO | Unit must have a yes in this box to be in compliance | | | | | | | | | | | |

Scoring:

Yes= Met standard or requirements.

Non Plus= not met standard or requirements.

Blank = Not Applicable

1= Does not meet accepted standards or requirements.

0= Meets accepted standards or requirements.

xx= see inspection notes

Component Trend Score: Reduced Sampling scoring must be 3 or less for the housing component to be considered to have met sanitary standards or requirements on all rows except the General, Day Room Furnishings, and Dormitory Bed rows which must be 2 or less.

Final EH Critical Criteria Inspection Ranking2 example: Example 1

**Note: Housekeeping passes passes with >80 % but Unit fails on sanitation**

*Benjamin v. Brann*                                                    **Environmental Conditions**
75 Civ. 3073 (LAP)                                                    **May – August 2020**

ii.      *Discussion of Findings*

The PHS inspections found 1931 violations distributed across all facilities, in the categories listed in the chart, immediately below, and the details of the violations observed in the categories are specified below or attached, if not identified here.  The inspection findings are discussed below in terms of the housekeeping inspection matrix developed by the expert sanitarians.

| Violation Category | Count of Violations |
|---|---|
| **Cleaning and Sanitizing Procedures (not) Followed–Management Violation** | 2 |
| **Inadequate Cleaning Equipment and Equipment Station–Management Violation** | 4 |
| **Vermin–Management Violation** | 43 |
| **Unclean to Sight** | 1072 |
| **Organic Soil Accumulations** | 51 |
| **Surfaces (not) Smooth and Easily Cleanable** | 467 |
| **Presence of Malodors** | 1 |
| **(Inadequate) Lighting** | 55 |
| **Obstructed Light Shield**[7] | 2 |
| **Ventilation** | 234 |

The following evaluative housekeeping criteria are taken directly from the training material and are used to assess compliance during sanitation inspections and apply to the PHS inspections undertaken during this monitoring period.  The following discussion is limited to the PHS inspections surveyed by OCC and does not represent all inspections undertaken during the May–August 2020 monitoring period.

---

[7] This is not a category developed by the expert sanitarians. It is a DOC housekeeping criterion that impacts the condition of light shields, which affects lighting and sanitation; accordingly, observations are recorded during PHS inspections.

**ADMINISTRATIVE and MANAGERIAL OBSERVATIONS** – The following five criteria apply

to all areas, and at least one observation of any of the first four causes the area to fail the inspection.

| 1.   CLEANING AND SANITIZING PROCEDURES (NOT) FOLLOWED |
| --- |

    a)  uniform sanitary procedures as detailed in policies and procedures not followed
    b)  cleaning frequency inadequate to maintain proper sanitation
    c)  policy is inadequate to address soiling of the unit
    d)  no evidence of training of inmates to housekeeping policy
    e)  disposable gloves and other personal protective equipment not available, provided or used as per manufacturer's label requirements and/or institutional policy

Verification of these criteria is by indicating <u>two</u> or more of the following:
- lack of adherence to established policies and procedures
- no notation in unit log (schedule or frequency)
- absence of training materials or instructional postings in critical housekeeping areas
- direct chemical test of finished disinfectant solution
- negative responses to inmate and/or staff interviews

        There were two instances, limited to West Facility, in which the EHU determined that the

Department's cleaning and sanitizing procedures were not being followed.  West Facility's Main

Intake had no goggles on 7/31/20 and had a compliance score of less than 80.00, so the area did not

pass inspection even without the management violation.  In West Facility Sprung 12, the institutional

aide[8] had a spray bottle with an unknown solution on 6/24/20.  If this did not occur, the housing area

would have passed inspection, with a compliance score higher than 80.00.  The Defendants

minimize the seriousness of these violations, stating "these deficiencies did not transform the

otherwise clean housing areas into unsanitary living areas."   Defs.' comments at 3. Foremost,

inmate safety is compromised without the availability of goggles, which could result in serious

---

[8] Management of Institutional Aides at the Communicable Disease Unit (CDU) and North Infirmary Command (NIC).

"The Assistant Commissioner for Environmental Health is responsible for supervising the supervising housekeepers at the CDU and NIC to develop proper cleaning protocols and schedules and to provide technical support.  The facilities' commanding officers are responsible for the day-to-day supervision of the supervising housekeepers." DOC Directive 3900R-A Environmental Health Program.

injury or refusal to undertake sanitation responsibilities for lack of personal protective equipment.

Unknown chemicals could cause an adverse reaction or simply be ineffective for the condition that

needs to be remedied.  These are serious matters and OCC agrees with the classification of these

instances as management violations but believes there are four additional instances not so classified

by the EHU.

> ➢ In GRVC 7A, there was no sanitation manual on 7/6/20 and, in GRVC 8A, there were
>
>     outdated English and Spanish sanitation posters on 7/13/20.  Neither of these housing areas
>
>     passed inspection with compliance scores of less than 80.00.

> ➢ MDC 5 West had no English sanitation posters on 5/27/20 and 6/23/20.  The housing area
>
>     had a compliance score less than 80.00 during the first inspection and did not pass but had a
>
>     higher compliance score during the latter and passed that inspection.

2.  LACK OF CLEANING CHEMICALS
    a)  cleaning chemicals not provided at the unit
    b)  par levels not appropriate to the unit
Verification of the deficiency is by any <u>one</u> of the following:
- boundary markers in inventory levels that signal replenishment is necessary not established, or,
- amount or level considered to be adequate, not maintained, or,
- absence of a standard quantity as established by policy

There were no reported instances of a lack of cleaning chemicals during the PHS inspections,

making it puzzling that the institutional aide mentioned above opted to use an unknown solution

instead of the authorized cleaning chemicals, and, as discussed below, there were four instances

where an inappropriate chemical was found in the possession of staff and inmates or the machine to

dispense the appropriate chemical was inoperable.  If these latter four instances do not represent a

lack of cleaning chemicals, OCC believes they are indicative of a failure to follow the cleaning and

sanitizing procedures more than inadequate equipment.  In any case, it would be helpful for the EHU

to inquire why staff and inmates opt for inappropriate cleaning chemicals when such instances are observed.

| 3.   INADEQUATE CLEANING EQUIPMENT AND EQUIPMENT SANITATION |
|---|
| a)  cleaning equipment in poor repair or worn |
| b)  cleaning equipment is visibly dirty and possibly malodorous |
| c)  inadequate storage of housekeeping equipment |
| d)  cleaning equipment storage appurtenances not available for the sanitary and safe storage of mops, brooms and brushes |
| e)  par levels inappropriate to the facility or not established to meet cleaning needs |

There were four instances recorded in this category during the PHS inspections.  In AMKC 1 Top a bottle of Milcide was found in the sleeping area on 5/28/20, but the housing area would not have passed inspection even without this violation as it had a compliance score of less than 80.00.  A Corcraft mold and mildew remover spray bottle was found in AMKC Quad 13 Lower, occupied cell #20, on 7/13/20.  The area would have passed the inspection otherwise.  In OBCC, a bottle of Milcide was found in the Main Intake on 7/10/20.  The area would have passed the inspection otherwise.  The Diversey dispenser, which dispenses cleaning and sanitizing chemicals, was inoperable in OBCC 5 West on 6/10/20 causing the area to fail the inspection.

| 4.   ADEQUATE WATER FACILITIES PROVIDED |
|---|
| a)  utility sink not readily available and/or accessible |
| b)  hot and cold water of adequate flow and pressure not provided |
| c)  absence of a free-flowing drain |

During this monitoring period, there were no instances of inadequate water facilities during the PHS inspections surveyed by OCC.

| 5. | PRESENCE OF VERMIN INCLUDING INDICATOR ARTHROPODS |
|----|---|

Unlike the other four management categories, observations in this category do not cause an

area to automatically fail inspection.

> This criterion is listed under the management section because the presence of vermin or indicator organisms requires subsequent action by the correctional staff in reporting the observable condition.  However, no further action on their part is necessary unless so directed.  If an observation is made, that observation is informational only and does not factor into the overall unit compliance unless it remains unreported or uncorrected.

"Housekeeping Inspection Matrix" at 12.  The inspections reviewed by OCC, indicated that the

Sanitarians observed vermin in all facilities except for VCBC and West Facility, in the instances

listed immediately below.

| Finding | Facility | Area | Location | Date |
|---|---|---|---|---|
| "mice droppings" | AMKC | *1 Top* | janitor's closet | 6/24/20 |
| "mice droppings" | | *4 Upper* | sleeping area | 7/20/20 |
| "mice droppings" | | | storage | 5/28/20 |
| "mice droppings" | | *W 17LA* | sleeping area | 6/22/20 |
| "mice droppings" | RNDC | *Intake* | pen #5 Brooklyn | 7/15/20 |
| ants | RNDC | *Intake* | pen #4 | 6/12/20 |
| dead cockroach on floor | RMSC | *Intake* | showers | 5/12/20 |
| flies in area | OBCC | *7 Lower* | sleeping area | 5/13/20 |
| large roaches (dead and live) | OBCC | *3 North* | cell #26 (vacant) | 6/10/20 |
| live drain flies on wall | AMKC | *W 17UA* | showers | 7/24/20 |
| live drain flies on wall | GRVC | *7A* | showers | 7/6/20 |
| live drain flies on wall | RMSC | *Intake* | showers | 5/12/20 |
| live flies on wall | GRVC | *7A* | showers | 6/10/20 |
| live flies on wall | | *9B* | showers | 5/5/20 |
| live fruit flies | AMKC | *Mod 1UA* | showers | 6/16/20 (wos 6/12/20, 6/14/20, and 6/16/20) |
| live fruit flies | | | dayroom | 7/22/20 (wos 7/10/20) |
| live fruit flies | MDC | *Intake* | pen #3 | 7/10/20 |
| live fruit flies | | | pen #4 | 7/10/20 |
| live fruit flies | | | pen #5 | 7/2/20 |
| live fruit flies | | | | 7/16/20 |
| live fruit flies | | | showers | 7/2/20 |
| live fruit flies | | | | 7/10/20 |
| live fruit flies | | | | 7/16/20 |
| two dead water bugs in light fixture | AMKC | *Main Intake* | pen #8 | 7/16/20 |

| | | | | |
|---|---|---|---|---|
| live ants on floor | AMKC | *4 Upper* | sleeping area | 7/20/20 |
| live ants on floor | | *Mod 1UA* | cell #15 (occupied) | 7/22/20 |
| live ants on floor | GRVC | *8A* | cell #18 (occupied) | 7/13/20 |
| ants in cell | RMSC | *Bldg. 2* | cell #7 (vacant) | 7/13/20 |
| large roach on toilet | RMSC | *Bldg. 2* | cell #6 (vacant) | 7/13/20 |
| flies on window screen | RNDC | *Intake* | middle section pens | 7/15/20 |
| fly at window area | RNDC | *Intake* | pen #6 | 7/15/20 |
| live gnats in area | AMKC | *4 Upper* | toilet area | 7/20/20 |
| live gnats in area | MDC | *5 West* | janitor's closet | 7/29/20 |
| live gnats in area | | *Intake* | common area | 7/30/20 |
| live gnats in area | | | search | 7/23/20 |
| live gnats in area | | | showers | 6/18/20 |
| live gnats in area | | | showers | 7/23/20 |
| live ant in sink | AMKC | *Mod 1UA* | cell #11 (vacant) | 7/22/20 |
| live roaches on floor | GRVC | *11B* | showers | 7/20/20 (wos 7/3/20) |
| flies observed | NIC | *Main Intake* | pen #4 | 7/22/20 |
| two dead water bugs in light shield | AMKC | *Main Intake* | showers | 7/23/20 |
| two dead water bugs in light shield | AMKC | *Main Intake* | showers | 7/30/20 |
| several gnats at every stall | MDC | *Intake* | showers | 7/30/20 |

Per, the "Inspection Matrix" (at 2) that was developed by Mr. Eugene Pepper and the parties'

experts in 2011 and currently used by the Department during its facility inspections.

> This observation was included because housekeeping is a major component of integrated pest management. As such, it is integral to an effective housekeeping program. Because the actual pest eradication is coordinated by a professional pest control technician, who is not under the direct supervision of inmate management administration, it is not controlled as other components of the housekeeping program. Even though this observation is essential in the health and wellbeing of the inmates and staff, it does not factor into the compliance score, but is included as an informational component that requires immediate action when noted.

In three cases, the sanitarian noted that a work order was submitted prior to the latest inspection's

finding of vermin, indicating an ongoing issue: On 7/20/20, the PHS observed "live roaches" on the

shower floor at GRVC 11B and noted that a work order was submitted on 7/3/20 for the area. On

6/16/20, the PHS observed "fruit flies" in the AMKC Mod 1UA shower and noted that work orders

were submitted on two occasions prior to that inspection, which yielded a third work order for the

same issue; likewise, on 7/22/20, the PHS observed "live fruit flies" in the AMKC Mod 1UA

dayroom and noted that a work order was submitted on 7/10/20 for that area.   There is no indication

of the Department's efforts toward remedying the conditions, and the PHS inspections indicate that

indicia of vermin were observed in the same location during different inspections.  Plaintiffs'

counsel finds it "[p]articularly disturbing . . . that DOC has apparently done nothing at all to abate

the presence of vermin in several areas, as well the numerous instances of other repeat violations

going unabated. (citation omitted) This is unacceptable."  Pls.' comments at 2.  The Defendants

report that the areas were treated on several occasions (Defs.' comments at 4); yet, the conditions

remained unabated.  Ultimately, "[t]he Department notes that it faces continued challenges in

staffing all open exterminator positions."  *Id.*

**HOUSEKEEPING OUTCOME OBSERVATIONS** – the following six criteria are direct

observations of physical housekeeping conditions.

1.  Unclean to Sight:
    - presence of loose filth and garbage
    - dust and dirt accumulation
    - soiling of touch points and/or high (common) touch surfaces
    - soiled bed frames and dayroom furnishings
    - soiled utility (janitor's) closet
    - soil imbedded at transition areas such as edges of spalled tile, floor to wall junctions, door jambs, and furnishing floor anchors

The sanitarians recorded 1072 instances, across all facilities, and the instances consist

principally of dirty floors, corners, and junctions; dirty walls; dirty/dusty window screens and

ledges; and dirty light shields.  Att. 2.  In certain cases, the PHS noted that the same condition was

previously reported, indicating that "unclean to sight" observations are not necessarily temporary if

they are not being addressed once reported.

2.  Organic Soil Accumulations in Wet and Moist Areas:
    - organic debris accumulation in and around toilets, urinals, utility sinks, lavatories and showers
    - drain screens[9] not cleaned of hair and debris; partially occluded drains resulting in temporary pooling of water
    - chronic pooling of water and/or presence of chronically wet walking surfaces

As indicated below, the observations in this category consisted mostly of mildew on floors, walls, and ceilings in all facilities except NIC and West Facility.  Pooling of water was limited to two separate instances in the AMKC Intake showers and once in the RMSC Intake's pen #4.

---

[9] Per the Housekeeping Matrix, "If the floor drain is occluded or partially occluded with organic deposits below the drain screen, it cannot be cleaned using regular housekeeping methods.  Therefore, it is not considered a non-compliance issue and a notation of the observation should be made in the comments section on the inspection report."

| Facility | Area | Finding | Location | Date |
|---|---|---|---|---|
|  | 4 Upper | mildew on floor guards | showers | 16-Jun |
| AMKC |  | mildew on junction at wall/floor | showers | 20-Jul |
|  | Main Intake | pooling water at floor corner | showers | 13-May |
|  |  | pooling water at floor corner |  | 19-May |
|  | Q13L | mildew on ceiling | dayroom toilet | 4-May |
|  | W 17LA | mildew on ceiling | showers | 22-Jun |
|  |  | mildew on wall | showers | 22-Jun |
|  | W 17UA | mildew on ceiling | showers | 22-Jun |
|  |  | mildew on wall | showers | 22-Jun |
| GRVC | 11B | mildew on wall/wall junction | showers | 20-Jul |
|  | 7A | mildew on wall | janitor's closet | 10-Jun |
|  |  | mildew on wall |  | 6-Jul |
|  |  | mildew at junctions | showers | 6-Jul |
|  | 9B | mildew on floor | showers | 5-May |
|  |  | mildew on floor |  | 10-Jun |
|  |  | mildew on floor |  | 6-Jul |
|  |  | mildew on junction at wall/floor | showers | 10-Jun |
|  |  | mildew on wall | janitor's closet | 10-Jun |
|  |  | mildew on wall |  | 6-Jul |
|  |  | mildew at junctions | showers | 6-Jul |
| MDC | 5 West | mildew on junction at wall/floor | showers | 29-Jul |
|  |  | mildew on wall | showers | 23-Jun |
|  |  | mildew on door | showers | 29-Jul |
|  |  | mildew on doorframe | showers | 29-Jul |
| OBCC | 5 West | mildew on floor | showers | 5-May |
|  |  | mildew on wall | showers | 5-May |
|  | 7 Lower | mildew on floor | showers | 13-May |
|  |  | mildew on floor |  | 14-Jul |
|  |  | mildew on wall | showers | 13-May |
|  |  | mildew on grout | showers | 14-Jul |
| RMSC | Intake | "flooded water" | pen #4 | 28-May |
|  |  | mildew on floor | showers | 10-Jul |
|  |  | mildew on floor |  | 17-Jul |
|  |  | mildew on floor |  | 31-Jul |
|  |  | mildew on wall | showers | 10-Jul |
|  |  | mildew on wall |  | 17-Jul |
|  |  | mildew on wall |  | 24-Jul |
|  |  | mildew on wall |  | 31-Jul |
|  |  | mildew at junctions | showers | 10-Jul |
| RNDC | 6 Upper S | mildew on floor | showers | 12-May |
|  |  | mildew on wall | showers | 12-May |
|  |  | mildew on floor | showers | 16-May |
|  |  | mildew on wall | showers | 16-May |
|  |  | mildew in toilet | cell #16 (vacant) | 16-May |
| VCBC | 3CB | mildew on ceiling | showers | 23-Jun |
|  |  | mildew on ceiling |  | 30-Jul |
|  |  | mold on ceiling | showers | 20-May |
|  | 2BA | mildew on ceiling | showers | 17-Jun |
|  |  | mildew on ceiling/wall junctions | showers | 17-Jun |

3.  Surfaces (not) Smooth and Easily Cleanable:
    - structural surfaces in poor repair; porous; uneven/irregular/jagged, for example: wall-floor junctions not smooth, rounded, or sealed; cracks, joints and tile grouting not sealed or in good repair
    - beds and/or dayroom furnishings in poor repair

There were 467 observations in this category (Att. 3); however, some are apparently inconsistent and seem to have been recorded during the inspections depending on which sanitarian undertook the inspection, ultimately affecting the outcome of the inspection.  For instance, during the first inspection, the PHS recorded six instances in this category, including in the showers and toilet area and a different sanitarian conducted the second inspection and recorded several of the same instances in the sleeping area, storage, dayroom, and common area, but none in the showers and toilet area. This difference alone—without consideration of the difference in ventilation findings—was a determining factor in whether the housing area passed or failed the inspection.

The foregoing is not a condemnation of the sanitarians and hopefully will not be viewed as a disparagement of the important work that they do daily.  Rather, this issue is raised to illustrate that there is a lack of uniformity amongst the sanitarians during the inspections that could affect the outcomes.  This inconsistency is found in additional categories such as unclean to sight and ventilation observations but is most identifiable in this category due to the relative "intransience" of the instances.  Of course, it is not expected that every sanitarian will observe every violation during all inspections and the observations will vary among inspecting agencies.  Indeed, the Defendants have previously argued about the effect of the variability in the experts' observations during sanitation inspections; accordingly, it would benefit the Defendants to reduce variability among PHS inspection practices to get a more reliable understanding of the inspection findings.  Such an understanding within the EHU will provide a more consistent view of the sanitation conditions to the facilities and ultimately improve compliance.

The Defendants' reported compliance does not incorporate the triggering of management violations based on the frequency of Unclean to Sight, Surfaces (not) Smooth and Easily Cleanable, and Organic Soil Accumulations in a unit.  Per OCC's sanitation expert, Eugene Pepper,

> These three criteria citations point out two critical failure by the institution. The first is the failure to properly clean (Unclean to Sight and Organic Soil Accumulations). The first step in any sanitation operations. This step is basically a soap and water step! This is a failure in procedure . . . . The frequency of these housekeeping failures, over 2 times in any one unit, is evidence of a general failure in following cleaning procedures prior to the sanitation step.  Such high frequencies of this citation trigger the more critical citation for failure to follow "Cleaning and Sanitizing Procedures" a management citation and an automatic non-compliance rating for the unit.

2013 ENVIRONMENTAL HEALTH INSPECTIONS FOR NEW YORK CITY JAIL FACILITIES AT RIKERS ISLAND, at 7.  The Defendants disagree with Mr. Pepper's position, which was supported by Plaintiffs' Counsel's expert during the 2011 sanitation inspection.

4.  Lighting
- less than 10 foot-candles, measured at three feet from the target horizontal surface, or,
- less than optimal lighting from an existing and operational luminary—this includes observable conditions such as dimming or flickering and/or the presence of blackened ends of fluorescent light bulbs

The Defendants' reporting of lighting observations has improved during this monitoring period; however, there is concern that the deficiencies are being ignored or that the inspections are not consistent enough to identify the scope of the delays in abating the deficiencies, in certain cases. For example, the AMKC Main Intake was inspected eleven times and during the first two inspections (conducted by "PHS1") the storage area and janitor's closet were found to have inadequate lighting as evidenced by 3.8 FC in the janitor's closet and 2.1 FC in the storage area with a dirty light shield and "dim light noted" therein, on 5/5/20, and 3.6 FC in the janitor's closet and 1.7 FC in the storage area with a "repeat" observation of a dirty light shield and a "dim light noted," on 5/13/20.

During subsequent inspections, conducted by two different sanitarians:

- 5/19/20: 4.8 FC in janitor's closet; storage inspected for all but lighting (PHS 1)
- 6/9/20: 3.9 FC in janitor's closet; storage inspected for all but lighting (PHS 1)
- 6/19/20: janitor's closet not inspected; storage inspected for all but lighting (PHS 2)
- 6/24/20: janitor's closet not inspected; storage inspected for all but lighting (PHS 2)
- 7/2/20: janitor's closet not inspected; storage inspected for all but lighting (PHS 2)
- 7/9/20: janitor's closet not inspected; storage inspected for all but lighting (PHS 2)
- 7/16/20: janitor's closet not inspected; storage inspected for all but lighting (PHS 2)
- 7/23/20: janitor's closet not inspected; storage inspected for all but lighting (PHS 2)
- 7/30/20: janitor's closet not inspected; storage inspected for all but lighting (PHS 2)

The area passed the first inspection, but failed the second.  The area passed all subsequent

inspections; however, if the lighting had been assessed similar to the first two inspections with

similar findings during subsequent inspections, e.g. 5/19/20, 6/9/20, 7/16/20, the area would not

have passed all of these inspections.

During every inspection throughout the monitoring period, the sanitarians reported that the

lighting in the RMSC janitor's closet was not being maintained and was inadequate in nine of the ten

inspections. In the tenth instance, the PHS was simply incorrect.

- 5/1/20:   2.8 FC   *Inspection Note: R - lighting not maintained—"One light fixture in the janitor room was inoperable."*
- 5/12/20: 2.5 FC   *Inspection Note: R1 – lighting not maintained—"One light fixture in the janitor room was inoperable." "No operational light."*
- 5/19/20: 2.7 FC   *Inspection Note: R - lighting not maintained—"Light fixture in janitor room was inoperable."*
- 5/28/20: 3.2 FC   *Inspection Note: WOS; R3 – lighting not maintained—"no operational light in janitor closet"*
- 6/12/20: 2.1 FC   *Inspection Note: WOS; R4 – lighting not maintained—"Light fixture was flickering and too dimmed."*
- 6/22/20: 1.4 FC   *Inspection Note: WOS; R4 – lighting not maintained—"operational light . . . was dimmed"*
- 7/10/20: 2.1 FC   *Inspection Note: lighting not maintained—"one light fixture . . . was inoperable"*
- 7/17/20: 3.6 FC   *Inspection Note: lighting not maintained—"light fixture noted inoperable"*
- 7/24/20: *Inspection Note: R1– lighting not maintained "one light fixture . . . was inoperable"*
- 7/31/20: 3.8 FC (no inspection note)

The EHU reported that the lighting in the janitor's closet was adequate during the 7/24/20 inspection

despite the inoperable light fixture and maintained that the light reading was *14.8 FC*.  This is highly

unlikely given that the light fixture was not repaired at the time of this inspection and the light

readings during and after this inspection were all exceptionally low, single-digit readings.[10]

| Facility | Area | Finding (foot-candles) | Location | Date |
|---|---|---|---|---|
| AMKC | 1 Top | 4.9 | janitor's closet | 28-May |
| | | 5.0 | janitor's closet | 24-Jun |
| | | 5.6 | toilet area | 24-Jun |
| | | 9.6 | showers | 24-Jun |
| | 4 Upper | 2.5 | janitor's closet | 28-May |
| | | 2.8 | janitor's closet | 16-Jun |
| | | 2.6 | janitor's closet | 20-Jul |
| | Main Intake | 1.7 | storage | 13-May |
| | | 2.1 | storage | 5-May |
| | | 3.6 | janitor's closet | 13-May |
| | | 3.8 | janitor's closet | 5-May |
| | | 3.9 | janitor's closet | 9-Jun |
| | | 4.8 | janitor's closet | 19-May |
| | Mod 9B | 2.8 | janitor's closet | 17-Jul |
| | | "no light fixture" | janitor's closet | 15-Jun |
| | | "no light fixture" | janitor's closet | 19-May |
| | Q13L | 3.4 | dayroom toilet | 8-Jun |
| | | 4.0 | dayroom toilet | 13-Jul |
| | | 4.5 | showers | 13-Jul |
| | | 4.7 | dayroom toilet | 4-May |
| | | 4.8 | showers | 8-Jun |
| | | 4.9 | showers | 4-May |
| | | 7.1 | janitor's closet | 13-Jul |
| | | 7.2 | janitor's closet | 4-May |
| | | 7.2 | janitor's closet | 8-Jun |
| | W 17UA | 9.3 | janitor's closet | 26-May |
| GRVC | 11B | 0.9 | janitor's closet | 20-Jul |
| MDC | 5 West | 8.1 | janitor's closet | 23-Jun |
| | | 8.2 | janitor's closet | 27-May |
| | Intake | 7.9 | showers | 18-Jun |
| | Intake | 8.1 | showers | 25-Jun |
| OBCC | 3 North | 7.2 | janitor's closet | 8-Jul |
| | 5 West | 5.7 | janitor's closet | 8-Jul |
| | | [light reading illegible] | janitor's closet | 5-May |
| | | *Inspection Note: inoperable light fixture* | | |
| RMSC | Intake | 1.4 | janitor's closet | 22-Jun |
| | | 2.1 | janitor's closet | 10-Jul |

[10] Lighting should be adequate enough for cleaning personnel to see soil or soap residues on surfaces. The American Public Health Association Standards for Health Services in Correctional Institutions recommends minimum light intensities for toilets and washrooms be 20 foot-candles, and for corridors and exit ways 10 foot-candles. This consultant (Eugene Pepper) continues to recommend that the utility/janitor closets should have a minimum of 20 foot-candles of lighting as well to better facilitate proper cleaning of these closets.

2013 ENVIRONMENTAL HEALTH INSPECTIONS FOR NEW YORK CITY JAIL FACILITIES AT RIKERS ISLAND, at 16.

The Defendants disagree with Mr. Pepper's recommendation.

| | | | | |
|---|---|---|---|---|
| | | 2.1 | janitor's closet | 12-Jun |
| | | 2.5 | janitor's closet | 12-May |
| | | 2.7 | janitor's closet | 19-May |
| | | 2.8 | janitor's closet | 1-May |
| | | 3.2 | janitor's closet | 28-May |
| | | 3.6 | janitor's closet | 17-Jul |
| | | 3.8 | janitor's closet | 31-Jul |
| | | 14.8 | janitor's closet | 24-Jul |
| **RNDC** | 5 Lower S | 3.5 | janitor's closet | 27-Jul |
| | | 6.8 | janitor's closet | 7-May |
| | Intake | 2.7 | janitor's closet | 9-Jul |
| | | 3.3 | janitor's closet | 29-Jul |
| | | 3.4 | janitor's closet | 22-Jul |
| | | 3.5 | janitor's closet | 15-Jul |
| | | 6.8 | showers | 22-Jul |
| | | 8.1 | showers | 9-Jul |
| | | 9.7 | showers | 15-Jul |
| **West Facility** | Main Intake | 6.9 | janitor's closet | 31-Jul |
| | | 7.1 | janitor's closet | 24-Jul |

Circumstances such as those in AMKC and RMSC should not be allowed to persist without consequence. These repeated and unabated violations—the R in the sanitarians' notes, above, indicate that the violation is a "repeat" followed by the number of instances the violation was reported—indicate a failure a "lack of adherence to established policies and procedures" and the absence of these deficiencies on the EHO reports (i.e. "no notation in unit log") reveal a failure to follow cleaning and sanitizing procedures and should be denoted as such, resulting in a failed inspection for the areas. Permitting these areas to regularly pass inspection despite repeated reports of the same violations sends the wrong message.

5.  Presence of Malodors:
Malodors are those that are classified as those that are distinctly septic, putrefactive, or body odors.

The only instance of malodors was reported in the OBCC Intake's toilet area on 5/22/20.

6.   Ventilation:
  • exhaust ventilation in toilets, showers and utility closets not working
  • exhaust ventilation grills occluded with dust, dirt or sealed with paint

The 234 instances of ventilation deficiencies were reported in all facilities and consisted principally of dirty/dusty vents and partially or fully occluded vents.  In limited instances, the PHS reported that there was no vent.  Att. 4.

*iii.     Recommendations*

The Defendants have made commendable progress toward improving compliance with the *Benjamin* sanitation mandates; however, those advances are concentrated in intake areas and significant deficiencies, revealing noncompliance, remain in living areas.  Overall, compliance may be improved by ensuring that inspections are more uniform and that there are clear consequences for ongoing violations.  Mr. Pepper suggested the following after the 2011 and 2013 inspections:

> Annual or biannual environmental health inspections by an independent third party/consultant should be put in place to insure:
>
> A.   Verification of proper inspection and reporting by "in house" inspectors.
>
> B.   Verification of proper management follow through to correct unsanitary conditions reported by inspectors.
>
> C.   Provide a training opportunity for OCC and Department inspectors.
>
> D.   Determine the progress, the lack thereof, and/or level of sanitation improvements the institution makes over time. One inspection with this new protocol does not establish the fact that DOC facilities have met compliance criteria.

The Defendants rejected Mr. Pepper's suggestions, stating, in 2012, "The Department believes that the monthly inspections performed by the NYC Department of Health and Mental Hygiene and the inspections performed by the Department's public health sanitarians are sufficient oversight."  (As noted below, the monthly inspections by DOHMH inspectors were suspended due to Covid-19.)

OCC believes that another expert sanitation inspection would be very beneficial to the *Benjamin* litigation to (1) assess the Defendants' overall progress made toward compliance, (2)

review the existing protocol to determine whether modifications need to be made, and (3) to

establish the training needs of OCC and EHU.  At this time, OCC has no staff to carry out

inspections and it would be expedient to wait until after an expert inspection to obtain and train staff

to undertake sanitation inspections.  OCC requests that an expert inspection be arranged for Spring

2021.

      2.  <u>DOHMH Inspection Reports</u>

      The Environmental Order requires the NYC Department of Health and Mental Hygiene's

Division of Environmental Health, hereinafter "DOHMH," (formerly DOH) to "thoroughly

inspect each jail at least once every month . . . submit to [OCC] . . . reports of all such

inspections, and the [DOC] shall provide [OCC] with a description of any ameliorative actions

taken, planned or recommended." Environmental Order at ¶ 6–6(a).  As reported during the

previous monitoring period, by Order dated March 24, 2020, the Court suspended "Paragraph

"6" of the April 26, 2001 Order on Environmental Conditions . . . during the current public

health crisis" and ultimately the DOHMH's inspection and reporting requirements, temporarily.

      Plaintiffs' counsel requests that "the final Report discusses what, if any, impact OCC

believes the suspension of these inspections has had on the sanitation of the jails."  Pls.'

comments at 2.  OCC is not able to determine the impact, if any, because the Department no

longer provides written comments to these reports.  Defs.' Sep. 20, 2019 comments to OCC draft

report at 2.  Without written responses to the reports, when they were being generated, OCC was

unable to determine how long deficiencies lasted or the ameliorative measures taken by the

Department once deficiencies were reported by DOHMH.  Therefore, there is no benchmark

against which to compare the impact of the suspension of the DOHMH reports.

## B. Ventilation

### 1. Operable Windows

Defendants shall ensure that all windows which are designed to be opened are operational. . . . A cell window that is designed to open and close shall not be considered operational unless it can be opened and closed by a detainee without the assistance of a staff member. Detainees shall not be housed in cells without operational windows [except in mental health areas at the direction of the authorities].

Environmental Order ¶ 15(e).

OCC reviewed the Defendants' inspection reports for the condition of windows in the various living areas. These reports indicate that many windows that are designed to open are not operational, as required by the Environmental Order. Additionally, the inoperable windows remained inoperable despite several reports, some of which spanned weeks or months.

### 2. Defendants' Ventilation Reports

#### a. *Defendants' Obligations*

The November 14, 2003 Ventilation Order ¶ 3 mandates, "Copies of [airflow reports], and of any correspondence or documentation made in response to them by the jails' stationary engineers, by the Director [sic] of Environmental Health, or by any other employee or agent of the Defendants, shall be provided to [OCC] and to Plaintiffs' counsel on a monthly basis." The February 11, 2009 Am. Supp. Ventilation Order ¶ 4(b) mandates that "[t]he Monthly Intake Ventilation Reports, Heating and Ventilation Certification Reports, and Monthly [Airflow] Reading Reports produced by the [Ventilation Task Force teams must] be produced to OCC and Plaintiffs' counsel on a quarterly basis."

### b.  *Defendants' Performance*

#### i.  *Annual Ventilation Certification*

The Environmental Order (¶ 15 (a)) mandates that prior to May 15 of each year, the Department shall inspect, test, and repair or replace to working order all ventilation systems in the various facilities, and —shall certify to the Court, with copies to its counsel, OCC, and Plaintiffs that these tasks have been completed.  Thereafter, the systems are to be maintained in working order.  The Defendants submitted the ventilation certification on 7/6/20 and the individual facility reports indicate that the majority of the equipment is functional; however, in certain instances, the Defendants provided dates for the abatement of deficiencies, which passed with no indication whether the deficiencies were actually abated as anticipated.

#### ii.  *Quarterly Mechanical Equipment Inspection Reports*

The Defendants submitted May 2020 mechanical inspection reports for AMKC, GRVC, MDC, NIC, OBCC, RMSC, and RNDC and June 2020 reports for all facilities except NIC.  The reports indicate that the majority of the equipment is functional.  The Defendants reported that most of the inoperable equipment was repaired and the equipment that remained inoperable affected officer-only areas and did not impact inmate areas.  The Defendants provided no additional reports, despite OCC's repeated requests.

#### iii.  *Monthly Airflow Reading Reports*

During this monitoring period, the Defendants did not submit the monthly airflow reading reports that are required to be submitted to OCC by the 2003 Ventilation Order (at ¶3) and the 2009 Am. Supp. Ventilation Order.  Instead, the Defendants submitted airflow reports for June–August 2020, on the evening of October 6, in response to the draft of this report, which noted the ongoing deficiency.  Per the Ventilation Order, the Department's Sanitarians are

required to "check the air flow readings at the ventilation registers, using a vane anemometer, in each jail's intake areas and in 15% of each jail's housing areas, including their bathroom and shower areas." The Defendants additionally are required to provide the airflow deficiency reports, which correspond to the monthly airflow reports; however, those reports have not been submitted. The monthly airflow reading reports differ from the monthly airflow deficiency reports in that the former reports convey the entirety of the findings as observed by the EHU sanitarians and the respective facility engineer or oiler while the latter reports focus only on the deficiencies and their abatement. OCC needs the airflow reports and corresponding airflow deficiency reports to review the Defendants' compliance with their testing and repair responsibilities. The latter reports still have not been submitted.

### AIRFLOW DEFICIENCY REPORTS

Airflow deficiency reports were not submitted for the current monitoring period.

### iv.     Monthly Intake Ventilation Reports

The Defendants have not submitted the monthly intake ventilation reports as required by the Am. Supp. Ventilation Order ¶ 4(b) on August 14, 2019. These reports chart the findings of inspections of intake mechanical equipment, identify corrective action needed to abate deficiencies, and provide the results of the corrective action. Historically, upon receipt of the various ventilation reports required to be submitted to OCC, this writer would review them and follow-up with DOC for clarification on any inconsistencies in the reports and request action for projects that appear to be delayed. Since the totality of reports were not submitted for the corresponding period, OCC has not been able to monitor compliance with the timely abatement of deficiencies identified by DOC during its required inspections of the ventilation equipment.

### c.   *Defendants' Compliance*

The Defendants are not compliant with the provisions of the collective ventilation orders that require them to provide various reports to OCC, Plaintiffs' counsel, and the Court.  To date, they have not yet provided all required reports, which continues to affect OCC's ability to monitor compliance with the Court's ventilation mandates.

## C.  Lighting

### a.   *Defendants' Obligations*

"Defendants shall ensure that in all cells and dormitory areas . . . no less than 20 foot–candles of light will be provided at bed or desk level for each inmate . . . ."  Am. Lighting Order ¶ 1.  "In areas in which the Defendants believe it will be unduly burdensome to comply with the 20 foot–candle requirement, the Defendants may provide no less than 15 foot–candles of light at bed or desk level for *each* inmate (emphasis supplied).  However, Defendants will make reasonable good faith efforts to provide a higher minimum amount of foot–candles . . . ."  *Id*. ¶ 2.

"In dormitories where Defendants cannot provide 15 foot–candles of light because of the positions of the lighting fixtures and dormitory beds, each dormitory will have at least one table in a dayroom where there is 20 foot–candles of light, and inmates will be advised of where the maximum lighting area is located—unless readings below 15 foot–candles are isolated and sporadic instances in that dormitory."  *Id*. ¶ 15.  Additionally, the Am. Lighting Order requires timely repair and maintenance of lighting by the Defendants (¶¶ 3–5 & ¶¶ 16–17) and conformity of DOC internal policies (¶ 6) with the requirements of the Order.

### b.   *Defendants' Performance*

A review of the PHS and EHO inspection reports for the current monitoring period

indicate numerous references to the lighting not being maintained, and where work orders have

been submitted the conditions have remained unabated, necessitating the submission of

additional work orders.   For example, in VCBC 2BB, the PHS submitted a work order on

6/17/20 after noticing two ceiling light fixtures remained inoperable in the dayroom after

previously submitting a work order on 6/3/20. In the sleeping area three ceiling light fixtures

above three beds remained inoperable on 6/17/20 after the PHS submitted a work order on

6/10/20.

### c.   *Defendants' Compliance*

The Defendants are not in compliance with the maintenance and repair provisions of the

Amended Lighting Order.

## D.  Fire Safety

During this monitoring period, OCC's fire safety expert, Mario Antonetti sought and

received approval (from the Defendants) to have a colleague, Joseph Weiler, assist him in

undertaking inspections at OBCC due to concerns about the impact the Covid-19 pandemic may

have on his own health.  Messrs. Antonetti and Weiler will make all necessary arrangements

directly with DOC.

On August 14, 2020, a fire was started by an inmate in MDC 9 South.  OCC has

requested and received some documents from the Defendants, which are being reviewed by Mr.

Antonetti.  Mr. Antonetti provided the below preliminary report on the fire and will update his

report when he has received all requested documents and media from the Defendants, as well as

Case 1:20-cv-03650-KPF   Document 67-9   Filed 01/22/21   Page 33 of 34

the opportunity to interview the engineer or technician with knowledge of the MDC heating,

ventilation, and air-conditioning system (HVAC).

> The Office of Compliance Consultants has retained Hughes Associates, Inc (HAI) to help
> with various fire and life safety situations in the New York City jail system.  On August
> 18, 2020, Legal Aid Society through Mr. Robert Quackenbush requested that OCC
> investigate the cell fire incidence at Manhattan Detention Center (MDC). The incident
> occurred on August 14, 2020.

> The incident was reported to the Fire Safety Unit on Friday August 14, 2020 at
> approximately 8:30 pm.  by automatic alarm (smoke detectors) from the 9th floor south
> side of the North Tower. Upon investigation it was determined that cell#7 occupied by Mr.
> Gambino Genao was set on fire. From the photos it appeared he set his mattress on fire and
> then closed the door to his cell. With the door to the cell closed, Mr. Genoa occupied the
> barred area immediately outside his cell. At some point the door to the cell was opened by
> Mr. Genoa which allowed the smoke to enter the main block area activating several smoke
> detectors. The activation of the detectors shutdown the HVAC systems.

> Mr. Genao was removed from the outer cell area and the fire was extinguished with the use
> of fire extinguishers. By this time with the fans shut down the smoke in the area was heavy
> and the clients were moved to a secured area. The buses that were brought into the secured
> fenced in area, were not used.

> Mr. Genao was brought to the main clinic for evaluation and sent to NIC.

> The NYC Fire Department arrived with heavy support and secured the fire scene.  The fire
> department evacuated the smoke with the use of portable smoke exhaust fans. The area was
> deemed safe for the clients to return.  It was not determined how Mr. Genao started the fire.

> As additional information is present the writer, the report will be modified to include the
> new information.

The Defendants have not commented on Mr. Antonetti's preliminary report, but have

promised to provide all requested information and have been cooperative.

## III.    COMPLAINTS

In addition to general monitoring responsibilities, OCC is tasked with investigating and responding to *Benjamin* related complaints from inmates or their representatives.  Currently, OCC does not have staff to directly investigate complaints.  During the monitoring period, Plaintiffs' counsel submitted twenty-six complaints to the Defendants, alleging inhabitable cell conditions, lack of cleaning supplies, and unsanitary living conditions.  The Defendants responded to three of the complaints, reporting that they were unsubstantiated.  Complaints received from inmates alleging non-*Benjamin* violations were referred to the Department's Office of Constituent and Grievance Services.

This concludes the summary of the May – August 2020 monitoring period.

Prepared and submitted by:

_____

Nicole ___
Deputy Director
Office of Compliance Consultants

REPORT ON ENVIRONMENTAL CONDITIONS
                May – August 2020
Dated this 15th day of October 2020