UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

JEAN AZOR-EL, *et al.*,

                              Plaintiffs,

          -against-

CITY OF NEW YORK, *et al.*,

                             Defendants.

------------------------------------------------------------------- x

**DECLARATION OF PATRICIA FEENEY IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

No. 20 CV 3650 (KPF)
No. 20 CV 3978 (KPF)
No. 20 CV 3980 (KPF)
No. 20 CV 3981 (KPF)
No. 20 CV 3982 (KPF)
No. 20 CV 3983 (KPF)
No. 20 CV 3985 (KPF)
No. 20 CV 3990 (KPF)

        **PATRICIA FEENEY**, declares that the following statements are true, pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury:

        1. I am employed by the New York City Department of Correction ("DOC" or "the Department") as the Deputy Commissioner of Quality Assurance and Integrity and have held this position since January 2018. I have been employed by DOC since January 6, 1992.

        2. This affidavit is based on my personal knowledge of the Department's environmental health policies, including a recently enacted COVID-19 plan in which I helped to craft, and it is based on information available to me in the course of my official duties.

## INTRODUCTION

        3. As the Deputy Commissioner of Quality Assurance and Integrity, I am responsible for taking the necessary steps so to monitor that the Department and its staff are adhering to the environmental health and safety rules mandated by city, state and federal regulatory agencies, and the Department's own internal policies.

4. I am also responsible for the management and oversight of the Department's Internal Audit Operations; the Environmental Health Unit ("EHU"); the Fire and Safety Unit; the Office of Policy and Compliance; the Emergency Preparedness Unit; the Internal Audit Review Unit; the Policy and Procedure Unit; the Engineering Audits Unit; and the Compliance and Safety Center.

5. Prior to my appointment as Deputy Commissioner, I served as the Assistant Commissioner of EHU for 16 years.

6. Prior to joining the Department, I served as a Public Health Sanitarian for the New York City Department of Health and Mental Hygiene ("DOHMH"), and I am a Registered Sanitarian in the State of New York.

7. A sanitarian is a specialist in sanitary science. As a sanitarian, on several occasions, I have testified in the Southern District of New York as an expert witness on environmental conditions in the City's jails, before the late Judge Baer in the ongoing class action, *Benjamin v. Brann*, 75-cv-3073 (LAP) (S.D.N.Y. filed June 24, 1975).

## PLAINTIFFS' GENERAL ALLEGATIONS

8. I have been advised by counsel that Plaintiffs seek a preliminary injunction to redress alleged conditions in the jails, with particular emphasis on the lack of sanitary wipes and hand sanitizer, and the lack of an effective testing regimen for incarcerated persons and staff. I have been further advised that plaintiffs claim the Department has been deliberately indifferent to the serious medical needs of incarcerated people in our care.

9. With this declaration, I advise this Court that the Department is not acting with deliberate indifference to the health and safety of the incarcerated persons in our care; indeed, as discussed below, the Department early-on implemented a COVID-19 emergency plan,

beginning with an initial meeting in February 2020, and the Department continues to act with great urgency as conditions on the ground and scientific understanding of COVID-19 evolve.

10. Our efforts are complemented by our health partner, Correctional Health Services ("CHS"), which operates medical clinics in every facility, an infirmary facility (North Infirmary Command or "NIC"), and a state-of-the-art Communicable Disease Unit ("CDU"), which is housed in West Facility (and operationally is considered part of NIC) and has 98 isolation rooms (88 of which are operable) with double doors and negative air pressure.

11. In implementing our policies, we follow the guidelines issued by the United States Centers for Disease Control and Prevention ("CDC"), DOHMH, and the New York State Department of Health ("NYSDOH"). We also regularly receive guidance from CHS, which is a division of the City's public hospital system, the New York City Health and Hospitals Corporation ("H+H").

12. While the COVID-19 public health emergency is unprecedented in certain ways, the Department has successfully navigated other similar public health emergencies, such as the tuberculosis epidemic in the early 1990s, and more recently, breakouts of avian flu and H1N1. I played a key role in formulating and implementing the Department's pandemic plans on those occasions.

13. This is not to suggest that the Department may not face significant hurdles; a detention system is designed for congregate housing. Moreover, like all agencies of government, the pandemic has placed enormous demands on the Department and its staff.

14. One of the Department's initial responses to the pandemic was working in close collaboration with our law enforcement partners and CHS to determine whether certain

incarcerated persons could be released. My understanding is that approximately 1,500 incarcerated persons were released as part of this response.

15. As of the date of this declaration, the population of incarcerated persons is approximately 5,100, which is higher than it was in April 2020, when the Department averaged a daily population of around 4,000.[1] In December 2019, prior to the epidemic, the Department also closed two of its jails for efficiency and as part of the City's ongoing plan to ultimately close Rikers Island and to build four new borough-based facilities. That reduced space available to house incarcerated persons to a certain degree, but it reflected a legitimate and important operational concern, and the Department has adequately accounted for its effect.

16. As noted below, with respect to new admissions, CHS will test and DOC will quarantine all incoming incarcerated persons (the test is voluntary), including those who may test positive or present symptoms. The Department reopened the Eric M. Taylor Center ("EMTC") as a new admission housing facility for asymptomatic males entering custody which provides access to additional housing units as necessary. In addition, we currently offer free on-site testing of our staff, and free vaccinations as well. While there have been recent instances of transmission, and we are cognizant of the so-called 'second wave,' we continue to monitor the conditions at our facilities.

**A.     Sanitation Protocols**

   **(a) Before COVID-19**

17. Even prior to implementing our COVID-19 emergency plan, the Department has a rigorous sanitation protocol, which derived in part from the late Judge Baer's

---

[1] By way of contrast, in the late 1980s/early 1990s, the Department's facilities housed over 22,000 inmates in the system.

Order on: Environmental Conditions, dated April 26, 2001, as well as from the Department's own internal regulations, particularly Directive 3900R ("Environmental Health Program"), Directive 3901R-B ("Housekeeping Procedures") and Directive 3903 ("Sanitation Procedures for Medical Services Area"). While a number of Judge Baer's specific directives have been terminated over the years, pursuant to the Prison Litigation Reform Act, those directives have been largely continued in our own policies. A true and accurate copy of Directive 3900R is attached hereto as **Exhibit 1**. A true and accurate copy of Directive 3901R-B is attached hereto as **Exhibit 2**. Finally, a true and accurate copy of Directive 3903 is attached hereto as **Exhibit 3**.

18. Under our procedures, housing areas are to be cleaned and sanitized by trained incarcerated individual work crews three times a day, and showers and bathrooms are to be cleaned and sanitized three times a day.

19. Sanitation in each facility is overseen by a captain trained by EHU managers who are professional sanitarians, and designated an Environmental Health Officer ("EHO"). Department procedures require that he or she conducts weekly inspections of their facilities and remediate deficiencies promptly, or if more is involved, made the subject of a work order request. The Department employs its own plumbers, electricians, exterminators, oilers, and the like, and has outside on-call vendors as needed for more involved work.

20. The EHU's own Public Health Sanitarians ("PHS") also conduct weekly inspections and follow-up, and respond to individual complaints from staff, incarcerated persons, advocates, or a Court Monitor appointed in connection with the *Benjamin* litigation, known as, the Office of Compliance Consultants ("OCC").[2]

---

[2] At the City's request in the *Benjamin* litigation, the Honorable Loretta A. Preska recently temporarily suspended the Environmental Health Order's provision requiring DOHMH to

21. The EHU also monitors sanitation at the two medical facilities, NIC and the CDU at West Facility. Unlike our other jails, these medical facilities do not rely on in-house work crews made up of incarcerated people for cleaning, but rather use institutional aides who are non-uniformed employees.

### (b) Current COVID-19 Procedures and Emergency Plan

22. With the advent of the recent COVID-19 pandemic, the Department enhanced its sanitation protocols and cleaning measures to combat the spread of COVID-19 throughout our facilities. This included implementing enhanced cleaning and sanitizing procedures on high-touch surfaces, which include doorknobs, telephones, sinks, faucets, and bathrooms.

23. In addition to the enhanced clearing and sanitizing procedures, a multi-tiered auditing system was initiated. First, captains are expected to conduct inspections in their assigned areas three times per eight-hour tour, a total of nine audits per day in all occupied areas. During the audit, the captains verify that sinks are operable, soap is provided, cleaning supplies and PPE, including masks are provided, and the area is clean. Additionally, staff assigned to the Quality Assurance and Integrity Division and the Bureau Chief of Facility Operations audit the facility intake and several housing areas per day. Finally, I tour facilities to monitor compliance with COVID procedures.

24. As part of its ongoing efforts to contain the spread of COVID-19, DOC has implemented the containment and control of transmission guidelines recommended by the

---

conduct monthly inspections at the correctional facilities. Those inspectors were needed to address other city-wide COVID-19 issues, and EHU believed that their own more frequent inspections were sufficient in the interim. Indeed, often the two inspections made similar observations. *See* Order, *Benjamin v. Brann*, 75-cv-3073 (LAP) (S.D.N.Y. Mar. 24, 2020), ECF No. 680.

CDC and DOHMH, and has communicated these guidelines to staff and persons in custody through in-person meetings, teletypes, posters, intranet, social media, and our in-house media, DOC TV. These recommendations include:

(a) People should cover their mouth/nose with a tissue when coughing or sneezing or sneeze/cough into their elbow;

(b) Post signs to promote respiratory/cough hygiene in common areas

(c) Refrain from touching your face;

(d) Hand hygiene – Wash hands frequently with soap and water. If soap and water are not available, the use of alcohol-based hand sanitizer shall be employed (but only staff may carry hand sanitizer per DOC policy);

(e) Social distancing strategies include:
1. Visual cues added to dayrooms to encourage social distancing;
2. Encouraging persons in custody to sleep head to toe in dormitories to further separate breathable spaces;
3. Encouraging social distancing in the housing area, including during meal time;
4. Suspending congregate services such as religious services, law library, and commissary. These services are now provided in the housing areas.
5. Persons in custody are also encouraged to not sit on each other's beds.

(f) Staff are instructed to stay home if they feel ill or have been in close contact with someone who is ill;

(g) Emphasizing that the required cleaning and sanitizing procedures are followed utilizing the Environmental Protection Agency's approved disinfectant and provided in the dispensers in all janitor closets. Each housing area has its own janitor's closet with multiple supplies.

### (c) Soap/Facility Cleaning

25. DOC's policy is to provide individuals in custody with their own bar of soap, and free access to cleaning supplies in the housing area janitor's closet, including, but not limited to: disinfectant, mold and mildew cleaner, general cleaner, floor cleaner, and cleaner without grit, all at Department expense.

26. Further, sanitation work details continue to be regularly assigned to sanitize the facilities, including housing areas, bathrooms, showers, and sinks. Sanitation and cleaning measures the sanitation work details are expected to take include: cleaning and sanitizing DOC housing units, dayrooms, and common spaces three times per day; cleaning shower areas three times per day; cleaning and sanitizing transport vehicles daily; with the proviso that any vehicle that is transporting a person who is symptomatic of respiratory illness will be sanitized immediately after transporting that individual.

27. Table top surfaces and high touch areas are expected to be sanitized every two hours. One of the changes made in our sanitization procedures in anticipation of COVID-19 was a new procedure to apply the sanitizer at least two times when cleaning surfaces, so the surface stays wet for 10 minutes. This was included in our training for staff and work details.

28. Soap is placed in bathrooms of the housing area where sinks are located, and individuals in custody housed in cells and dormitories have individual hand soap. Each person's individual cell has a sink with tap water. Soap is also placed in intake pens, which have sinks with running water, as do the bathrooms in all social service offices (although the latter have been temporary closed in response to COVID-19). In addition, any individual may request additional soap from the housing area officer.

29. EHU is also providing additional sanitation and sanitization trainings to our institutional aides and dedicated sanitation work details to highlight appropriate cleaning and sanitizing procedures that are being utilized to combat the spread of COVID-19.

30. I am advised by counsel that Plaintiffs allege there are problems with liquid soap dispensers. (*E.g.*, Azor-El Decl. ¶ 12.) To DOC's knowledge, liquid soap dispensers are in use only in medical treatment areas not our housing areas due to security concerns about containers being vandalized or weaponized. I would imagine that clinicians are well aware of the need for sanitary conditions due to their line of work and any problems with those dispensers would be sporadic and quickly remediated.

**B.    Additional Subsequent Measures as Public Health Emergency Has Continued**

31. Since implementing these procedures, we have monitored conditions in the jails and have implemented additional measures in response to changing circumstances.

32. As to social distancing, where possible, we have reduced the capacity of dorm units to allow for greater space between persons in these units. Where possible, this includes allowing for an empty bed in between each person in custody. If this spacing is not possible, incarcerated persons are instructed to sleep head-to-toe to maximize the space between them during sleep.

33. When a bed is assigned to an incarcerated person, before its new occupant uses the bed, the mattress and the bedframe are expected to be sanitized.

34. We also have facilities with single celled housing which facilitates separation and social distancing.

35. For incarcerated persons who are positive or who have symptoms, we first house them at the CDU, up to its 98-person capacity. (The CDU currently has 88 operable rooms.)

36.     Due to CDU's limited capacity, at the beginning of the pandemic, the Department re-opened a closed jail on Rikers, EMTC, to be utilized solely for incarcerated persons with COVID-19 or COVID-19 symptoms, to facilitate separation and prevent transmission. EMTC is predominantly a dormitory facility.

37.     While we subsequently closed EMTC in the last week of June 2020, when infections stabilized, the current circumstances have led us to reopen the facility again.

38.     We also have opened additional housing areas at another jail, the Robert N. Davoren Center ("RNDC"), to facilitate separation of incarcerated persons.

39.     We separate female detainees with COVID-19 or COVID-19 symptoms at a separate housing unit in the women's facility, the Rose M. Singer Center ("RMSC").

40.     So that incarcerated persons continue to receive important services, while minimizing the number of people coming to the jails, the Department developed remote alternatives to accommodate for the suspension of in-person visitation and attorney visits in the wake of the pandemic. The Department launched a new televisit program which allows family members to access visits remotely from their personal devices. There is a 30-minute delay between each televisit session to permit the sanitization of the televisit booth, including the chair, counter, and other contact surface areas. Tele-court appearances and Skype-based attorney conferencing are also available.

## C.     Personal Protective Equipment

41.     As to masks and PPE, the DOC initially provided masks to staff assigned to areas where symptomatic incarcerated individuals are housed and to those transporting symptomatic individuals. Shortly thereafter, the Department provided masks to all employees and incarcerated individuals. As the pandemic progressed, we then directed the use of face coverings for staff when within six feet of anyone, and we further recommended its use during

the entire tour. Failure to follow the directives subject staff to disciplinary proceedings, although we still encourage adherence to policy through counseling and cooperation. *See* City of N.Y. Dep't of Corr., Directive 2269, Wearing Masks/Face Coverings (Sept. 25, 2020), a true and accurate copy of which is annexed as **Exhibit 4**.

42. In the spirit of cooperation and mentorship, the Compliance and Safety Center ("CASC"), which I also oversee, monitors facilities through a remote video feed. If a member of the CASC unit observes a staff member not wearing or improperly wearing a mask, then the staff member is called and encouraged to don their mask in an effort to foster compliance with the Department's directives.

43. This is an example of how we continue to evolve in our policies.

44. We also have ample supplies of masks for staff and incarcerated persons--currently six months' worth of PPE in our storehouse--and have not run out during the pandemic. We typically distribute surgical masks, but when staff are assigned to a housing area with incarcerated persons with COVID-19 or symptoms, we issue the higher-grade N-95 masks. We also provide N-95 masks to officers assigned to court areas or transportation.

45. Masks are also freely available to incarcerated persons, typically from the officer assigned to a housing area, and we encourage their use. Masks are handed out, and the housing areas have a steady supply, which is monitored using the audit system described above. Incarcerated individuals are expected to wear their mask whenever they leave their assigned housing area.

46. Generally speaking, the Department does not mandate the use of gloves to limit the transmission of COVID-19, as the CDC recommends the best course action is hand-washing with soap and water for 20 seconds. *See* Ctrs. for Disease Control & Prevention, *Interim*

*Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional & Detention Facilities*, "Operations, Supplies, and PPE Preparations" section (last updated Jan. 19, 2021), *available at* https://perma.cc/L3LC-FVAB. Gloves are mandated or recommended in other settings, however, e.g., touching an inmate, handling bodily fluids, and cleaning. *Id.* at tbl. 1.

## PLAINTIFFS' SPECIFIC ALLEGATIONS

47.     In alleging that conditions are unsafe, I understand that Plaintiffs focus on hand sanitizer, sanitary wipes, and a testing program. As discussed below, the Department is able to meet the health and safety needs with alternative methods that do not undermine other important Department concerns.

**A.     Hand Sanitizer**

48.     I am aware of allegations that incarcerated persons do not have ready access to alcohol-based hand sanitizer. This item has not been freely available due to safety and security concerns. For example, its alcohol content raises concern about ingesting an intoxicating substance. Alcohol-based substances are highly flammable and a potential source of fire in the jails. However, as noted above, there is ample soap and water available. The CDC recommends the use of hand sanitizer when ready access to sinks, water and soap is not available. Ctrs. for Disease Control & Prevention, *Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional & Detention Facilities*, "Operations, Supplies, and PPE Preparations" section (last updated Jan. 19, 2021), *available at* https://perma.cc/L3LC-FVAB. For this reason, staff members are given sanitizer when they are posted in areas where they do not have ready access to a sink.

49. While I am not personally aware of any individual incidents with incarcerated persons abusing sanitizer--largely due to its unavailability in our system--I did mention at my deposition a recent news report of sanitizer injuring a person when it was ignited. See WABC-

-12-

TV New York, *New hand sanitizer warning after woman was burned in house fire*, ABC, Inc. (Sept. 7, 2020), *available at* https://abc7ny.com/new-hand-sanitizer-warning-after-woman-was-burned-in-house-fire/6412854/.

50. In addition, incarcerated persons setting fires and ingesting substances and splashing officers and staff with various fluids have long been a risk in a detention system. The policy prohibiting the use of hand sanitizer by incarcerated people is thus based on the collective experience of DOC jail managers.

51. I also understand that Plaintiffs assert that our distribution of laundry detergent to the incarcerated population contradicts this policy. (Am. Compl. ¶ 134.) In fact, the detergent we use meets correctional standards and does not contain alcohol.

**B.      Staff Testing and Vaccination.**

52. While Plaintiffs complain that DOC does not require testing of staff, we note that public health officials have not made testing of staff mandatory. However, DOC encourages testing and offers free testing to its staff at various urgent care centers, through an agreement with Northwell Health.

53. We also now provide free on-site testing at Rikers. The Department has issued a number of Teletype Orders to advise staff to take advantage of the testing site at the George Motchan Detention Center on Rikers. *E.g.*, City of N.Y. Dep't of Corr., Teletype Order No. HQ-02752-0 (Dec. 14, 2020), a true and accurate copy of which is attached hereto as **Exhibit 5**.

54. In addition, our staff who are now eligible to receive a free vaccine under Phase 1B of the State's vaccine distribution plan may receive vaccines. CHS clinical staff have previously been eligible to receive the vaccines. Vaccines are currently available to eligible staff on-site, without an appointment.

55. In addition, we have issued other teletypes throughout the pandemic to remind staff of the importance of testing. A teletype order is read at 21 consecutive roll calls, at each of the three tours daily, prior to discharging staff to begin their assignments. True and accurate copies of a number of these Teletype Orders are attached hereto as **Exhibit 6**. They demonstrate that the Department encourages testing, and actively reminds staff of how important it is to be tested.

56. DOC does require staff reporting daily to the jails to answer a health questionnaire concerning symptoms and proximity to others with COVD-19, and we take a temperature check of staff before allowing them in the facilities. Any employee with a temperature of 100.4°F or greater is required to report to their physician, and must be cleared by the DOC's Health Management Division before returning to work.

57. There have been occasions when staff have tested positive. They are not allowed back to work until cleared by medical staff. In addition, we do contact tracing of staff and reach out to employees to inform them of their possible exposure. The names of incarcerated persons possibly exposed are sent to CHS, who perform their own contact tracing and outreach to the incarcerated persons. In addition, housing areas where staff worked immediately prior to reporting a positive test are designated "Asymptomatic Exposed" ("AE"). The AE housing units have been quarantined for at least 14 days, which includes minimization of unnecessary movement of persons in and out of the house and limiting the addition of individuals to the housing unit during the time it is designated as AE. This is one of the reasons we have minimized transfers and unnecessary movement within our jails, to help contain any potential exposure.

### C.  Disinfecting Wipes

58. While Plaintiffs allege that disinfecting wipes should be freely available, we prefer to provide disinfectant in a dispenser, which is transferred to a bucket and given to incarcerated persons on request with a sponge or scouring pad. Each housing area and support area has its own janitor's closet and is expected to have ample amounts for multiple uses, typically, six each of sponges and pads, and four each of mops and buckets. These are for individual use and are intended to supplement the regular cleaning and sanitization by the house detail and assigned work detail.

59. A bucket of disinfectant is also placed in the telephone area. We use Virex 256 which is effective against COVID-19. The reason we do not provide wipes is that they tend to be flushed down the toilets. In fact, we conducted a pilot program with hand wipes at the Bronx Criminal Court holding pens about a year and a half ago, and it resulted in clogged toilets, which presents sanitation issues.

### D.  Kitchen Issues

60. I understand that Plaintiffs also complain that kitchen and pantry staff are not using PPE. Food is prepared in two industrial grade kitchens on Rikers, and transported to the jails in individual sealed containers. To minimize contact, incarcerated persons eat in their housing area rather than in a cafeteria. Under the City Health Code, 24 R.C.N.Y. § 81.07(j), all kitchen staff are required to wear gloves when preparing food to prevent direct hand contact.

61. We also do not allow buffet-style eating, as I understand is alleged in the amended complaint. (*E.g.*, Am. Compl. ¶ 85.) In the pantries and mess halls, trays are pre-plated by the kitchen/pantry workers, and a tray is passed through a slot which minimizes the likelihood of groups of incarcerated persons touching or breathing on food.

## DOC/CHS COORDINATION

62. As mentioned above, DOC maintains regular contact with Correctional Health Services ("CHS"), which is the medical provider for persons in custody, to monitor at-risk individuals in the Department's care. In addition, DOC staff has been instructed to refer any individual in custody who is exhibiting COVID-19 like symptoms to CHS for an evaluation.

63. We understand that all new incarcerated persons are offered COVID-19 testing by CHS; any incarcerated person who declines is quarantined for 14 days. Newly admitted incarcerated persons awaiting test results or the passage of 14 asymptomatic days are held in separate cohorts to minimize contact with others. Only following CHS clearance will they be assigned to a housing area within the General Population.

64. If an already-incarcerated person is COVID-19 positive or has COVID-19 symptoms, CHS informs DOC of this fact. The COVID-positive or -symptomatic person is then removed from his or her housing area and placed in the CDU or another facility, as I have previously described. That incarcerated person's housing area is then designated as "Asymptomatic Exposed" and is essentially placed in quarantine until the housing area is cleared by CHS.

65. We have also minimized certain intra-departmental staff transfers to keep the cohorts distanced from other staff members and incarcerated persons to the extent possible.

66. Every facility also has an on-site medical clinic and any incarcerated person can sign up for daily sick call. An incarcerated person is also able to use telehealth services.

67. A sick incarcerated person who needs a higher level of care will be transported via Emergency Medical Services to either Elmhurst Hospital or Bellevue Hospital for

necessary in-patient treatment. (While these two hospitals have been designated for the care of incarcerated persons, we can transport incarcerated persons to any other hospital as needed.)

## CONCLUSION

68. The Department has taken the spread of COVID-19 very seriously and is committed to protecting the health and safety of the individuals who work in, live in and visit its facilities. I believe our COVID-19 pandemic plan is comprehensive and has been highly effective. The Department seriously considers the recommendations of public health authorities and when unique operational concerns make it difficult for the Department to adopt such recommendations, the Department makes best efforts to find alternative measures that it can apply.

69. This is consistent with the CDC's own guidelines, which note that its recommendations "will not necessarily address every possible custodial setting" and "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Ctrs. for Disease Control & Prevention, *Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional & Detention Facilities*, "Intended Audience" section (last updated Jan. 19, 2021), *available at* https://perma.cc/L3LC-FVAB.

70. The Department is committed to continuing to take the steps necessary to prevent the widespread community transmission of COVID-19.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     Queens, New York
           February 1, 2021

_____
PATRICIA FEENEY