L2J5azoD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JEAN AZOR, *et al.*,

                    Plaintiffs,

              v.                          20 Civ. 3650 (KFP)
                                          Telephonic Proceeding
NEW YORK CITY DEPARTMENT OF
CORRECTIONS, *et al.*,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          February 19, 2021
                                          11:05 a.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                          District Judge


                         APPEARANCES


KEENAN & BHATIA, LLC
        Attorneys for Plaintiffs
BY:   SONAL BHATIA
BY:   EDWARD E. KEENAN


JAMES E. JOHNSON
        Corporation Counsel for the City of New York
BY:   DAVID S. THAYER
BY:   CHLARENS ORSLAND
        Assistant Corporation Counsel

L2J5azoD

1          (Case called; The Court and all parties appearing

2     telephonically)

3          THE DEPUTY CLERK:  Counsel, please state your name for

4     the record, beginning with plaintiffs.

5          MR. KEENAN:  May it please the Court, E.E. Keenan

6     appearing on behalf of the plaintiffs.

7          MS. BHATIA:  Sonal Bhatia appearing on behalf of the

8     plaintiffs.

9          MR. KEENAN:  And with us on separate lines are Julia

10     Gokhberg, a litigation manager and paralegal with our firm; and

11     Marcus Miller, who is a clinical intern with our firm.  Also on

12     the line today, separately is Mr. Anthony Medina, who is one of

13     the plaintiffs.

14          THE COURT:  Thank you very much and good morning to

15     all of you.

16          And representing the defendants this morning?

17          MR. THAYER:  Good morning, your Honor.  This is David

18     Thayer from the New York City Law Department on behalf of

19     Defendant City of New York, Kisa Smalls, and Robin Collins.  I

20     am also joined by my colleague in the general litigation

21     division at the law department Chlarens Orsland, and also

22     joined by a volunteer in our office, Amy Gordon, who is a

23     recent law school graduate and is kindly volunteering her time

24     before she starts at a firm.

25          Thank you.

L2J5azoD

```
1          THE COURT:  I have a number of people it seems to be
2     thanking for doing their work on this case so I appreciate all
3     of those efforts.  What I would like to do now is to render the
4     oral decision in this case and I will ask for your attention as
5     I do that.  In the course of that, though, there are a couple
6     of housekeeping issues that I will be raising but those will be
7     probably closer to the end of my decision.
8          What I would like to do, as I begin, is to echo what I
9     believe I said at last week's oral argument, and that is that I
10    appreciate to each of you your preparation and your
11    presentations, written and oral, as well as the additional
12    factual information that I have received from the witnesses in
13    this case and information from expert witnesses including
14    Dr. Harrington.  I want to also thank the Keenan & Bhatia firm
15    for accepting this pro bono representation for plaintiffs
16    because this allows me to hear a greater number of related
17    cases in a more efficient manner.  And I do, and I hope to
18    continue, to appreciate the dialogues that counsel are having
19    with each other and with their clients.  The most recent
20    exchange evidenced by the letter that I received today and
21    yesterday suggests a bit of a bump in the road in counsel's
22    relationship.  I do hope they're able to work that out and that
23    they're able to speak with each other before speaking to me,
24    but I also see that each side is having dialogues with their
25    clients and that has aided me.  Plaintiffs' counsel's dialogue
```

L2J5azoD

1    with the clients permits me to obtain real-time updates

2    concerning conditions at Rikers Island, while the dialogue that

3    defendants' counsel has had with defendants permits me to

4    understand the background of certain policy decisions and it

5    has allowed me to inquire, where it is appropriate, regarding

6    the reconsideration of those decisions.

7             For the reasons I am about to outline, I am not

8    granting plaintiffs' motion for preliminary injunctive relief

9    at this time.  But, with respect to certain policies that have

10   been put forward by defendants as evidence of their

11   understanding of and compliance with their constitutional

12   obligations, I am also authorizing limited, targeted discovery

13   as to how these policies operate in practice at Rikers Island,

14   and at the conclusion of that period of discovery, I may

15   schedule a second round of motion practice for a more limited

16   form of injunctive relief if it turns out that these policies

17   are not in fact being followed.

18            Now, as I understood from oral argument, the parties

19   are largely in agreement regarding the applicable law so I'm

20   going to discuss it only briefly.

21            In last year's decision in *New York v. United States*

22   *Department of Homeland Security*, 969 F.3d 42, the Second

23   Circuit instructed that a plaintiff seeking a preliminary

24   injunction must establish that he is likely to succeed on the

25   merits, that he is likely to suffer irreparable harm in the

L2J5azoD

absence of preliminary relief, that the balance of equities

tips in his favor, and that an injunction is in the public

interest.  In this regard, irreparable harm is injury that is

neither remote nor speculative but actual and imminent, and

that cannot be remedied by an award of monetary damages.  And,

that's from the same decision.

Plaintiffs here, are at least in part, asking the

Court to order a change in the status quo which would be

considered a mandatory preliminary injunction.  The standard

there is more stringent and it requires the moving party to

demonstrate a substantial likelihood of success on the merits.

The cases for this proposition I cite, *Yang v. Kosinski*,

another 2020 decision from the Second Circuit reported at 960

F.3d 119, and *New York Progress & Protection PAC v. Walsh*, 733

F.3d 483, (2d Cir. 2013).  While each of the named plaintiffs

in this case is a pretrial detainee, plaintiffs also purport to

represent a class of all Rikers Island inmates and that class

would include both pretrial and convicted detainees.  The

Eighth Amendment for convicted prisoners and the Fourteenth

Amendment for pretrial detainees govern plaintiffs' claims of

unconstitutionality and therefore guide the Court's analysis in

determining their likelihood of success on the merits.  A

decision where I think the Second Circuit best established this

principle is *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir.

2017).  Under the Eighth and Fourteenth Amendment there is both

L2J5azoD

1    an objective and subjective prong to the analysis of whether an

2    inmate's conditions of confinement are unconstitutional.

3            Judge Ramos, in last year's decision in

4    *Fernandez-Rodriguez v. Licon-Vitale*, 470 F.Supp. 3d 323, spoke

5    about this and discussed it at length.  The objective propping

6    asks whether the conditions of which the inmates complain,

7    either alone or in combination, pose an unreasonable risk of

8    serious damage to their health which includes the risk of

9    serious damage to physical and mental soundness.  And that is

10   from the *Darnell* decision I just mentioned.

11           In a case where the inmates complain of an elevated

12   risk of being harmed by the allegedly unconstitutional

13   conditions, the Court must determine whether society considers

14   the risk that the prisoner complains of to be so grave that it

15   violates contemporary standards of decency to expose anyone

16   unwillingly to such a risk.  In other words, the prisoner must

17   show that the risk of which he complains is not one that

18   today's society chooses to tolerate.  I am quoting here from

19   the *Fernandez-Rodriguez* decision, and that, in turn, is quoting

20   from the Supreme Court's decision in *Helling v. McKinney*, 509

21   U.S. 25 from 1993.  This particular prong, the objective prong,

22   is identically analyzed for convicted and pretrial inmates.

23   The subjective prong, by contrast, differs slightly between the

24   Eighth and Fourteenth Amendment analyses as discussed in

25   *Darnell* and as discussed in *Fernandez-Rodriguez*.  Let me make

L2J5azoD

1   clear, though, *Fernandez-Rodriguez* was in the Fifth Amendment

2   due process context, but I believe it is equally applicable

3   under the Fourteenth.

4          Under the Eighth Amendment, the inmates must show that

5   the official knows of and disregards an excessive risk to

6   inmate health or safety; the official must both be aware of

7   facts from which the inference could be drawn that a

8   substantial risk of serious harm exists, and he must also draw

9   the inference.  That's from the *Darnell* decision which, in

10  turn, was quoting *Farmer v. Brennan*, 511 U.S. 825, the Supreme

11  Court decision from 1994.  The Fourteenth Amendment, however,

12  has a less stringent showing -- only that the official knew or

13  should have known that the condition posed an excessive risk to

14  health or safety.  And, in this context, disregard means

15  failing to take reasonable measures to abate the

16  unconstitutional condition.  That is from the *Farmer* decision I

17  just mentioned.

18         There is, separately, some claims under the Americans

19  with Disabilities Act and the Rehabilitation Act, and in order

20  to establish a violation under the ADA, the plaintiffs must

21  demonstrate that they are qualified individuals with a

22  disability; that the defendants are subject to the ADA; that

23  plaintiffs were denied the opportunity to participate in or

24  benefit from defendants' services, programs, or activities, or

25  were otherwise discriminated against by defendants by reason of

L2J5azoD

plaintiffs' disabilities.  I am quoting here from *Henrietta D*

*v. Bloomberg*, a Second Circuit decision from 2003, reported at

331 F.3d 261.  And, because Section 504 of the Rehabilitation

Act and the ADA impose identical requirements, Courts usually

consider such claims in tandem and I will be considering them

in tandem here.

          Beginning with the analysis, having now just described

the applicable law, I find that plaintiffs satisfy the

objective prong of the constitutional analysis and, in this

regard, plaintiffs and defendants raise nearly identical

arguments to address the irreparable harm element of the motion

for a preliminary injunction and the objective prong of their

likelihood of success on the merits element and that's why I am

addressing them together at this time.

          Plaintiffs argue that substantially increased risk of

serious illness and death always constitutes irreparable

injury, even if plaintiffs have not been harmed.  And that is

at their briefing, page 20.  The plaintiffs similarly argue

that the serious nature of COVID-19 means that it stands with

the roster of infectious diseases from which correctional

officials have an affirmative obligation to protect detainees,

thereby satisfying the objective prong.  And that's from their

briefing at page 21.

          The defendants, for their part, concede that a

vulnerable person's infection with a serious communicable

L2J5azoD

1    disease can constitute irreparable harm and that congregate

2    settlings, such as jails, present unique concerns in the midst

3    of a pandemic but they argue, nonetheless, that the wide

4    panoply of protective measures undermines any contention by

5    plaintiffs that any potential harm is actual and imminent.  And

6    this is from the opposition submission at page 7.

7            Defendants also claim that the objective prong is not

8    met because the panoply of protective measures in place, based

9    on experience derived from prior pandemics, ensures that

10   incarcerated persons do not face an unreasonable risk of

11   serious harm to their health and safety.  This is at page 11 of

12   the opposition.  They argue that because there have been

13   relatively few deaths and recent infections at Rikers are

14   relatively low, there is no unreasonable risk of substantial

15   harm.  And, finally, they contend that plaintiffs have not

16   substantiated that they are at a heightened risk due to medical

17   conditions because they have not submitted any medical records

18   supporting their claimed diagnosis.  This is at page 8 and 9 of

19   their opposition.

20           In reviewing this issue and resolving it, the Court

21   has reviewed several district and circuit court decisions

22   addressing constitutional claims involving prison conditions:

23   In particular, because of their comprehensiveness and because

24   of their obvious factual similarities, the Court has considered

25   judge Kovner's decision in *Chunn v. Edge*, 465 F.Supp. 3d 168

L2J5azoD

1   from the Eastern District in 2020, which addressed

2   pandemic-related conditions of confinement at the Metropolitan

3   Detention Center or MDC in Brooklyn, and Judge Ramos' decision

4   in *Fernandez-Rodriguez v. Licon-Vitale*, which I mentioned

5   earlier, which case concerned pandemic-related conditions of

6   confinement at the Metropolitan Correctional Center, or MCC, in

7   Manhattan.

8           Each decision resolved a motion for preliminary

9   injunction and each followed a multi-day evidentiary hearing.

10  The plaintiffs in *Chunn* sought both the immediate release of a

11  class of medically vulnerable inmates and proactive measures

12  including screening, testing, and quarantining protocols, as

13  well as mask-wearing and surface-cleaning protocols.  The

14  hearing testimony included medical professionals on both sides,

15  as well as Bureau of Prisons, or BOP, personnel, and a prison

16  management consultant.  Judge Kovner also remarked that she

17  reviewed an received thousands of pages of documents as

18  exhibits including numerous factual declarations.

19          In the course of detailing the MDC's then current

20  screening, sanitation, and sick call policies, Judge Kovner

21  concluded the evidence establishes that, on the whole, the MDC

22  has responded aggressively to COVID-19, implementing an array

23  of measures that largely track CDC guidance.  The record leaves

24  open the possibility, however, that there were early lapses in

25  implementation of these policies.  And, it suggests that in

L2J5azoD

several areas, most notably relating to sick-call responses and use of isolation, the MDC has yet to fully implement the CDC's recommendations.  I am quoting from this decision at page 181.

          For the purposes of this segment of its analysis, this Court will focus on Judge Kovner's evaluation of the objective prong which she framed as whether petitioners have shown substantial risk of serious harm from COVID-19 at the MDC in light of the counter-measures that the facility has in place. Ultimately, she concluded that the preliminary injunction record leaves substantial reason to doubt petitioners will ultimately succeed in making that showing.  The MDC's response to COVID-19 has been aggressive and has included, among other steps, massively restricting movement within the facility, enhancing sanitation protocols, and creating quarantine and isolation units.  And the data, though limited, suggests that these measures have been quite effective in containing COVID-19 thus far.  This is from page 201 of her decision.

          The MCC plaintiffs in *Fernandez-Rodriguez* made similar arguments and sought similar categories of relief.  Judge Ramos, however, concluded after the hearing, that plaintiffs were likely to meet the objective prong.  In so doing he stated:  The record shows, with the above guidelines in mind, that the conditions in the MCC, despite the MCC's attempts at protective measures, posed a substantial risk to the health of its inmates.  Rather than having a functioning sick-call

L2J5azoD

system, the MCC admits it entirely failed to reviewed inmates'
electronically-submitted complaints due to neglect in staffing
of the sick-call inbox.  Rather than rigorously and regularly
screening inmates in quarantine or those who had been exposed
to the Coronavirus, the MCC admits its staff came to rely on
temperature checks and generalized inquiries ignoring half of
the screening protocol recommended by both MCC's own policy and
the CDC.  Rather than trace the contacts of infected staff, the
MCC admits that it failed to conduct the majority of these
investigations.  And rather than attempt to use home
confinement, furloughs, and compassionate release as tools to
reduce the density among the most vulnerable inmates, the
prison chose not to pursue that path at all until well after
the initial outbreak had subsided.  Furthermore, the MCC did
not provide serious rebuttal to the declarations to many of the
inmates who testified that a broad spectrum of their neighbors
developed symptoms of COVID-19 but never received care or
isolation, sometimes despite informing guards and medical staff
of their submissions.  This is at page 350 and 351 of Judge
Ramos' decision.

          On the record before it, this Court finds that
plaintiffs have met the objective prong of the constitutional
analysis.  Plaintiffs argue that the defendants are not doing
enough to prevent both the introduction of the Coronavirus,
which no one can seriously dispute poses a substantial risk of

L2J5azoD

1    harm -- particularly to folks with underlying co-morbidities or

2    living situations that hamper social distancing -- into the

3    Rikers Island complex, and that they're not doing enough to

4    prevent the spread of the virus once it was or has been

5    introduced.

6           In opposition, defendants argue that the many policies

7    and procedures they have developed and implemented beginning in

8    early 2020 to combat the virus are enough to reduce the risk of

9    harm to plaintiffs and thereby foreclose a finding on the

10   objective prong.  Let me take a moment to be clear to the

11   parties that on this record, the Court does not need to resolve

12   the legal issue of whether DOC's compliance with its own

13   internal policies would preclude a finding that plaintiffs have

14   met the objective prong, and that is because there is a serious

15   factual dispute over the efficacy and the actual implementation

16   of defendants' proffered safety measures.  And, as examples, I

17   am comparing the Feeney declaration from the defendants, with

18   the declarations of plaintiffs Azor-El, Barnar, and Cole.  And

19   on the current record, the Court cannot accept defendants' word

20   that their practices are effective and are actually being

21   implemented and, thus, it will not resolve the broader issue of

22   whether actual implementation would foreclose a finding that

23   the risks of which plaintiffs complain pose an unreasonable

24   risk of serious damage to their health.  This dichotomy between

25   policy and practice was raised in plaintiffs' reply brief and

L2J5azoD

1    it was, the parties will recall, discussed at length during the

2    oral argument.  I do note how however, that this Court agrees

3    with Judge Ramos that the situation at Rikers Island does not

4    need to "deteriorate before the Court can find that conditions

5    pose a substantial risk to inmates' health."  This is from the

6    *Fernandez-Rodriguez* decision, 470 F.Supp. 3d at 352.  The issue

7    for this Court is that plaintiffs are unable to make a

8    sufficient showing on the subjective prong and the Fourteenth

9    Amendment requires that DOC knew or should have known that the

10   conditions imposed an excessive risk to health or safety and,

11   as noted earlier, disregard -- which is another term it has

12   used in this context -- means failing to take reasonable

13   measures to abate the unconstitutional condition.

14        Courts in the Second Circuit have required plaintiffs

15   to establish that defendants demonstrated deliberate

16   indifference to the substantial risk of serious harm in order

17   to satisfy the subjective prong.  And this was found both by

18   the *Fernandez-Rodriguez* decision at pages 353 and 354, and the

19   *Chunn* decision at pages 202 to 204.  I will note, however, that

20   this is a very stringent standard and one that has not been

21   adopted by all Circuits.  In the Seventh Circuit, for example,

22   in the *Mays v. Dart* decision reported at 974 F.3d 810 from

23   2020, the Seventh Circuit rejected the deliberate indifference

24   test for pretrial detainees asserting Fourteenth Amendment

25   violations in the analogous contact and the identical context

L2J5azoD

1    of the COVID-19 pandemic.

2          Plaintiffs argue that defendants' failure to implement

3    the very protective measures that plaintiffs now seek is,

4    itself, sufficient to meet the subjective prong.  In this

5    regard, plaintiffs have focused on the inadequacy of

6    defendants' proffered reasons for failing to offer hand

7    sanitizer and wet wipes, COVID-19 testing to staff and inmates,

8    social distancing protocols, mask enforcement, and proper

9    ventilation.  And the defendants counter that the policies and

10   procedures they have developed to minimize the spread of the

11   Coronavirus, plus their extensive planning to address the virus

12   as early as February 2020, demonstrates that they were not and

13   could not be viewed as deliberately indifferent to the risks

14   that the COVID-19 pandemic posed.

15          Arguments similar to those advanced by plaintiffs were

16   made to, and rejected by, the Courts in *Chunn* and

17   *Fernandez-Rodriguez*.  Judge Kovner, in addition to finding that

18   the MDC plaintiffs had failed to meet the objective prong, also

19   found failure to meet the subjective prong, and in particular

20   she found that the evidence shows that MDC officials have been

21   acting urgently to prevent COVID-19 from spreading and from

22   causing harm.  They have imposed dozens of measures such as

23   enhancing intake screening procedures for all inmates and

24   staff; providing soap and other cleaning products to inmates at

25   no cost; increasing cleaning of common areas and shared items;

L2J5azoD

1    isolating symptomatic inmates; broadly distributing and using

2    PPE to prevent transmission of the virus; and modifying

3    operations throughout the facility to facilitate social

4    distancing to the greatest extent possible and abate the risk

5    of spread.  That's a quote from Judge Kovner.  She further

6    found, and I quote again, "Taken together, these and other

7    measures indicate that prison officials are trying very hard to

8    protect inmates against the virus and to treat those who have

9    contracted it and belie any suggestion that prison officials

10   have turned the kind of blind eye and deaf ear to a known

11   problem that would indicate deliberate indifference."  This is

12   from pages 202 to 203 of her decision.

13         Even though, and even to the extent that the record

14   before her demonstrated gaps in or departures from BOP's stated

15   policies, Judge Kovner found them to be negligent errors rather

16   than deliberate indifference.  And this is at page 203 of her

17   decision.

18         DOC here has implemented many of these same policies

19   at Rikers Island and this Court cannot find a principal basis

20   on which to distinguish the two cases on the current record.

21   And for his part, Judge Ramos found that while MCC officials

22   were aware of the risks to inmate health were the Coronavirus

23   to circulate through their facility, the plaintiffs there were

24   still unlikely to show that the officials disregarded that risk

25   by failing to take reasonable measures to abate it.  And this

L2J5azoD

1    is the *Fernandez-Rodriguez* decision 470 F.Supp. 3d at 352 to

2    355.  And in part of this section Judge Ramos collected cases

3    from other Circuits where Court of Appeals had in fact vacated

4    preliminary injunctions on the subjective prong.

5         Here, in this case, the degree of planning and

6    preventive measures that are discussed in the Yang and the

7    Feeney declarations indicate levels of planning and concern

8    that actually exceeded that which Judge Ramos had found to be

9    adequate.  And, indeed, while the plaintiffs in

10   *Fernandez-Rodriguez* had argued for additional testing

11   screening, sanitation, and hygiene protocols very similar to

12   those sought here, Judge Ramos found that in seeking those

13   measures, the plaintiffs had failed to show that the additional

14   protections they seek are necessary to bring the conditions in

15   the MCC above the constitutional minimum.  And that's at page

16   354 of his discussion.

17        This Court agrees with that analysis and while it

18   appreciated and listened very carefully to Dr. Harrington's

19   explanation of the benefits of multiple and perhaps overlapping

20   intervention in suppressing the COVID-19 pandemic, and while it

21   doesn't -- it doesn't -- and I have no basis to dispute the

22   efficacy of his suggestions, the Court cannot conclude that the

23   failure to adopt anything less than the full slate of

24   plaintiffs' suggestions a amounts to a constitutional

25   violation.

L2J5azoD

1          Judge Ramos left open the possibility that the

2    plaintiffs in his case would lose the battle but win the war.

3    In particular he noted, and I am quoting from him, "Of course,

4    the MCC may fall short in its efforts to improve its pandemic

5    response.  Should the Court be in a position to issue a final

6    ruling on the propriety of a permanent injunction, it will

7    consider these factors and a further developed factual record

8    in its deliberation."  That is from the decision at page 355.

9    And, I want to make clear to the parties that I find the same

10   and I will do in this case.

11          During the oral argument the Court asked Mr. Keenan to

12   distinguish *Chunn* and *Fernandez-Rodriguez*, and he suggested

13   that the amount of time that had passed since their issuance

14   merited a different decision, that at a different stage of the

15   pandemic this Court should come to different conclusions.  That

16   might be the case if DOC had been static in its response

17   despite developments in understanding of the pandemic or had

18   mounted only half-hearted efforts at the beginning followed by

19   a period of inaction, but the record before me indicates that

20   DOC's policies and responses are themselves evolving as new

21   information comes in.  That is evident in the discussions in

22   the briefing and with the parties about the possibility of

23   vaccination, and in the Court's colloquy with Mr. Thayer about

24   asking his client to reconsider certain policies.  For this

25   reason, the analysis in these earlier decisions remains useful

L2J5azoD

1   and the record in this case supports a similar finding on the

2   subjective prong.  But I will note again -- and I suspect the

3   parties are becoming attuned to these emphases that I am

4   drawing -- this decision is based on this record and that

5   record does not support a finding of deliberate indifference.

6   Should it turn out that evidence reveals DOC's knowing or

7   reckless failure to implement the very policies on which they

8   rely as evidence of no deliberate indifference, the Court's

9   conclusions could be very different.

10          Separately, I find that plaintiffs have failed to

11  demonstrate a likelihood of success on ADA and Rehabilitation

12  Act claims.  They indicate and they claim that the defendants

13  have violated the ADA and the Rehabilitation Act because

14  certain of plaintiffs are qualified individuals within the

15  meaning of the ADA.  DOC concedes that they are subject to the

16  ADA and defendants fail to offer reasonable accommodations in

17  the form of measures like sanitizing wipes, hand sanitizer, and

18  COVID-19 testing.  Even were I to accept plaintiff's argument

19  that their placement at the NIC establishes that they have a

20  qualifying disability, I agree with defendants that plaintiffs

21  have failed to demonstrate a causal connection between their

22  purported disabilities -- and defendants do not concede that

23  plaintiffs have established a qualifying disability on this

24  record -- but their purported disabilities and the denial of

25  any reasonable accommodation.  I am noting here and I am

L2J5azoD

agreeing, at least for today's purpose, with the analysis set

forth at page 25 of the defendant's opposition.

So, I am concluding today that the plaintiffs have

failed to demonstrate a likelihood of success on their

constitutional and their statutory claims, and for this reason

I am denying their request for injunctive relief.  In so doing,

let me observe that the plaintiffs' motion had a mandatory

component to it and a correspondingly high bar to meet.  I have

also attempted to balance appropriately my concerns for the

safety and the well being of detainees at Rikers Island with my

disinclination, absent a greater record of constitutional

violation, to micro manage the operations at Rikers Island.

But, in so doing, I wish to offer the following thoughts to the

parties:  It may be that the record before the Court was

insufficient to warrant injunctive relief today but defendants

are cautioned, particularly as the factual record is developed

in this case, that plaintiffs may well identify genuine

material disputes of fact regarding their constitutional and

statutory claims, and we may ultimately find ourselves at trial

on these same issues.  To the extent that this knowledge, this

advance warning causes defendants to continue or to resume

internal discussions about appropriate COVID-19 protocols at

Rikers Island, or it causes defendants to reach out to

plaintiffs about mediation of these disputes, the Court would

welcome these developments.

L2J5azoD

1          And on the issue of the factual record, which I have

2      mentioned numerous times in this decision, I observed when I

3      drafted this opinion that the record before me was less than

4      those developed by Judges Kovner and Ramos, and for reasons

5      that I will explain in a moment, I am going to authorize

6      targeted expedited discovery on certain topics.

7          Plaintiffs' proposed list of safety protocols includes

8      both policies that have been adopted, to some degree, by DOC,

9      such as mask-wearing and the availability of free COVID-19

10     testing for staff and the provision of certain cleaning

11     supplies, but also policies that have not been adopted

12     including the distribution of hand sanitizer among detainees,

13     the provision of disposable wipes to detainees or mandatory

14     staff testing.  These latter policy suggestions may be

15     well-grounded from medical and public health perspectives, but

16     for reasons similar to those suggested by Judge Ramos, this

17     Court is not yet prepared to find their absence to be a

18     constitutional violation.  Instead, this Court is focusing on

19     the degree to which DOC's COVID-19 policies are being followed

20     by the staff at Rikers Island.  As the Court suggested in its

21     colloquy with Mr. Thayer, the more that defendants rely on

22     their development and implementation of these policies to stave

23     off constitutional challenges by detainees to the conditions of

24     their confinement -- one moment, let me pause.

25          Ms. Noriega, are we still on?

L2J5azoD

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  Yes, Judge.  It looks like somebody |
| 2 | else joined the line and I muted them. |
| 3 | THE COURT:  I thank you very much. |
| 4 | Let me just repeat myself, and I appreciate the |
| 5 | parties' indulgence as I do that. |
| 6 | As the Court suggested in its colloquy with |
| 7 | Mr. Thayer, the more the defendants rely on their development |
| 8 | and implementation of these policies to stave off |
| 9 | constitutional challenges by detainees to the conditions of |
| 10 | their confinement, the more appropriate it is for this Court to |
| 11 | consider whether those policies are merely aspirational or have |
| 12 | actually been put into place with appropriate penalties for |
| 13 | non-compliance.  The current record does not support a finding |
| 14 | of deliberate indifference, but a more thoroughly developed |
| 15 | factual record may establish defendants' deliberate |
| 16 | indifference which might include, for example, relying on |
| 17 | policies known to be ineffective, or by failing to implement |
| 18 | policies that were believed to be effective. |
| 19 | In reviewing the record in this case, I noted |
| 20 | considerable disputes between the parties over policies and |
| 21 | practices regarding mask-wearing by staff at Rikers Island and |
| 22 | the provision and use of cleaning supplies, particularly to |
| 23 | detainees and particularly in common areas.  And what I am |
| 24 | going to do as a result of that is to order targeted, expedited |
| 25 | discovery on these two areas.  I am ordering the parties to |

L2J5azoD

| | |
|---|---|
| 1 | meet and confer and to submit to me, by February 26, one week |
| 2 | from now, a letter addressing the scope and the schedule for |
| 3 | this targeted discovery including a time table for the |
| 4 | production of witness discovery and written discovery, and as |
| 5 | appropriate, the provision of witness testimony.  If the |
| 6 | parties have disputes, they should bring them promptly to my |
| 7 | attention.  But, those are the two areas in which I would like |
| 8 | to focus because, as I have mentioned a moment ago, these are |
| 9 | the policies that are being put forward by DOC as evidence that |
| 10 | they are not deliberately indifferent and I need to see what |
| 11 | they are and whether they have been followed.  When that |
| 12 | discovery has concluded, we will meet again and we will talk |
| 13 | about whether it is appropriate to proceed to broader, more |
| 14 | plenary discovery or, perhaps and, whether it is appropriate to |
| 15 | schedule a second, comparably targeted, round of preliminary |
| 16 | injunction motion practice focused on whether and how these two |
| 17 | preventive policies are being carried out at Rikers Island. |
| 18 | Now, as a separate discovery issue, I did understand |
| 19 | from the parties that there was an interest on both sides in |
| 20 | Court-ordered disclosure of certain medical information.  I |
| 21 | would ask you, please, to finish your discussions on that issue |
| 22 | as well and to submit to me a proposed disclosure order on or |
| 23 | before February 26, and that as yet another house-keeping |
| 24 | measure, I believe that we have been in discussions with |
| 25 | plaintiff's counsel regarding Plaintiff Cole's financial |

L2J5azoD

1   status.  I believe that's where we were with that, either

2   plaintiffs' counsel was going to resolve the IFP -- in forma

3   pauperis -- application materials, or to cover the filing

4   costs.  I would like that matter, if it hasn't already been

5   resolved, to be resolved before February 26, 2021.

6           I want to end by thanking you for listening to that

7   which I have just read and for your attention, but I also want

8   to end with this point that I really hope you pay attention to

9   and that I speak to you as much as a human being than as a

10  Judge.  I fully expect that at some point after this targeted

11  period of discovery is concluded we will proceed to plenary

12  discovery.  I don't think that the discovery portion of this

13  litigation will be short and, more than that, even on the

14  limited record I have now, I don't see defendants succeeding on

15  a motion for summary judgment, and I think, instead, that all

16  of these issues are going to be hashed out in what I expect

17  would be a lengthy jury trial.  Nothing stops defendants here

18  from adding to the preventive measures that they have

19  implemented.  Nothing stops defendants here from considering or

20  reconsidering the measures proposed by plaintiffs in their

21  motion papers.  I hope we all agree, those on this call, that

22  the concern here is to prevent the introduction and the spread

23  of the COVID-19 virus to the detainees and to the staff at

24  Rikers Island, and such prevention can only redound to our

25  benefit as fellow New Yorkers.  It is my hope -- it is my

L2J5azoD

1    expectation -- that the defendants, that the parties, focused

2    on that shared concern and not merely on litigation strategy.

3         With that, I have resolved the issues that I wanted to

4    bring to your attention and I have resolved the outstanding

5    motion.

6         Mr. Keenan, I know that you have been paying very

7    careful attention to what I have said.  Is there any issue that

8    I have left open that you wish to bring to my attention now?

9         MR. KEENAN:  Thank you, your Honor.  We really

10   appreciate the Court bringing us together today to announce its

11   decision and just want to thank the Court again.

12        There are no issues that we can think of at this time.

13   I imagine there might be things that come up in the targeted

14   discovery that your Honor has spoken of.  The one issue that

15   comes to the top of my mind is the ability to effectively get

16   testimony from inmates at a variety of Rikers units to give

17   basically a sampling of what inmates are seeing on the ground

18   at different facilities.  I know that probably isn't an issue

19   that we can or should resolve on the record today but I want to

20   flag that and we will, of course, work with the defendants in

21   order to make that happen.  But, we just want to make sure that

22   we are able to talk with a reasonable number of inmates in

23   different facilities and get declarations or short deposition

24   testimony from them, if necessary.

25        THE COURT:  Okay.  I appreciate you calling that to my

L2J5azoD

1    attention because that is a very thoughtful thing to think

2    about at this time.  I am expressing, I think, a preference for

3    declarations at this time but I would understand if the parties

4    can make it happen where we can have short depositions so that

5    both sides can question these individuals, this sample size as

6    you said, I can understand how that would be effective as well.

7         Look.  I will be waiting for you all to tell me what

8    your disputes are.  My hope remains that there aren't that many

9    but I am here if you need them resolved.

10        MR. KEENAN:  Certainly.  Thank you, your Honor.  And

11   the reason that we might ask for a brief -- and I am talking

12   about 15 or 20-minute -- depositions, say by Skype or by

13   telephone is the realities of the lag time in the mail, even

14   from lower Manhattan to get, to talk with someone on the phone,

15   draft a declaration, send it to Rikers, have it processed

16   through the mail system and security there, and then get it

17   back, we are seeing a two-week turnaround on that, whereas

18   Rikers has a system for having inmates -- obviously they can

19   call but there is a system for them to use Skype or Microsoft

20   Teams to have a video conference and that could be convened,

21   with all counsel present, everybody talking with the inmate at

22   the same time, maybe with a court reporter there, on a day's

23   notice.  So, really it is the time factor why we think it might

24   be helpful in this instance to have a few, very short, very

25   targeted depositions.  That's what we have to say on that

L2J5azoD

1  issue.

2          THE COURT:  Thank you.  And, Mr. Keenan, as I always

3  do, I appreciate the information that I don't have which is I

4  am aware that there are delays in the mail.  I see them here.

5  I did not appreciate that you are seeing a two-week turnaround.

6  That could potentially eat up a large chunk the period of

7  discovery so thank you for telling me about that and I

8  understand the issue better now.

9          Mr. Thayer, turning to you, sir, are there open issues

10  that we should be resolving in this conference?

11          MR. KEENAN:  No, your Honor.  The defendants don't

12  have anything that they would like to raise.  Then, with regard

13  to the scheduling of some sort of interchange between

14  plaintiffs counsel and us and inmates at Rikers, we are

15  certainly happy to talk about that and see what we can do to

16  keep discovery moving quickly and to honor both the text and

17  spirit of your Honor's order.

18          THE COURT:  Thank you.  I am confident that both sides

19  will play together nicely as we put together the schedule.  You

20  will tell me any issues that arise.  With that, I am going to

21  bid you farewell, and on this very snowy Friday I wish you, as

22  I hope I always do, safety and good health during this

23  pandemic, I wish you well.

24          We are adjourned.  Thank you.

25                          o0o